POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DYLAN OLSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RED CAT HOLDINGS, INC., JEFFREY THOMPSON, LEAH LUNGER, JOSEPH HERNON, GEORGE MATUS, GEOFFREY HITCHCOCK, and BRENDAN STEWART,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Dylan Olsen ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters,

based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Red Cat Holdings, Inc. ("Red Cat" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Red Cat securities between March 18, 2022 and January 15, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Red Cat, together with its subsidiaries, provides various products, services, and solutions to the U.S. drone industry.  The Company's products include,

*inter alia*, the "Teal 2" drone, a small, unmanned aircraft system ("sUAS") designed to purportedly "Dominate the Night" during nighttime military operations.

3.     Red Cat manufactures its drones through its subsidiary Teal Drones, Inc. ("Teal") at a facility located in Salt Lake City, Utah (the "Salt Lake City Facility").  Throughout 2022, Defendants touted their development of the Salt Lake City Facility's capacity to produce "thousands of drones per month" or "tens of thousands of drones" per year.

4.     In March 2022, Red Cat announced that Teal had been selected by the U.S. Department of Defense ("DoD")'s Defense Innovation Unit and the U.S. Army to compete in Tranche 2[1] of the U.S. Army's Short Range Reconnaissance Program of Record (the "SRR Program").  The SRR Program is a U.S. Army initiative to provide a small, rucksack-portable sUAS to U.S. Army platoons.

5.     At all relevant times, Defendants suggested or otherwise asserted that the SRR Program's Tranche 2 contract (the "SRR Contract") was worth potentially hundreds of millions to over a billion dollars in contract revenues.

6.     In March 2023, Company management confirmed that "[t]he Salt Lake City factory is complete and ready to go" and "[w]e now have the capacity to produce thousands of drones per month."

---

[1] Tranche 1 of the SRR Program began in 2020.

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and Defendants' progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

8.     On July 27, 2023, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for its fiscal year 2023.[2]  During the call, Defendants revealed that the Salt Lake City Facility could only currently produce 100 drones per month, and that the facility was still being built, refined, and expanded.  Red Cat filed an annual report on Form 10-K with the SEC the same day, which likewise reported that construction of the facility was only "***substantially completed***" and ***potentially*** could reach a production capacity of one thousand drones per month over the next ***2 to 3 years***, but only with additional capital investments and manufacturing efficiencies realized.[3]

---

[2] Red Cat's fiscal year ended on April 30 at all relevant times until December 31, 2024, when the Company's Board of Directors approved changing the Company's fiscal year to end on December 31.

[3] All emphasis added unless otherwise noted.

9.     Following these disclosures, Red Cat's stock price fell $0.10 per share, or 8.93%, to close at $1.02 per share on July 28, 2023.

10.     On September 23, 2024, Red Cat issued a press release announcing its financial and operating results for the first quarter of its fiscal year 2025.   Among other results, the Company reported losses per share of $0.17, missing consensus estimates by $0.09, and revenue of $2.8 million, missing consensus estimates by $1.07 million.  On a subsequent conference call that Red Cat hosted with investors and analysts the same day to discuss these results, Company management disclosed that Red Cat had spent "the past four months . . . retooling [the Salt Lake City Facility] and preparing for high volume production[,]" while admitting that a "pause in manufacturing of Teal 2 and building our Army prototypes impacted Teal 2 sales" because, *inter alia*, Red Cat "couldn't produce and sell Teal 2 units[] while retooling [its] factory."

11.     On this news, Red Cat's stock price fell $0.80 per share, or 25.32%, over the following two trading sessions, to close at $2.36 per share on September 25, 2024.

12.     On November 19, 2024, Red Cat issued a press release announcing that it had won the SRR Contract.  On a subsequent conference call that Red Cat hosted with investors and analysts the same day to discuss the contract win, Defendants continued to assert that the SRR Contract was worth potentially hundreds of millions

of dollars, while expressing their confidence that Red Cat could realize up to $50 million to $79.5 million in revenue from the SRR Contract during it fiscal year 2025 alone.

13.     Then, on January 16, 2025, Kerrisdale Capital ("Kerrisdale") published a report (the "Kerrisdale Report") alleging, *inter alia*, that Defendants had overstated the value of the SRR Contract, which Kerrisdale found was only worth approximately $20 million to $25 million based on U.S. Army budget documents. The Kerrisdale Report also alleged that Defendants had been misleading investors about the Salt Lake City Facility's production capacity for years, while also raising concerns about the timing of executive departures and insider transactions that took place shortly after Red Cat announced it had won the SRR Contract.

14.     On this news, Red Cat's stock price fell $2.35 per share, or 21.54%, over the following two trading sessions, to close at $8.56 per share on January 17, 2025.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Plaintiff is a resident of this District, and a substantial part of the property that is the subject of this action is thus situated in this District.  Moreover, per Red Cat's most recent quarterly report on Form 10-Q, as of May 12, 2025, there were more than 90 million shares of the Company's common stock outstanding.  Red Cat's common stock trades on the Nasdaq Stock Market ("NASDAQ").  Accordingly, in addition to Plaintiff, there are presumably hundreds, if not thousands, of investors in Red Cat common stock located in the U.S., some of whom, like Plaintiff, undoubtedly reside in this District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.     Plaintiff, as set forth in the attached Certification, acquired Red Cat securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  Plaintiff resides in Sussex County, New Jersey, which is located in this District.

21.     Defendant Red Cat is a Nevada corporation with principal executive offices located at 15 Avenue Munoz Rivera, Suite 2200, San Juan, Puerto Rico 00901.   The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "RCAT."

22.     Defendant Jeffrey Thompson ("Thompson") has served as Red Cat's Chief Executive Officer at all relevant times.  During the Class Period, Defendant Thompson sold 500,000 shares of the Company's common stock for total proceeds of over $5.7 million.

23.     Defendant Leah Lunger ("Lunger") served as Red Cat's Chief Financial Officer ("CFO") from June 10, 2024 to January 10, 2025, before which she served as the Company's Interim CFO from March 15, 2024 to June 10, 2024. During the Class Period, Defendant Lunger sold 524,798 shares of the Company's common stock for total proceeds of approximately $5 million.

24.     Defendant Joseph Hernon ("Hernon") served as Red Cat's CFO from before the start of the Class Period to March 15, 2024.

25.    Defendant George Matus ("Matus") served as Red Cat's Chief Technology Officer from November 27, 2023 until or on around December 25, 2024. Defendant Matus is also the founder of Teal and served as its CEO at all relevant times until or on around December 25, 2024.  During the Class Period, Defendant Matus sold 781,383 shares of the Company's common stock for total proceeds of approximately $9.2 million.

26.    Defendant Geoffrey Hitchcock ("Hitchcock") has served as Red Cat's Chief Revenue Officer since November 27, 2024.  Defendant Hitchcock also served as Teal's General Manager from March 2024 to November 27, 2024, before which he served as Red Cat's Senior Vice President of Global Defense Solutions at all relevant times.  During the Class Period, Defendant Hitchcock sold 113,823 shares of the Company's common stock for total proceeds of approximately $1.2 million.

27.    Defendant Brendan Stewart ("Stewart") has served as Red Cat's Vice President of Regulatory Affairs at all relevant times.

28.    Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart are collectively referred to herein as the "Individual Defendants."

29.    The Individual Defendants possessed the power and authority to control the contents of Red Cat's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Red Cat's SEC filings and press releases alleged herein to be misleading prior to or

shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Red Cat, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

30. Red Cat and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31. Red Cat, together with its subsidiaries, provides various products, services, and solutions to the U.S. drone industry.

32. On August 31, 2021, Red Cat acquired Teal, manufacturer of the Golden Eagle drone, which, at the time, was one of only five drones approved by the DoD for reconnaissance, public safety, and inspection applications.

33. Following Red Cat's acquisition of Teal, it also developed and launched, *inter alia*, the "Teal 2" drone, an sUAS designed to purportedly "Dominate the Night" during nighttime military operations.

34.    Teal manufactures the Company's drones at the Salt Lake City Facility.

35.    On March 14, 2022, Red Cat announced that Teal had been selected by the DoD's Defense Innovation Unit and the U.S. Army to compete in Tranche 2 of the U.S. Army's SRR Program.  The SRR Program is a U.S. Army initiative to provide a small, rucksack-portable sUAS to U.S. Army platoons.

36.    At all relevant times, Defendants suggested or otherwise asserted that the SRR Contract was worth potentially hundreds of millions to over a billion dollars in contract revenues.

### Materially False and Misleading Statements Issued During the Class Period

37.    The Class Period begins on March 18, 2022, the day after Red Cat hosted a conference call with investors and analysts during after-market hours to discuss its financial and operating results for the third quarter of its fiscal year 2022. During the call, Defendant Hernon stated, in relevant part:

> During the quarter, we doubled the size of the Teal facilities, both to increase its manufacturing output capabilities as well as to house its workforce . . . . [W]e have been making a lot of capital investments in Teal both in its facilities and its people to take advantage of what we see as significant commercial opportunities for the Golden Eagle.

38.    During the same call, Defendant Thompson stated, in relevant part:

> [W]e are poised to grow like crazy. ***The plant is ready to go*** . . . . We are keeping our heads down and getting our manufacturing capability to be able to put out ***thousands of drones a month*** . . . . [T]hat's our focus, and everyone is doing a great job on it.

39.    On July 27, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for its fiscal year 2022 ("FY22"). During the call, Defendant Thompson stated, in relevant part, that "[t]he Teal Drone production line is in *full swing*[,]" that "[w]e expect to go into mass production *in the fall*," and that the SRR Program's "Tranche 2 . . . is for tens of thousands of drones and *hundreds of millions of dollars' worth of revenue*[.]"

40.    Also on July 27, 2022, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY22 (the "2022 10-K"). The 2022 10-K stated, in relevant part, that Teal had "doubled the size of [the Salt Lake City Facility] in order to *fully scale* production capacity to meet the forecasted growth in demand[.]"

41.    Appended as exhibits to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Thompson and Hernon certified, in relevant part, that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

42.    On September 12, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the first

quarter of its fiscal year 2023.  During the call, with respect to the Salt Lake City Facility's production capacity, Defendant Thompson stated, *inter alia*:

> **We are currently switching from . . . production validation tests to ramp in mass production** . . . . If we win Tranche 2, we will be capable of basically hitting the ground running and produced [*sic*] this drone as quickly as possible . . . . **[N]ow we basically fix any issues and problems and vendors and tooling** that we want to do to automate production line so that we can really scale it . . . . **We hope to have the construction done in the next month or two and put this behind us and that will also bring us into full mass production.**

43.    On November 29, 2022, Red Cat hosted a conference call with investors and analysts to provide a business update, during which Defendant Thompson stated, in relevant part:

> We are about to start being able to ship over the next four to six weeks, the brand new bird that we've been working on . . . . **So the factory is going to be basically in full swing.** It's starting now and we'll be able to produce **thousands of drones per month** . . . . We have the inventory, we have the parts, we have the capital . . . . So the factory is doing awesome.

44.    On December 15, 2022, Red Cat issued a press release announcing its financial and operating results for the second quarter of its fiscal year 2023 ("2Q23").  The press release stated, in relevant part, that "[e]xpansion of [the] manufacturing facility at Teal *[is] expected to be completed in [the] fourth quarter of fiscal 2023* and will double production capacity[.]"

45.    The same press release also quoted Defendant Thompson, who represented, in relevant part, that "the production line from our new U.S. factory in

Salt Lake City . . . *has the capacity to build thousands of drones*" and "that *the U.S. Army's [SRR] program continues to expand in scope and value*."

46.     Also on December 15, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 2Q23. During the call, Defendant Thompson represented that the "new factory in Salt Lake City that can produce *tens of thousands of drones per year*."

47.     On March 7, 2023, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2023. During the call, Defendant Thompson represented, in relevant part, that "*[t]he Salt Lake City factory is complete and ready to go*" and "*[w]e now have the capacity to produce thousands of drones per month.*"

48.     The statements referenced in ¶¶ 37-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Red Cat's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and Defendants' progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

49.    On July 27, 2023, during after-market hours, Red Cat hosted a conference call (the "FY23 Conference Call") with investors and analysts to discuss its financial and operating results for its fiscal year 2023 ("FY23").  During the FY23 Conference Call, Defendants revealed that the Salt Lake City Facility could only currently produce 100 drones per month and was still being built, refined, and expanded.    Specifically, Defendant Hernon disclosed that Teal's operations personnel were ***still*** "focused on building, refining and expanding our production capacity, which is ***presently at 100 systems per month***," and that Defendants "***believe*** [they] can more than triple [this capacity] over the next ***few years***."

50.    During the FY23 Conference Call's question-and-answer phase, an investor noted that "[y]ou said production is 100 per month" but "I think in the past you'd reference maybe 1,000 per month[,]" and asked "[i]s the 100 per month going to increase or is that pretty much where we're at for the rest of the year?"  In response, Defendant Thompson stated, in relevant part:

> [F]irst you just got to get the factory up and running and make sure that you have all the issues out of the production line to reliably do 100 a month, as some of our team says, we do 100 a month, no problem at ease right now. And that number is already growing slightly. ***But you don't go off and build 1,000 drones***, because there's different frequencies . . . . ***And so you can't just make . . . batches and hope for the best of 1,000 and then ship them out.***

51.    In response to the same question, Defendant Hernon stated "***I don't personally recall us ever saying we could produce 1,000 a month.***"

52.    Also on July 27, 2023, during after-market hours, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY23 (the "2023 10-K"). The 2023 10-K reported, *inter alia*, that construction of the Salt Lake City Facility was only "***substantially completed***[,]" reiterated that its "***production capacity was approximately [only] 100 drones per month***[,]" and advised that "maximum production capacity for this facility can reach 1,000 drones per month over the next ***2 to 3 years, provided that additional capital investments are made and manufacturing efficiencies realized***."

53.    Following Red Cat's FY23 Conference Call and its filing of the 2023 10-K, the Company's stock price fell $0.10 per share, or 8.93%, to close at $1.02 per share on July 28, 2023. Despite this decline in the Company's stock price, Red Cat securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning the Salt Lake City Facility's production capacity, Defendants' progress in developing the same, and the overall value of the SRR Contract.

54.    For example, during the FY23 Conference Call, Defendant Thompson indicated that the value of the SRR Contract could potentially exceed a billion dollars. Specifically, he noted that, although "[w]e still do not know the size of the

award for the now combined Tranche 2 and 3" of the SRR Program, "the information we do have" is that "Tranche 1 production award was for $100 million for approximately 1,000 drones" and "Tranche 2 and 3 is for approximately 12,000 drones[.]"

55.     Similarly, on March 18, 2024, during a conference call that Red Cat hosted with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2024, Defendant Thompson stated, in relevant part, that "[t]he [SRR] contract is for approximately 12,000 drones. The award for the first tranche of production drones two years ago, was $100 million for 1,083 drones."

56.     During the same call, with respect to the Salt Lake City Facility's production capacity, Defendant Thompson stated, in relevant part:

> Production facility in Salt Lake City *is in full mass production mode* . . . . *We are now demonstrating that we can build tens of thousands of drones yearly.*

57.     On August 8, 2024, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal year 2024 (the "2024 10-K").  The 2024 10-K stated, in relevant part, that "[d]uring Fiscal 2024, Teal continued to scale the [Salt Lake City Facility], including dedicated teams for production and assembly, manufacturing engineering, supply chain and logistics, warranty and returns, as well as a flight operations team that is focused on manufacturing and quality assurance and quality control."

58.    Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 41, *supra*, signed by Defendants Thompson and Lunger.

59.    The statements referenced in ¶¶ 54-58 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and Defendants' progress in developing the same, was overstated; (ii) the overall value of the SRR Contract was overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

60.    On September 23, 2024, during after-market hours, Red Cat issued a press release (the "1Q25 Press Release") announcing its financial and operating results for the first quarter of its fiscal year 2025 ("1Q25").  Among other results, the Company reported losses per share of $0.17, missing consensus estimates by $0.09, and revenue of $2.8 million, missing consensus estimates by $1.07 million.

61.    The same day, also during after-market hours, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 1Q25 (the "1Q25 Conference Call").  During the 1Q25 Conference Call, Defendant Thompson disclosed that, contrary to his prior representations that the

18

Salt Lake City Facility was "in full mass production mode" and capable of "build[ing] tens of thousands of drones yearly," Red Cat had spent "the past four months . . . retooling and preparing for high volume production."  Likewise, in addressing the Company's sales results for the quarter, Defendant Thompson admitted that a "pause in manufacturing of Teal 2 and building our Army prototypes impacted Teal 2 sales" because, *inter alia*, Red Cat "couldn't produce and sell Teal 2 units[] while retooling [its] factory."

62.    Following Red Cat's issuance of the 1Q25 Press Release and Defendant Thompson's disclosures during the 1Q25 Conference Call, the Company's stock price fell $0.80 per share, or 25.32%, over the following two trading sessions, to close at $2.36 per share on September 25, 2024.  Despite this decline in the Company's stock price, Red Cat securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning the Salt Lake City Facility's production capacity, Defendants' progress in developing the same, and the overall value of the SRR Contract.

63.    For example, on November 19, 2024, Red Cat issued a press release announcing that it had won the SRR Contract "to meet the Army's currently stated acquisition objective for 5,880 systems, which is subject to change over the 5 year period of performance."  The same day, Red Cat hosted a conference call with

investors and analysts (the "November 2024 Conference Call"), during which Defendant Matus indicated, *inter alia*, that total revenue under the SRR Contract could exceed $260 million, stating:

> *[T]he average price per system . . . includes [*sic*] two drones and one controller is around $45,000, depending on configuration. And the Army's stated authorized acquisition objective or AAO, is 5,880 systems . . . . [Y]ou can do some simple math on those numbers. And we also expect the Army to buy spare parts, training and maintenance in addition to systems themselves.* I think it's also worth noting that the Army's acquisition objective number was created before the invasion of Ukraine and before the world realized that drones are really as impactful as the introduction of the machine gun, a 100 years ago. *In my opinion, the United States Army is going to need a lot more drones.*

64.    Also during the November 2024 Conference Call, Defendants Stewart and Thompson expressed their confidence that Red Cat could realize up to $50 million to $79.5 million in revenue from the SRR Contract during the Company's fiscal year 2025 alone:

> [Defendant Stewart:] Right now, in the National Defense Authorization Act, we're sitting at a [*sic*] approximate program line value . . . *that supports SRR of $79.5 million*. Now that is a – that number is not final. The NDAA is still not passed and won't be for about 60 days. But we feel very confident that through this support, we'll be able to expand this program going into the future.
>
> * * *
>
> [Defendant Thompson: W]e gave guidance of $50 million to $55 million for calendar 2025 . . . . And if you add the number that Brendan was talking about . . . for 2025, which is that *$79 million that could possibly put the calendar year on $120 million for next year*. So, that's pretty exciting. And that would just be the army . . . . [W]e're trying to figure out that line item that [Defendant Stewart] talked about is *up to*

*$79 million for the – for 2025* . . . . [W]e're supposed to be making the first deliveries in late spring, and we only have till the end of September to deliver on 2025 calendar. *So, it could be up to $79 million.* Once we have more clarity, *we think it's easily going to be in the close to $50 million anyway for 2025 calendar*. So, guidance will probably and this isn't official guidance yet. But again, we just got this notification and we think *it'll be approximately $50 million from SRR and other things that will add to that* as other branches of the Army piles on there.

65.     During the same call, Defendants Thompson and Hitchcock suggested that Red Cat could earn an additional *30% to 70%* of revenue from the SRR Contract based on supplemental services:

[Defendants Thompson: H]ow these programs of records [like the SRR Program] work [is] that *they typically have anywhere from 30% to 65%, 70% sometimes of additional revenue from training, spares and repairs*."

* * *

[Defendant Hitchcock: T]ypically, year-over-year, *you could expect somewhere in the range of 30% added for spares, repairs and training year-over-year*."

66.     The statements referenced in ¶¶ 63-65 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Salt Lake City Facility's production capacity, and Defendants' progress in developing the same, was overstated; (ii) the overall

value of the SRR Contract was overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### **The Truth Fully Emerges**

67.    On January 16, 2025, during intraday trading hours, Kerrisdale published a report alleging, *inter alia*, that Red Cat had overstated the value of the SRR Contract and lacks the production capacity to deliver on its promises. For example, the Kerrisdale Report stated, *inter alia*:

> **The SRR contract that Red Cat won in November and preemptively announced without the Army's permission is much smaller and less favorable than management has intimated.** Red Cat management has spent years hyping the potential of Tranche 2 of the Army's [SRR sUAS] program for which the company was competing. Investors were initially led to believe that the revenue potential of a win would be in the billion dollar range over the course of 5-10 years. Upon winning the contract, management curbed those expectations by quite a bit, though *still* signaled revenue of $260 million for 5,880 drone systems over the next five years, plus about 30% of that sticker price to be earned in repairs, replacements, and training services. Management called out $80 million in 2025 expected revenue, specifically citing the National Defense Authorization Act (NDAA) text.
>
> But the NDAA says nothing about the SRR funding in particular and the Army's detailed funding request for 2025 shows that the service expects to procure between 275 and 300 systems annually at a cost of $20-25 million, which is a very far cry from Red Cat's 2025 SRR guidance. Additionally, the cost for repairs, replacements, and related services are *included* in that $20-25 million, so Red Cat's "plus 30%" should be entirely discounted.

(Emphases in original.)

22

68.     The Kerrisdale Report also noted that Red Cat had compromised the

overall value of the SRR Contract by announcing its award of the contract without

the U.S. Army's permission, stating, *inter alia*:

> We also discovered in the course of our diligence that Red Cat's
> November announcement of the SRR contract win was made
> improperly without the Army's approval. While that's unlikely to
> scuttle the contract win completely, our sources indicated that it might
> make negotiating the precise contract terms with the Army contentious
> and more difficult for Red Cat. It may also result in the Army more
> strictly enforcing contract terms and more willing to contemplate other
> suppliers if and when the opportunity presents itself.

69.     Further, the Kerrisdale Report raised concerns about the timing of

executive departures and insider transactions that took place shortly after the

announcement of the SRR contract, stating, *inter alia*:

> **Teal's wunderkind founder and brains behind the SRR,**
> **[Defendant] Matus, resigned just a week after the SRR**
> **announcement, with [Defendant] Lunger resigning just 3 weeks**
> **later.**
>
> * * *
>
> Six days after Red Cat announced the SRR award, [Defendant] Matus
> gave 30 days' notice of his resignation. Between December 20th and
> December 27th, he sold about 800,000 shares at an average price of
> $11.75. Just a few days after his resignation, [Defendant] Matus
> announced he was co-founding a new company dedicated to addressing
> weaknesses in the defense procurement ecosystem, which suggests that
> his resignation was a long time in coming. That seems to us like a harsh
> repudiation of Red Cat and its management team, and a vote of no-
> confidence in the ability of the company to achieve what management
> says it will.

> [Defendant] Matus wasn't the only one at Red Cat lacking conviction. [Defendant] Lunger announced on the mid-December earnings call that she was resigning for family reasons and sold half a million shares – about 60% of her holdings – for $9.52 on December 20th. Other directors and insiders – including [Defendant] Thompson! – have sold a total of 1.6 million shares for over $16 million just since December 20th.

(Emphasis in original.)

70.    The Kerrisdale Report also alleged that Red Cat has continued to mislead investors about the Salt Lake City Facility's production capacity, stating, *inter alia*:

> Over the last 3 years, Red Cat has promised investors *multiple times* that within some clearly definable near-term deadline it will be capable of producing "thousands of drones" per month. First it was "by the fall" in early 2022, then it was "in a few months" in November of 2022, then "now" in March of 2023, then "in a few months" in July of that year, then "now" (again) in early 2024, and most recently (in September) it was to be at some point in 2025 . . . . ***[D]rone industry sources close to the company don't think Red Cat has the manufacturing capability for mass production of drones.*** Getting there would take time and a real capital expenditure commitment.
>
> * * *
>
> In the course of our due diligence, ***we found a drone industry specialist who's been following Teal since its founding by [Defendant] Matus*** and who had the utmost admiration for what he's accomplished. ***They were adamant that there's just no way that Teal is capable of any sort of mass production*** . . . . Red Cat's financials seem to confirm this assessment: ***Over the 3 years ending on October 31, the company has spent a mere $3.1 million on capital expenditures, with over two thirds of that before the end of 2022. It's highly implausible that a mass-production facility for manufacturing drones has been built at any point in the last two years for less than $1 million.***

71.    Following publication of the Kerrisdale Report, Red Cat's stock price fell $2.35 per share, or 21.54%, over the following two trading sessions, to close at $8.56 per share on January 17, 2025.

72.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Regulation S-K Items 105 and 303**

73.    Throughout the Class Period, Red Cat's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Red Cat to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants failed to disclose, *inter alia*, that the Salt Lake City Facility could not produce thousands of drones per month and was still in need of various improvements to reach such a production capacity, thereby increasing the risk that it would never reach such a production capacity.  Defendants' failure to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

74.     For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Red Cat to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose, *inter alia*, the issues described *supra* at ¶ 73 violated Item 303 because these issues represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## SCIENTER ALLEGATIONS

75.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Red Cat's securities, Defendant Thompson enriched himself by over $5.7 million by selling 500,000 shares of Red Cat common stock, Defendant Lunger enriched herself by approximately $5 million by selling 524,798 shares of Red Cat common stock, Defendant Matus enriched himself by approximately $9.2 million by selling 781,383 shares of Red Cat common stock, and Defendant Hitchcock enriched himself by approximately $1.2 million by selling 113,823 shares of Red Cat common stock.

76.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period. Indeed, at all relevant times, Defendants were highly focused on ramping the Salt Lake City Facility's production capacity, as well as the SRR Contract, as reflected by their numerous statements and representations concerning these business factors throughout the Class Period.  Accordingly, Defendants were intimately aware of the false and misleading nature of these statements, as alleged herein, when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Red Cat securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

78.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Red Cat securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Red Cat or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

28

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Red Cat;

- whether the Individual Defendants caused Red Cat to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Red Cat securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

83.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Red Cat securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Red Cat securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

84.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

85.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

86.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

87.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

88.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Red Cat securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Red Cat securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

89.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or

issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Red Cat securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Red Cat's finances and business prospects.

90.    By virtue of their positions at Red Cat, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

91.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Red Cat, the Individual Defendants had knowledge of the details of Red Cat's internal affairs.

92.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Red Cat.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Red Cat's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Red Cat securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Red Cat's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Red Cat securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

93.    During the Class Period, Red Cat securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Red Cat securities at prices

artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Red Cat securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Red Cat securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

94.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

95.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

96.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

34

97.     During the Class Period, the Individual Defendants participated in the operation and management of Red Cat, and conducted and participated, directly and indirectly, in the conduct of Red Cat's business affairs.  Because of their senior positions, they knew the adverse non-public information about Red Cat's misstatement of income and expenses and false financial statements.

98.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Red Cat's financial condition and results of operations, and to correct promptly any public statements issued by Red Cat which had become materially false or misleading.

99.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Red Cat disseminated in the marketplace during the Class Period concerning Red Cat's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Red Cat to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Red Cat within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Red Cat securities.

100.   Each of the Individual Defendants, therefore, acted as a controlling person of Red Cat.  By reason of their senior management positions and/or being directors of Red Cat, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Red Cat to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Red Cat and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

101.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Red Cat.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 23, 2025                    Respectfully submitted,

POMERANTZ LLP

*/s/ Thomas H. Przybylowski*
Thomas H. Przybylowski
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Attorneys for Plaintiff*

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, Dylan Olsen, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Red Cat Holdings, Inc. ("Red Cat") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Red Cat securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Red Cat securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Red Cat securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>4/28/2025                              </u>
                          **(Date)**

<span style="border:1px solid">Signed by:

*Dylan Olsen*
</span>
175038DB04D74CF...
                          **Dylan Olsen**

**Red Cat Holdings, Inc. (RCAT)**                                                        **Dylan Olsen**

### List of Purchases/Acquisitions and Sales

| Transaction<br>Type | Security<br>Type | Date | Number of<br>Shares/Unit | Price Per<br>Share/Unit |
|---|---|---|---|---|
| Purchase/Acquisition | Common Stock | 1/7/2025 | 2,500 | $13.5300 |
| Purchase/Acquisition | Common Stock | 1/14/2025 | 1,100 | $9.2800 |
| Sale | Common Stock | 1/15/2025 | (100) | $10.4500 |
| | | | | |
| Purchase/Acquisition | C 20250417 12 | 1/7/2025 | 10 | $4.5000 |
| Purchase/Acquisition | C 20250417 12 | 1/8/2025 | 10 | $3.5000 |
| Purchase/Acquisition | C 20250718 12 | 1/7/2025 | 10 | $5.7000 |