POMERANTZ LLP
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com

*Counsel for Movants James Cheng and*
*Levelt Howard and Proposed Lead*
*Counsel for the Class*

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DYLAN OLSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RED CAT HOLDINGS, INC., JEFFREY THOMPSON, LEAH LUNGER, JOSEPH HERNON, GEORGE MATUS, GEOFFREY HITCHCOCK, and BRENDAN STEWART,<br><br>Defendants. | Case No. 2:25-cv-05427-MEF-JSA<br><br>Hon. Michael E. Farbiarz<br><br>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION OF JAMES CHENG AND LEVELT HOWARD FOR APPOINTMENT AS CO-LEAD PLAINTIFFS AND APPROVAL OF CO-LEAD PLAINTIFFS' SELECTION OF LEAD COUNSEL<br><br>Motion Date: August 18, 2025 |

# **TABLE OF CONTENTS**

ARGUMENT ............................................................................................................1

    I.    CHENG AND HOWARD DID NOT OVERSTATE
          THEIR LOSSES ...............................................................................1

    II.    GREENSTONE CANNOT CLAIM THE LARGEST
          FINANCIAL INTEREST UNDER ANY RELEVANT METRIC ......5

    III.    CHENG'S LOSSES ON OPTIONS IS NOT DISQUALIFYING .......7

    IV.    CHENG IS NOT A DAY TRADER OF RED CAT
          COMMON STOCK .........................................................................11

    V.    CHENG AND HOWARD ARE A PROPER MOVANT DUO.........13

CONCLUSION .....................................................................................................15

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Vitamin Shoppe, Inc.*,
No. 2:17-CV-6454-KM-MAH, 2018 WL 1960444
(D.N.J. Apr. 25, 2018) ...............................................................................13

*Baby Neal v. Casey*,
43 F.3d 48 (3d Cir. 1994) ...........................................................................8

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006) .......................................................................8

*Bensley v. FalconStor Software, Inc.*,
277 F.R.D. 231 (E.D.N.Y. 2011).................................................................12

*China Agritech, Inc. v. Resh*,
584 U.S. 732 (2018)....................................................................................14

*Cook v. Allergn PLC*,
8 Civ. 12089 (CM) *et al.*, 2019 WL 1510894
(S.D.N.Y. Mar. 21, 2019) .............................................................................2

*D'Agostino v. Innodata, Inc.*,
No. 2:24-CV-00971-JKS-JSA, 2024 WL 4615728
(D.N.J. Oct. 30, 2024)...................................................................................6

*DeLuca v. Instadose Pharma Corp.*,
No. 2:21CV675 (RCY), 2022 WL 3020417
(E.D. Va. July 29, 2022) .............................................................................14

*Deutschman v. Beneficial Corp.*,
132 F.R.D. 359 (D. Del. 1990) ................................................................7, 9

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................1, 2, 4, 5

*Feldman v. Scynexis, Inc.*,
No. 2:23-CV-22082-BRM-CLW, 2024 WL 3415121
(D.N.J. July 15, 2024)...................................................................................1

*Flora v. Hain Celestial Grp., Inc.*,
No. 16CV4581ADSSIL, 2017 WL 11816987
(E.D.N.Y. June 5, 2017) ...................................................................................7

*Hall v. Medicis Pharm. Corp.*,
No. CV08-1821PHX-GMS, 2009 WL 648626
(D. Ariz. Mar. 11, 2009) ..................................................................................7

*In re BP, PLC Sec. Litig.*,
758 F. Supp. 2d 428 (S.D. Tex. 2010)............................................................10

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ...............................................................6, 8, 14, 15

*In re Network Assocs., Inc. Sec. Litig.*,
76 F. Supp. 2d 1017 (N.D. Cal. 1999)..............................................................4

*In re Vonage Initial Pub. Offering (IPO) Sec. Litig.*,
No. CIV A 07-177 FLW, 2007 WL 2683636 (D.N.J. Sept. 7, 2007) .................8

*In re WatchGuard Sec. Litig.*,
No. C05-678JLR, 2005 WL 8188936 (W.D. Wash. July 13, 2005) ...............2, 5

*Lawless v. Aurora Cannabis Inc.*,
No. CV2013819RMBSAK, 2021 WL 2850451
(D.N.J. July 8, 2021)..................................................................................10, 13

*Lax v. First Merchants Acceptance Corp.*,
No. 97 C 2715, 1997 WL 461036 (N.D. Ill. Aug. 6, 1997) ...........................5, 6

*Li Hong Cheng v. Canada Goose Holdings Inc.*,
No. 19-CV-8204 (VSB), 2019 WL 6617981
(S.D.N.Y. Dec. 05, 2019) .................................................................................4

*Luo v. Spectrum Pharms., Inc.*,
No. 21-cv-01612, 2022 WL 2985939 (D. Nev. July 28, 2022)..........................2

*Medina v. Clovis Oncology, Inc.*,
No. 15-CV-2546-RM-MEH, 2016 WL 660133
(D. Colo. Feb. 18, 2016) ..................................................................................7

*Miller v. Ventro Corp.*,
No. 01-CV-1287, 2001 WL 34497752 (N.D. Cal. Nov. 28, 2001)...................13

iii

*Plaut v. Goldman Sachs Grp., Inc.*,
  No. 18-CV-12084 (VSB), 2019 WL 4512774
  (S.D.N.Y. Sept. 19, 2019) ..............................................................................4

*Roby v. Ocean Power Techs., Inc.*,
  No. 14-CV-3799 FLW LHG, 2015 WL 1334320
  (D.N.J. Mar. 17, 2015) ...................................................................................5

*Rodriguez v. DraftKings Inc.*,
  21 Civ. 5739 (PAE) *et al.*, 2021 WL 5282006
  (S.D.N.Y. Nov. 12, 2021) ..............................................................................11

*Soto v. Hensler*,
  235 F. Supp. 3d 607 (D. Del. 2017)...........................................................13, 14

**Statutes**

15 U.S.C. § 78u-4...........................................................................................14

Private Securities Litigation Reform Act of 1995 ...................................7, 13, 14, 15

**Rules**

Fed. R. Civ. P. 23 ...........................................................................................10

Movants Cheng[1] and Howard respectfully submit this Reply Memorandum of Law in further support of their motion for appointment as Co-Lead Plaintiffs and approval of their selection of Pomerantz as Lead Counsel (Dkt. No. 6).

## ARGUMENT

### I.    CHENG AND HOWARD DID NOT OVERSTATE THEIR LOSSES

Contrary to Greenstone's assertions (*see* Dkt. No. 11 at 2-3, 10-17), Cheng and Howard's losses are properly accounted for under the last-in, first-out ("LIFO") accounting methodology.  "[C]ourts overwhelmingly prefer LIFO . . . in calculating shareholder losses."  *Feldman v. Scynexis, Inc.*, No. 2:23-CV-22082-BRM-CLW, 2024 WL 3415121, at \*2 (D.N.J. July 15, 2024) (collecting cases).  Here, Cheng and Howard's LIFO losses total approximately $294,016.  *See* Dkt. No. 6-3 at \*4.  No one has argued otherwise, nor argued that anyone incurred larger LIFO losses.  Rather, Greenstone argues that Cheng and Howard "overstated" their losses by claiming "unrecoverable" losses from "in-and-out" transactions—*i.e.*, securities purchased and sold before any corrective disclosure.  Dkt. No. 11 at 2, 6 n.2, 10-17.  In support, Greenstone cites *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)—a case evaluating claims at the motion to dismiss stage—and its progeny for the general proposition that "losses incurred before the revelation of alleged corrective disclosures" are "not recoverable[.]" Dkt. No. 11 at 10-11.  Accordingly, Cheng's loss calculation should purportedly exclude losses on option contracts that he purchased after September 23, 2024, the Complaint's second alleged corrective

---

[1] All capitalized terms herein are defined in Cheng and Howard's moving or opposition briefs, unless otherwise indicated.  *See* Dkt. Nos. 6-2, 9.

disclosure, and that also were sold or expired before January 16, 2025, the Complaint's third alleged corrective disclosure. *See id.* at 13-14. This argument is unavailing. "[T]he appropriateness of employing *Dura* analysis at the lead plaintiff stage is subject to considerable dispute" because it requires courts to conduct a merits analysis necessitating expert opinion and otherwise consider factors not yet clear at this stage. *Cook v. Allergn PLC*, 8 Civ. 12089 (CM) *et al.*, 2019 WL 1510894, at *3 (S.D.N.Y. Mar. 21, 2019) (rejecting *Dura*-derived loss-causation methodology at lead plaintiff appointment stage); *see also Luo v. Spectrum Pharms., Inc.*, No. 21-cv-01612, 2022 WL 2985939, at *3 (D. Nev. July 28, 2022) (same); *In re WatchGuard Sec. Litig.*, No. C05-678JLR, 2005 WL 8188936, at *4 n.6 (W.D. Wash. July 13, 2005) (same, noting "[t]he Supreme Court recognized . . . that numerous factors may affect the price of a security" and "did not suggest that a court should guess about the effect of these as-yet-unknown factors in selecting a lead plaintiff, nor did it consider the issue").

Here, the Complaint does ***not*** simply allege that Class members were harmed ***only*** by the corrective disclosures currently pleaded in the Complaint, but rather, more broadly, that investors were harmed by Defendants' false and misleading statements during the Class Period. *See generally* Dkt. No. 1. Further, following Lead Plaintiff appointment, the initial Complaint will likely be superseded in short order by an Amended Complaint that may identify additional corrective disclosures. Indeed, a review of Red Cat's stock chart strongly suggests that between the September 23, 2024 and January 16, 2025 corrective disclosures, additional corrective disclosures occurred. For example, from September 23, 2024 until

2

approximately the start of December 2024, Red Cat's stock price was largely on an upward trajectory, closing as high as $11.77 per share on November 29, 2024. *See* Reply Declaration of Thomas H. Przybylowski in Further Support of Motion, Ex. A. Red Cat's stock price then steadily declined until closing as low as $7.19 per share on December 12, 2024, as well as experienced additional periods of steady or sharp decline at various points thereafter until January 16, 2025. *See id.*

The foregoing downward trends in Red Cat's stock price clearly reflect, *inter alia*, the market's reaction to negative disclosures regarding the Company's business and operations, some of which no doubt relate to the alleged fraud. Indeed, during this timeframe, Red Cat disclosed negative information that implicated issues with its Salt Lake City Facility's production capacity, which clearly relates to the alleged fraud (*see* Dkt. No. 1 ¶ 7). For example, on December 16, 2024, after markets closed, Red Cat issued a press release disclosing, *inter alia*, that it "halted production of the Teal 2" drone "to retool" another drone product.[2] This disclosure concerned the Salt Lake City Facility—that is, the same facility the production capacity of which was overstated during the Class Period, per the Complaint's allegations. *See* Dkt. No. 1 ¶¶ 3, 34. Red Cat's stock price closed 7.46% lower the day after the press release.[3] The December 16, 2024 press release thus facially appears to relate to the fraud

---

[2] *Red Cat Holdings Reports Financial Results for Fiscal Second Quarter 2025 and Provides Corporate Update*, Red Cat (Dec. 16, 2024, 4:10 p.m. EST), https://ir.redcatholdings.com/news-events/press-releases/detail/165/red-cat-holdings-reports-financial-results-for-fiscal-second-quarter-2025-and-provides-corporate-update.

[3] *See Historical Data*, *Red Cat Holdings, Inc. (RCAT)*, Yahoo! Finance (last visited Aug. 11, 2025), https://finance.yahoo.com/quote/RCAT/history/.

alleged in this litigation.  Significantly, certain of the losses that Greenstone seeks to exclude from Cheng's recovery stem from *5,036* option contracts that Cheng held at the time of the December 16, 2024 press release.  *See* Dkt. No. 6-3 at *13-16.  By myopically focusing only on the corrective disclosures already alleged in the Complaint, the application of a *Dura*-derived methodology at this early stage would thus disregard the broader theory of loss caused by the Defendants' alleged fraud and exclude losses likely to have been incurred in connection with the alleged fraud.

Moreover, courts generally decline to apply *Dura* at this stage where, as here, multiple corrective disclosures are alleged.  In such circumstances, the "fraud premium"—*i.e.*, the amount by which the price of the relevant securities was inflated by the Defendants' fraud—"varie[s] over the course of the class period', such that 'some transactions resulted in greater losses than others.'"  *Li Hong Cheng v. Canada Goose Holdings Inc.*, No. 19-CV-8204 (VSB), 2019 WL 6617981, at *5 (S.D.N.Y. Dec. 05, 2019) (quoting *In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999)); *see also Plaut v. Goldman Sachs Grp., Inc.*, No. 18-CV-12084 (VSB), 2019 WL 4512774, at *4 (S.D.N.Y. Sept. 19, 2019) (noting when "the complaint alleges multiple partial disclosures over the course of the Class Period, courts have been reluctant to apply a *Dura*-based approach to calculate[e] losses").  Here, the Complaint in the Action alleges three corrective disclosures, occurring on July 27, 2023, September 23, 2024, and January 16, 2025, following which Red Cat's stock price fell by 8.93%, 25.32%, and 21.54%, respectively.  *See* Dkt. No. 1 ¶¶ 8-11, 13-14, 49-53, 60-62, 67-71.  Each of these three disclosures independently reduced Red Cat's stock value, meaning the fraud

4

premium at issue clearly varied during the Class Period, such that certain of the movants' transactions resulted in greater losses than others.  Given that varying fraud premium, it is plainly premature to decide, at the very outset of this litigation, that certain of the investment losses that Cheng and likely many other similarly situated Class members incurred are categorically unrecoverable.

Considering all the foregoing, it would clearly be improper to apply *Dura*-derived loss-causation principles at this stage of the litigation.  Doing so would amount to simply "guess[ing] about the effect of . . . as-yet-unknown factors in selecting a lead plaintiff", *Watchguard*, 2005 WL 8188936, at *4 n.6—which is ***not*** the holding of *Dura*.

## II.    GREENSTONE CANNOT CLAIM THE LARGEST FINANCIAL INTEREST UNDER ANY RELEVANT METRIC

In its opposition brief, Greenstone claims it possesses the largest financial interest when "holistically" considering all four of the financial interest factors articulated in *Lax v. First Merchants Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 6, 1997), because, even though it cannot claim the largest loss, it nevertheless purportedly "carries three of the four *Lax* factors, having purchased 160,850 shares of Red Cat common stock during the Class Period, expended $1,861,714 on these purchases, and retained 60,000 shares of Red Cat common stock through the end of the Class Period."  Dkt. No. 11 at 5, 22. Greenstone is wrong.

In the Third Circuit, "'largest financial interest' means the largest loss." *Roby v. Ocean Power Techs., Inc.*, No. 14-CV-3799 FLW LHG, 2015 WL 1334320, at *5

(D.N.J. Mar. 17, 2015) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 223 (3d Cir. 2001)); *see also D'Agostino v. Innodata, Inc.*, No. 2:24-CV-00971-JKS-JSA, 2024 WL 4615728, at *2 (D.N.J. Oct. 30, 2024) (same). Indeed, in *Innodata*, the court rejected a lead plaintiff movant's argument "that he should be appointed lead plaintiff because he purchased and retained more shares than [the competing movant] and expended greater funds" even though he claimed lesser losses because "courts within the Third Circuit consider the approximate loss suffered to be the most important factor[.]" 2024 WL 4615728, at *2. Greenstone fails to cite a single decision from the Third Circuit that found otherwise.

Even if the Court *were* to consider all four *Lax* factors holistically, Cheng and Howard still have the largest financial interest because they claim the largest losses *and* the largest net funds expended ($3,828,651). *See* Dkt. No. 6-3 at *4. Greenstone artificially limits the net funds expended factor to "Stock Expenditures"—claiming Cheng and Howard's net funds expended amounts to only $168,481.00. Dkt. No. 11 at 6. Limiting this *Lax* factor to "stock expenditures" is incongruent with both *Lax* and Third Circuit precedent. *See Lax*, 1997 WL 461036, at *5 (stating more broadly to consider "the total net funds expended by the plaintiffs during the class period"); *Cendant*, 264 F.3d at 262 (same). Cheng and Howard's total net funds expended on Red Cat securities—*i.e.*, stock *and* options—during the Class Period totals $3,828,651 (Dkt. No. 6-3 at *4), significantly larger than that claimed by Greenstone ($1,861,714 (*see* Dkt. No. 11 at 6)). Accordingly, Cheng and Howard claim *two* of the four *Lax* factors, including loss, the most important factor, meaning they have the largest financial interest even under a holistic *Lax* factor analysis.

### III.    CHENG'S LOSSES ON OPTIONS IS NOT DISQUALIFYING

The Mayers and Greenstone argue that Cheng and Howard are atypical, inadequate, and subject to unique defenses because Cheng only has losses on his Red Cat options investments and realized a gain on his stock investments. *See* Dkt. No. 10 at 2, 4-6; Dkt. No. 11 at 3, 18-19. Yet courts throughout the country routinely appoint movants who suffered most, or even ***all***, of their losses on options investments to serve as lead plaintiff in PSLRA cases. *See, e.g.*, *Flora v. Hain Celestial Grp., Inc.*, No. 16CV4581ADSSIL, 2017 WL 11816987, at *1 (E.D.N.Y. June 5, 2017) (appointing co-lead plaintiffs, finding "the fact that [one of them] ***only*** purchased options during the class period does not rebut the presumption in its favor" (emphasis added)); *Hall v. Medicis Pharm. Corp.*, No. CV08-1821PHX-GMS, 2009 WL 648626, at *4-6 (D. Ariz. Mar. 11, 2009) (appointing options holder instead of stock investor because the latter failed "to offer any evidence that [option holder]'s specific options are themselves atypical"); *Medina v. Clovis Oncology, Inc.*, No. 15-CV-2546-RM-MEH, 2016 WL 660133, at *3 (D. Colo. Feb. 18, 2016) (appointing lead plaintiff that "may have held securities that other members of the class did not, such as options . . . [because] the losses allegedly incurred on those securities are still premised on the same factual allegations and legal theories"); *see also Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 371 (D. Del. 1990) (certifying class of options and stock investors with representative who ***only*** purchased options).

Nothing about Cheng's options transactions disqualifies him as a Class representative. To make "the *prima facie* determination of adequacy, a court should consider whether the movant 'has the ability and incentive to represent the claims of

7

the class vigorously, [whether the movant] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class.'" *In re Vonage Initial Pub. Offering (IPO) Sec. Litig.*, No. CIV A 07-177 FLW, 2007 WL 2683636, at *5 (D.N.J. Sept. 7, 2007) (quoting *Cendant*, 264 F.3d at 265). Here, with an investment loss of $262,176, Cheng plainly has the incentive to represent *all* Class members' claims, whether they invested in stock or options, Cheng has retained qualified and experienced counsel, and the competing movants have identified *no* conflict between Cheng's interests and those of the Class (indeed, there is none). Further, even after offsetting his relatively minor $8,369 gain on stock investments, Cheng still incurred significant overall losses of $262,176 (*see* Dkt. No. 6-3 at * 4)—more than any other movant—and he has repeatedly attested under oath to seeking recovery on behalf of *all* Class members. *See* Dkt. No. 6-3 at *11 ¶ 4, *26 ¶¶ 5-6. Against this evidence, there is no reason to speculate that he would not adequately represent the Class.

Moreover, nothing about Cheng's options investments makes him atypical of the Class. The test for typicality is whether "'the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class.'" *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994)). "Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58. Here, the Complaint expressly defines the putative Class as consisting of all investors "that purchased *or otherwise acquired* Red Cat

8

*securities*"—that is, not merely stock—during the Class Period.  Dkt. No. 1 ¶ 1 (emphases added).  Given this expansive Class definition, the Class will necessarily consist of investors who purchased different types of securities, including common stock *and* options.  Cheng thus fits squarely within the Class definition.

Further, Cheng's trading activity was predominantly in Red Cat common stock and *call* option contracts, the latter of which gave him the right—although not the obligation—to purchase Red Cat common stock at a specific price (*i.e.*, strike price) and time, allowing him to profit if the share price exceeded the strike price before the expiration of the option. *See* Dkt. No. 6-3 at *13-16.  Specifically, Cheng purchased 11,465 shares of Red Cat common stock and 24,434 Red Cat call option contracts during the Class Period—an investment strategy consistent with a view that the Company's share price would increase during the Class Period.  *See id.* "[B]oth call option purchasers and stock purchasers hope to profit from an *increase* in the market price of the underlying security." *Beneficial*, 132 F.R.D. at 371 (emphasis in original).  Additionally, "the premium, or price of [a call] option contract is directly responsive to the market price of the underlying security and to information affecting that price" and, "[c]onsequently, [call] option traders, like purchasers of the underlying security, are susceptible to misrepresentations which distort the market price" and "can invoke the fraud on the market theory." *Id.* at 371.  Cheng held 500 and 5,707 Red Cat call option contracts as of September 23, 2024 and January 16, 2025, respectively, when the truth regarding Defendants' alleged fraud emerged, causing Red Cat's share price to plummet (*see* Dkt. No. 1 ¶¶ 8-11, 13-14, 49-53, 60-62, 67-71), and ultimately suffered significant overall

9

investment losses of *$262,176*.  *See* Dkt. No. 6-3 at *4.  Cheng, like all Class members, thus invested in Red Cat securities in reliance upon Defendants' positive Class Period statements about the Company in the good-faith expectation that Red Cat's stock price would increase and suffered losses when the truth emerged via the revelation of the alleged fraud.  *See generally* Dkt. No. 1.  Cheng is thus a wholly typical Class member under Rule 23.

Finally, even assuming *arguendo* that incurring all of his losses on Red Cat options might raise concerns about Cheng's fitness to represent a Class consisting of both common stock and options investors (and as discussed *supra*, it does not), his appointment as a Co-Lead Plaintiff alongside Howard—who incurred *all* of his $31,839 investment losses on Red Cat common stock—allays any such speculative concerns.  *See Lawless v. Aurora Cannabis Inc.*, No. CV2013819RMBSAK, 2021 WL 2850451, at *5 (D.N.J. July 8, 2021) (finding a "small group of individuals as lead plaintiff has certain advantages . . . including avoiding the re-determination of lead plaintiff if an individual lead plaintiff is . . . deemed inadequate"); *see also In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428, 441-42 (S.D. Tex. 2010) ("[a]llowing for diverse representation . . . ensures that the interests of all class members will be adequately represented" (internal quotation marks omitted)).  Because Howard's losses stem solely from common stock (*see* Dkt. No. 6-3 at *4), his appointment alongside Cheng will ensure that the Class's leadership includes investors strongly incentivized to pursue recovery of both common stock and options losses, and that the Class will remain well represented throughout the pendency of this litigation should any questions as to Cheng's typicality or adequacy arise at a later stage.

## IV.    CHENG IS NOT A DAY TRADER OF RED CAT COMMON STOCK

Greenstone also argues that "Cheng's trading in Red Cat common stock [purportedly] constitutes in-and-out 'day trading'" because he "purchased 5,200 shares of Red Cat stock on November 15, 2024, and sold those 5,200 shares the same day"; "purchased 3,755 shares on December 20, 2024, and sold those 3,755 shares the same day"; and "purchased 2,440 shares on December 24, 2024, and sold those shares the following trading day, on December 26, 2024." Dkt. No. 11 at 18. This trading activity does ***not*** "evidence a [purported] pattern of day-trading," much less "subject[] the Cheng/Howard Group to unique reliance defenses." *Id.* at 3. Day trading involves rapidly buying and selling securities within a single day to capitalize on small price movements, often opening and closing a position in a company's securities within hours, minutes, or seconds, and rarely maintaining overnight positions, closing out entirely before the market closes.[4] A primary concern with appointing a day trader as a lead plaintiff is that a day trader is "vulnerable to attacks that he did not rely on the market price in trading [the subject securities], which could sever[] the link between the alleged misrepresentation and . . . [the investor's] decision to trade at a fair market price." *Rodriguez v. DraftKings Inc.*, 21 Civ. 5739 (PAE) *et al.*, 2021 WL 5282006, at *10 (S.D.N.Y. Nov. 12, 2021) (second alteration in original) (internal quotation marks omitted). Courts have also declined to appoint day traders whose in-and-out trading activity resulted in their selling ***all*** of their

---

[4] *See What Is Day Trading?*, Investopedia (updated Aug. 8, 2025), https://www.investopedia.com/articles/trading/05/011705.asp#toc-what-is-day-trading.

11

securities prior to the alleged corrective disclosures, thus raising unique defenses related to loss causation. *See Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 241 (E.D.N.Y. 2011) (denying motion by investor who sold all subject securities before the fraud was revealed, finding that "a *total* in-and-out trader . . . may be unable to demonstrate loss causation" (emphasis added)).

Here, Greenstone notes a mere *three* separate occasions when Cheng bought and sold the same amount of Red Cat stock within one to two days. *See* Dkt. No. 11 at 18. These stock transactions hardly qualify as the type of rapid, high-frequency trading that distinguishes day-traders from others. Indeed, Cheng only traded in Red Cat stock on *seven* different days during the nearly *three-year-long* Class Period, executing a mere *eleven* purchases and *four* sales. *See* Dkt. No. 6-3 at *4. Accordingly, contrary to Greenstone's assertions, Cheng cannot reasonably be characterized a day trader because he was not frequently buying and selling securities within a single trading day and rapidly opening and closing his position. Ironically, Greenstone itself traded in Red Cat stock on twelve different days during the Class Period, executing fifteen purchases and five sales—trading more frequently in Red Cat stock than Cheng. *See* Dkt. No. 5-4 at *3. Further, *Greenstone itself* was in-and-out of Red Cat stock on *two* separate occasions (*i.e.*, only one less occasion than Greenstone attributes to Cheng) within a few days—entering its Red Cat stock position by purchasing 56,500 shares on December 20, 2024, and then entirely selling out of that position (*i.e.*, selling all 56,500 shares) on December 23, 2024; and purchasing 28,000 and 10,000 shares on December 24 and 26, 2024, respectively, before selling all 38,000 shares on December 26, 2024. *See id.*

12

## V.    CHENG AND HOWARD ARE A PROPER MOVANT DUO

Contrary to the Mayers' and Greenstone's assertions (*see* Dkt. No. 10 at 2, 6-8; Dkt. No. 11 at 3, 20-21), Cheng and Howard are precisely the type of cohesive pairing that courts in the Third Circuit and throughout the country have routinely appointed to serve as Co-Lead Plaintiffs in PSLRA actions, as discussed at length in their opposition brief (*see* Dkt. No. 9 at 3-6, 10-15).   Specifically, Cheng and Howard: (i) are a cohesive duo; (ii) have submitted a detailed Joint Declaration attesting to, *inter alia*, their decision to work together to achieve the best possible result for the Class; (iii) will ensure that the interests of stock *and* options investors are adequately represented; and (iv) claim the largest financial interest without grouping (Cheng does so alone). *See Aurora*, 2021 WL 2850451, at *5 (appointing "relatively small group of three" who submitted a joint declaration indicating they will fairly and adequately represent the class's interests); *Aguilar v. Vitamin Shoppe, Inc.*, No. 2:17-CV-6454-KM-MAH, 2018 WL 1960444, at *9-11 (D.N.J. Apr. 25, 2018) (same and collecting cases); *Soto v. Hensler*, 235 F. Supp. 3d 607, 621 (D. Del. 2017) (appointing duo where one alleged the largest loss among competing movants, "eas[ing] any concerns about the two plaintiffs having come together solely due to manipulation by their counsel"); *Miller v. Ventro Corp.*, No. 01-CV-1287, 2001 WL 34497752, at *11 (N.D. Cal. Nov. 28, 2001) (appointing stockholder and bondholder to "represent the entire putative class of litigants").

The Mayers and Greenstone make much of the fact that Cheng and Howard have no prelitigation relationship, speculating as to the circumstances under which they chose to pair together, and citing cases to the effect that groups of unrelated

13

investors should not be appointed where it appears they solely joined together to claim the largest financial interest. *See* Dkt. No. 10 at 2, 6-8; Dkt. No. 11 at 3, 20-21. However, the Third Circuit "disagree[s] with those courts that have held that the statute invariably precludes a group of unrelated individuals from serving as a lead plaintiff[,]" and instead has held that "[t]he statute contains no [such] requirement" and "requires only that any such group fairly and adequately protect the interests of the class." *Cendant*, 264 F.3d at 266 (internal quotation marks omitted). The Mayers and Greenstone have failed to explain *why* Cheng and Howard will not "fairly and adequately protect the interests of the class" (*id.*), much less provide "*proof*" they will not, as the PSLRA requires (15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added)). Moreover, Cheng *alone* claims the largest financial interest, "eas[ing] any concerns [that he and Howard] hav[e] come together solely due to manipulation by their counsel." *Soto*, 235 F. Supp. 3d at 621; *see also DeLuca v. Instadose Pharma Corp.*, No. 2:21CV675 (RCY), 2022 WL 3020417, at *4 (E.D. Va. July 29, 2022) ("The most important factor to the Court is that the Group contains the individual with the largest loss among all movants."). Further, in *China Agritech, Inc. v. Resh*, the Supreme Court affirmed the propriety of, and indeed, anticipated the appointment of groups, like Cheng and Howard, as lead plaintiff in PSLRA cases, finding that "[d]istrict courts often permit aggregation of plaintiffs into plaintiff groups[.]" 584 U.S. 732, 742 n.3 (2018).

In any event, Cheng and Howard's Joint Declaration confirms that they were *not* unwittingly paired together by their counsel. *See* Dkt. No. 6-3 at *26 ¶ 4 ("We are aware of each other, have one another's contact information, and approved the

14

filing of a motion on our behalves seeking appointment jointly as Co-Lead Plaintiffs."). Their Joint Declaration also affirms their "shared belief in the merits of this action; [their] shared desire to achieve the best possible result for the Class; [their] shared interest in prosecuting the case in a collaborative and likeminded manner; [their] understanding of the fiduciary obligations of Lead Plaintiffs; and [their] preparedness to supervise counsel and undertake all actions necessary to ensure that the Class's claims will be zealously and efficiently litigated." *Id.* ¶ 5. Indeed, "[g]iven [their] significant financial interest in the claims against the defendants, [Cheng and Howard] are strongly motivated to recover the significant losses that [they] and the Class suffered[.]" *Id.* ¶ 6. They also affirm, *inter alia*, that their "principal goal in seeking to serve as Co-Lead Plaintiffs in this case is to achieve the best possible recovery for the Class from all culpable parties" (*id.*) and that they "determined that [they] could maximize the Class's recovery by pooling [their] respective resources and experience by jointly seeking appointment as Co-Lead Plaintiffs" (*id.* at *27 ¶ 9). Accordingly, notwithstanding the Mayers' and Greenstone's *speculation*, Cheng and Howard have put forth ample *evidence* that they *will* "fairly and adequately protect the interests of the class," which is all the Third Circuit and the PSLRA requires. *Cendant*, 264 F.3d at 266.

## CONCLUSION

For the foregoing reasons, the Court should grant Cheng and Howard's motion in its entirety and deny the competing motions.

15

Dated:  August 11, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Thomas H. Przybylowski*
Thomas H. Przybylowski
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
tprzybylowski@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

*Counsel for Movants James Cheng and
Levelt Howard and Proposed Lead Counsel
for the Class*

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
(*pro hac vice* application forthcoming)
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Movant Levelt
Howard*

16