POMERANTZ LLP
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

*Counsel for Co-Lead Plaintiffs James
Cheng and Levelt Howard and
Co-Lead Counsel for the Proposed
Class*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DYLAN OLSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RED CAT HOLDINGS, INC., JEFFREY THOMPSON, GEORGE MATUS, GEOFFREY HITCHCOCK, JOSEPH HERNON, LEAH LUNGER, ALLAN EVANS, and CHRISTIAN KOJI ERICSON,<br><br>Defendants. | Case No. 2:25-cv-05427-MEF-JSA<br><br>Hon. Michael E. Farbiarz<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ................................................................................ 2

II.    JURISDICTION AND VENUE ............................................................................... 7

III.   PARTIES ................................................................................................................. 8

    A.   Plaintiffs ...................................................................................................... 8

    B.   Defendants ................................................................................................... 8

    C.   Relevant Non-Parties ................................................................................ 11

IV.    SUBSTANTIVE ALLEGATIONS ....................................................................... 14

    A.   Background ................................................................................................ 14

    B.   Teal's Background ..................................................................................... 15

    C.   The Company Acquires Teal and Begins Focusing on the Military and Government Market ................................................................................... 17

    D.   During the Class Period, Defendants Tout the SRR Program and the Company's Production Capacity ................................................................. 20

    E.   Investors Begin to Learn the Truth About the Company's Production Capacity . 28

    F.   Information from Former Employees Confirms That Defendants Misrepresented the Company's Production Capacity and the Quality and Failure Rate of Its Drones .......................................................................................................... 33

        *1.   The Company's Production Capacity Was a Fraction of What Defendants Claimed* .......................................................................... 33

        *2.   The Company's Salt Lake City Facility, Manpower, and Financial Position Were Insufficient to Meet Defendants' False Claims* ................. 36

        *3.   The Company's Production Suffered from Massive Design and Quality Control Problems* ..................................................................... 41

        *4.   The Company's Supply Chain Constrained its Production Capacity and Contributed to Quality Control Problems* ................................. 45

    G.   Defendants Continue Touting the Value of the SRR Program and Announce that Teal Has Secured a Contract ................................................................. 51

    H.   Kerrisdale Capital Reveals that Defendants Had Misled Investors Regarding the SRR Contract and the Company's Production Capacity ...................................... 57

    I.   Defendants Reiterate 2025 Guidance ................................................................. 62

i

J.     Fuzzy Panda Research Reveals Information Mispresented by Defendants, and Additional Disclosures Confirm that the Company Was Not the "Only Vendor" Selected for Tranche 2 ........................................................................ 65

K.     Defendants Made Repeated Misrepresentations about Raising Capital and Diluting Shareholders ........................................................ 70

L.     Relevant Post-Class Period Events ........................................................ 85

V.    CLASS PERIOD MISREPRESENTATIONS ................................................... 87

A.     March 17, 2022 3Q22 Earnings Call ........................................................ 87

B.     June 7, 2022 LD Micro Conference ........................................................ 88

C.     July 27, 2022 FY22 Earnings Call and 2022 10-K ................................. 89

D.     September 12, 2022 1Q23 Earnings Call ................................................. 92

E.     November 29, 2022 Business Update Call ............................................... 93

F.     December 15, 2022 2Q23 Press Release and Earnings Call .................... 94

G.     March 7, 2023 3Q23 Earnings Call ......................................................... 95

H.     July 27, 2023 FY23 Earnings Call .......................................................... 97

I.     September 19, 2023 1Q24 Press Release ................................................. 98

J.     October 3, 2023 LD Micro Conference ................................................... 98

K.     October 12, 2023 Dawson James Conference ........................................ 99

L.     November 7, 2023 2Q24 Preliminary Results Press Release ............... 101

M.     March 18, 2024 3Q24 Earnings Call ..................................................... 101

N.     August 8, 2024 4Q24 Earnings Call ...................................................... 105

O.     September 23, 2024 1Q25 Earnings Call ............................................... 108

P.     November 19, 2024 SRR Selection Announcements ............................ 109

Q.     December 16, 2024 2Q25 Earnings Call ............................................... 114

R.     February 12, 2025 Press Releases .......................................................... 115

S.     February 13, 2025 Thompson Stocktwits Post ..................................... 116

T.     February 27, 2025 Investor Day ............................................................ 117

U.     August 14, 2025 Town Hall Investor Meeting ...................................... 118

VI.    LOSS CAUSATION .................................................................................... 120

ii

A.      July 27, 2023 FY23 Earnings Call .................................................................. 121

B.      December 6, 2023 Prospectus Filings............................................................. 123

C.      September 23, 2024 1Q25 Earnings Call........................................................ 124

D.      January 16, 2025 Kerrisdale Report................................................................ 125

E.      April 10, 2025 Stock Offering Press Release ................................................. 127

F.      June 17, 2025 Stock Offering Press Release .................................................. 128

G.      August 15, 2025 First Fuzzy Panda Report ................................................... 129

H.      September 17-18, 2025 Stock Offering Press Releases................................... 130

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER........................................... 131

A.      The Individual Defendants Had a Motive to Sell Company Stock at Artificially Inflated Prices ................................................................................................. 131

B.      Defendant Thompson Had Additional Motives to Inflate Red Cat's Stock Price ............................................................................................................... 135

C.      Red Cat Suffered Large Losses and Its Survival Depended on Obtaining Cash from Investors ................................................................................................. 137

VIII.   CLASS ACTION ALLEGATIONS ............................................................... 138

IX.     COUNTS....................................................................................................... 142

X.      PRAYER FOR RELIEF ................................................................................ 147

XI.     DEMAND FOR TRIAL BY JURY ............................................................... 148

iii

## Exhibit List

| | |
|---|---|
| Exhibit A | List of Red Cat Holdings, Inc. Periodic Reports filed with the United States Securities and Exchange Commission during the Class Period |
| Exhibit B | Kerrisdale Capital, *Red Cat Holdings, Inc.: Flying Blind* (January 16, 2025) (available at https://www.kerrisdalecap.com/wp-content/uploads/2025/01/RCAT-Kerrisdale.pdf) |
| Exhibit C | Fuzzy Panda Research, *Red Cat (RCAT): Short This Stock Promote Now That It's Time to Deliver – Hand-Assembled Drones, Formers Revealed High Failure Rate* (August 15, 2025) (available at https://fuzzypandaresearch.com/red-cat-army-drones-engineers-flee-stock-promote/) |
| Exhibit D | Fuzzy Panda Research, *Red Cat (RCAT) – FOIAs Reveal Key Army Contract Way Smaller Than Claimed; More Hype & Chinese Parts Exposed; Guidance Miss Coming* (October 10, 2025) (available at https://fuzzypandaresearch.com/rcat-army-contract-smaller-than-claimed/) |

Court-appointed Co-Lead Plaintiffs James Cheng ("Cheng"), Levelt Howard ("Howard"), William and Tamara Mayers (the "Mayers," and together with Cheng and Howard, "Co-Lead Plaintiffs"), and Additional Plaintiff Greenstone Nevada, LLC ("Greenstone," and together with Cheng, Howard. and the Mayers, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon investigation by counsel, including, among other things, review and analysis of public filings made by Red Cat Holdings, Inc. ("Red Cat" or the "Company") with the United States ("US" or "U.S.") Securities and Exchange Commission ("SEC"); review and analysis of press releases and other publications disseminated by Defendants;[1] review and analysis of news articles and conference call transcripts; review and analysis of other publicly available information concerning Defendants; and information from former employees of the Company.[2]

---

[1]    The "Defendants" are Red Cat, Jeffrey Thompson ("Thompson"), George Matus ("Matus"), Geoffrey Hitchcock ("Hitchcock"), Joseph Hernon ("Hernon"), Leah Lunger ("Lunger"), Allan Evans ("Evans'), and Christian Koji Ericson ("Ericson").

[2]    These former employees ("FEs") are referred to using masculine pronouns, regardless of their gender, in order to preserve their anonymity.

1

Plaintiffs believe that substantial additional evidence will support their allegations after a reasonable opportunity for discovery.[3]

## I.    SUMMARY OF THE ACTION

1.    This is a federal securities class action brought on behalf of purchasers of the Company's common stock or call options, and sellers of the Company's put options, during the period from March 18, 2022 to September 17, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 CFR 240.10b-5.

2.    Red Cat focuses on selling drones (or unmanned aerial systems), particularly to government and military customers through its wholly-owned subsidiary, Teal Drones, Inc. ("Teal" or "Teal Drones"), which it acquired in August 2021. During the Class Period, the Company's primary focus was obtaining a contract with the US Army (the "Army") pursuant to the Army's Short Range Reconnaissance ("SRR") drone procurement program (the "SRR Program"). Defendants emphasized to investors that an SRR contract would be worth hundreds of millions of dollars and transform the Company, which had only $9.9 million of revenue in its fiscal year ending April 30, 2023.

---

[3]    Emphases herein are added unless otherwise noted.

2

3.      During the Class Period, Defendants made a series of statements misleading investors about (1) the Company's production facility in Salt Lake City, where Teal was headquartered and produced its drones (the "Salt Lake City Facility"), (2) the value of the contract the Company was pursuing in Tranche 2 (or Tranche 2/3) of the SRR Program, (3) the quality and failure rate of the Company's drones, and (4) the Company's capital-raising activities.

4.      Defendants repeatedly touted to investors that, after incurring substantial expenses purportedly improving Teal's Salt Lake City Facility, the Company could produce "thousands of drones per month," with a production line "in full swing" and able to "ramp" quickly to "mass production." For instance, on December 15, 2022, Defendant Jeffrey Thompson ("Thompson"), the Company's Chief Executive Officer ("CEO"), told investors that "[w]e have invested in a new factory in Salt Lake City that can produce *tens of thousands of drones per year*." Similarly, on March 7, 2023, Thompson represented that "*[t]he Salt Lake City factory is complete and ready to go*" and "*[w]e now have the capacity to produce thousands of drones per month.*"

5.      These claims were revealed to be false. For instance, on July 27, 2023, Defendants disclosed that its production was "presently at 100 systems per month." An investor noted this discrepancy, remarking "[y]ou said production is *100* per month" but "I think *in the past you'd reference maybe 1,000 per month*[,]" and

3

Defendant Thompson conceded that "we do 100 a month." Even as investors began to learn the truth through a series of disclosures, Defendants continued to mislead investors regarding the Company's production capacity.

6.      Information from seven former employees of the Company, uncovered in Plaintiffs' investigation, confirms that Defendants misled investors. In truth, the Company struggled to produce even 100-200 drones per month, forcing the Company to scramble to deliver customer orders, and even reallocate drones made for one customer to other customers' orders. The Salt Lake City's production capacity suffered from a lack of manpower and resources, an insufficient supply chain, and persistent manufacturing and design flaws. As a result, the drones produced by the Company experienced high failure rates.

7.      Defendants also represented that an SRR Tranche 2 contract would be worth hundreds of millions of dollars. For instance, Defendants represented that a Tranche 2 contract "for approximately 12,000 drones" would be worth, at least, hundreds of millions because "Tranche 1 production award was for $100 million for approximately 1,000 drones." On November 19, 2024, Defendants announced that the Company "has been selected as *the* winner of [Tranche 2 of] the U.S. Army's Short Range Reconnaissance (SRR) Program of Record," and that the Company "[wa]s focused on ramping production of Teal's next generation system *to meet the Army's currently stated acquisition objective for 5,880 systems*," with the average

4

price per system—including two drones and one controller—hovering around $45,000, implying that the contract was worth at least ***$264 million***. Consistent with the announcement that the Company was "the"—i.e., sole—winner, Defendant George Matus ("Matus"), the Company's Chief Technology Officer ("CTO"), emphasized that "Teal is ***the only vendor*** selected to move into production."

8.      However, on January 16, 2025, Kerrisdale Capital ("Kerrisdale") published a report (the "Kerrisdale Report") revealing the fact that Tranche 2 of the SRR Program was not "sole source" and thus that, even if the Company secured a contract, it still faced competition to *deliver* drones—which was especially significant in light of the Company's manufacturing problems and elevated failure rates. Further, Kerrisdale revealed that Defendants had misleadingly suggested that a Tranche 2 contract "for approximately 12,000 drones" would be worth, at least, hundreds of millions because "Tranche 1 production award was for $100 million for approximately 1,000 drones," identifying federal procurement records and an Army press release showing that, in Tranche 1, "the Army only used *$47.8 million* of the total contract's capacity and acquired 1083 systems (that's about 2200 drones)." These disclosures drove the Company's stock price down *21.54%* over two trading sessions.

9.      Later, on August 15, 2025, Fuzzy Panda Research ("Fuzzy Panda") issued a report confirming that the SRR contract was not "sole source" and that, in

5

May 2025, the Company's primary competitor in Tranche 2 of the SRR, Skydio, Inc. ("Skydio"), another American drone manufacturer that had also won an SRR contract, had "fulfilled the *first* order under the U.S. Army's Short Range Reconnaissance (SRR) Tranche 2 program," delivering hundreds of drones to the Army.

10.    Defendants also misled investors about the Company's financing needs and capital raising activities. During the Class Period, Defendants repeatedly assured investors that the Company was in a strong financial position and did not need to raise capital, particularly through any transactions that would dilute existing shareholders. However, the Company conducted dilutive capital raises four times during the Class Period, shortly after making such misrepresentations. For instance, on October 12, 2023, Defendant Thompson assured investors that ***"[w]e have a lot of ways to raise non-dilutive capital over the next few months*,**" noting that the Company had "a bunch of term sheets" for debt transactions and stating explicitly that "***[w]e're not going to dilute the company*.**" However, less than two months later, the Company disclosed that it was conducting a public offering of 16 million shares of its common stock at a price of $0.50 per share. In response to this news, the stock price fell *27.6%*. Afterwards, Defendant Thompson admitted that the term sheets he had previously touted "were *horrific* and *would have destroyed the company*."

6

11.   In December 2024, after Defendants misleadingly, and prematurely, announced that the Company had been selected for Tranche 2 of the SRR Program—and before investors such as Kerrisdale could investigate those claims—four Defendants sold massive amounts of their stock holdings, reaping millions of dollars in proceeds. The Company's investors, however, have suffered substantial damages as a result of Defendants' misconduct. This action seeks to recover those losses.

## II.   <u>JURISDICTION AND VENUE</u>

12.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a).

13.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.   Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27(c) of the Exchange Act, 15 U.S.C. § 78aa(c). Defendants conduct business in this Judicial District. The Company's common stock trades on the Nasdaq Stock Market ("Nasdaq"). Per the Company's most recent annual report, filed with the SEC on March 19, 2026, there were 121,138,764 shares of Red Cat common stock outstanding as of March 17, 2026. Accordingly, there are presumably hundreds, if not thousands, of investors in Company common stock located within the US, some of whom undoubtedly reside in this Judicial District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiffs

16.    Plaintiffs acquired Red Cat common stock at artificially inflated prices during the Class Period, as set forth in their previously filed Certifications (ECF Nos. 3-5, 5-4, and 6-3) listing their transactions for the class period alleged in the initial complaint (ECF No. 1), and were damaged upon the disclosure of the true facts and the materialization of the risks concealed and misrepresented by Defendants.

### B.    Defendants

17.    Defendant Red Cat is incorporated in Nevada with principal executive offices located at 2800 S West Temple, Suite 5, South Salt Lake, Utah. The Company's common stock trades under the ticker symbol "RCAT" on the Nasdaq.

18.    Defendant Jeffrey Thompson ("Thompson") has served as the Company's CEO and President since May 15, 2019, as a member of the Company's Board of Directors ("Board") since that same time, as Chairman of the Board since no later than April 30, 2021. In addition, Thompson served as the Company's Interim

8

Chief Financial Officer ("CFO") from no later than March 10, 2025 until March 31, 2025.

19.    Defendant George Matus ("Matus") served as Red Cat's CTO from November 27, 2023 until or on around December 26, 2024. Defendant Matus is also the founder of Teal and served as its CEO until or on around December 26, 2024.

20.    Defendant Geoffrey Hitchcock ("Hitchcock") has served as Red Cat's Chief Revenue Officer ("CRO") since November 27, 2024. Defendant Hitchcock also served as Teal's General Manager from March 2024 to November 27, 2024, before which he served as the Company's Senior Vice President of Global Defense Solutions beginning in September 2021.

21.    Defendant Joseph Hernon ("Hernon") served as the Company's CFO from January 2020 to March 15, 2024. Before joining the Company, Hernon served as CFO for three other publicly-traded companies during the period 1998 to 2016. In addition, Hernon worked for ten years in the audit practice of PricewaterhouseCoopers, and is a certified public accountant.

22.    Defendant Leah Lunger ("Lunger") served as the Company's CFO from June 10, 2024 to January 10, 2025, before which she served as the Company's Interim CFO from March 15, 2024 to June 10, 2024. Lunger served as the Company's Vice President of Finance beginning in January 2023, and as the Company's Corporate Controller beginning in November 2020, when she joined the

9

Company in connection with its acquisition of Fat Shark Holdings, Ltd. ("Fat Shark"), where she was Controller. Lunger is a certified public accountant.

23. Defendant Allan Evans ("Evans") joined the Company in November 2020 and served as its Chief Operating Officer ("COO") from June 3, 2021 until November 27, 2023.

24. Defendant Christian Koji Ericson ("Ericson") has served as the Company's COO since December 2, 2025. Prior to that, he served as CFO beginning March 31, 2025. Ericson is a certified public accountant.

25. Defendants Thompson, Matus, Hitchcock, Hernon, Lunger, Evans, and Ericson are collectively referred to herein as the "Individual Defendants."

26. The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings, press releases, and other market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions at the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

10

misleading. The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

27. The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## C.    Relevant Non-Parties

28. FE-1 was the Vice President of Engineering at Teal Drones from 2017 until early 2024. FE-1 worked at the Salt Lake City Facility and reported to Defendant Matus until the Company acquired Teal, after which he reported to Defendant Evans. FE-1 had wide-ranging responsibilities, including designing drones (including for the SRR Program), hiring the technical team, and setting up manufacturing lines.

29. FE-2 was the Lead Electronic Repair Technician at Teal Drones from early 2023 until early 2024. FE-2 worked at the Company's Salt Lake City Facility and reported to Jay Weight, the Vice President of Manufacturing at the time (whom FE-2 believed reported directly to Defendant Matus). FE-2 was, effectively, the head of the "RMA" department, referring to "Return Merchandise Authorizations," and was tasked with diagnosing and fixing defective drones that customers returned to the Company.

30. FE-3 was the Senior Director for Business Development, Public Safety & Government at Teal Drones from fall 2021 until December 2023. FE-3 worked

11

remotely and reported to Defendant Hitchcock, who was the General Manager at Teal Drones before being promoted to the Company's CRO in November 2024. FE-3 was responsible for customer accounts with government and public safety agencies.

31.    FE-4 was the PLM ("product lifecycle management") Manager at Teal Drones from early 2022 until mid-2024. FE-4 worked at the Salt Lake City Facility and reported to Roger Johnsen, who reported to Defendant Matus. FE-4's duties centered on organizing the technical information that Company engineers applied to building drones. FE-4 worked with the Company's product data system and helped to manage and track the "bill of materials" for each drone product, which listed all parts used to build the product. FE-4 was responsible for ensuring that the bill of materials for each drone model was updated when the design changed, and preparing each model for production.

32.    FE-5 was a Technical Documentation Specialist at Teal Drones from April 2023 until mid-2024. FE-5 worked in the Salt Lake City Facility and reported to Jim Russell and then Matt McFadden, then the Vice President of Engineering. FE-5 had responsibility for writing the operator's manuals for the Teal 2 and Teal 3 (aka Black Widow) drones, as well as a "quick guide" and "field guide" for the Teal 3, which explained to users how to operate the drone.

33.    FE-6 was the Director of Program Management at Teal Drones from 2019 until early 2023. FE-6 worked at the Salt Lake City Facility and reported to Defendant Matus. FE-6 was responsible for ensuring that the Company had proper documentation for its drone products, including testing documentation. This was especially important for Teal's most important customer, the Army, which required "a lot of documentation." As a result, FE-6 had weekly meetings with Army representatives for the latter portion of this time at the Company. Per FE-6, "higher level stuff" concerning the Company's relationship with the Army "would come through [Defendant] George Matus or [Defendant] Allan Evans."

34.    FE-7 was a Senior Accountant at Teal Drones from April 2023 until mid-2024. FE-7 worked at the Salt Lake City Facility and reported to Defendant Lunger, who was Vice President of Finance before her promotion to Interim CFO in March 2024. FE-7 was involved in tracking the Company's payroll, drone production, and operating costs, including creating a spreadsheet tracking drone production. FE-7 also attended meetings between the Company and Army representatives concerning the SRR Program, during which Defendants Matus and Hitchcock spoke on behalf of the Company. FE-7 also had responsibilities concerning the Company's accounts receivable, contacting customers regarding outstanding invoices.

13

## IV.   **SUBSTANTIVE ALLEGATIONS**

### A.   **Background**

35.   The Company was originally incorporated under the laws of the State of Colorado in 1984 under the name Oravest International, Inc. Since then, the Company has changed its name, and business, several times.

36.   In 2019, the Company changed its operating business from the bitcoin industry to the drone industry, and changed its name from TimefireVR, Inc. to Red Cat Holdings, Inc.

37.   The Company then undertook an acquisitive strategy. In January 2020, the Company acquired Rotor Riot, LLC ("Rotor Riot"), a "hobby-based" drone company focused on selling high-performance drone parts such as drone racing hardware.

38.   In November 2020, the Company acquired Fat Shark, which the Company touted as "the leading provider of headsets and goggles for professional FPV (First Person View) racers and drone pilots with an estimated market share of 85%."

39.   And, in May 2021, the Company acquired Skypersonic, Inc. ("Skypersonic"), a provider of drone products and software, particularly for drone inspection flights, which allow a pilot to remotely inspect locations using a drone.

14

40.     These acquired companies primarily served consumer and commercial customers.

**B.     Teal's Background**

41.     Teal was founded in 2015 by Defendant Matus in Salt Lake City, where it is still based and where, prior to and during the Class Period, it has a single location containing offices as well as its sole manufacturing facility. Originally focused on the consumer market, Teal announced its first drone in 2016. This "Teal 1" drone first began shipping to customers to 2018.

42.     Prior to the Class Period, and now, the leading drone producer by market share was Shenzhen Da-Jiang Innovations Sciences and Technologies Ltd. ("DJI"), a Chinese company headquartered in Shenzhen, Guangdong, People's Republic of China. Its drones were, and remain, massively popular with both consumers and institutions, and were used by the US military and federal agencies.

43.     However, US government and military use of DJI drones became increasingly constrained. in 2017, an Immigration and Customs Enforcement ("ICE") memo suggested that DJI drones might be transmitting sensitive information about US infrastructure to China. That same year, the Army ordered troops to stop using consumer drones made by DJI. In 2018, the Department of Defense ("DoD") issued a ban on the purchase and use of all commercial off-the-shelf drones due to cybersecurity concerns. In 2019, the US Department of the Interior grounded all

drones in its fleet (with the exception of those being used for emergency purposes) that were manufactured in China or contained Chinese-made parts, pending a review. The following year, the Interior Department extended that order.

44.   As a result of these restrictions on using drones from DJI and other Chinese companies, the US military and government needed to look elsewhere to acquire drones—and specifically to US companies. These restrictions also meant that drone companies seeking to supply the US military and government had to ensure that they did not use components that were subject to these and other restrictions, in particular by avoiding Chinese-made components.

45.   After launching the Teal 1, Teal began focusing on developing products for government and military applications, eyeing the opportunity created by the restrictions on Chinese-made drones. In 2019, the DoD Defense Innovation Unit ("DIU"), which aims to accelerate commercial technology for national defense, in partnership with the US Army, began the SRR Program with the goal of delivering an inexpensive, rucksack portable, vertical take-off and landing drone for real-time intelligence and surveillance use by soldiers in the field.

46.   The Army structured the SRR Program with phased tranches to maintain flexibility—including between vendors—to respond to advances in technology and user feedback. Interested companies submit applications, and the Army selects certain applicants to participate in an in-person flying demonstration.

16

From that group, the Army picks finalists and awards them with a prototype contract to compete against each other in the development of a drone to meet the program's requirements. Following several program milestones and test events, the Army selects a winner—or winners—to transition into production, ultimately providing one or more low-rate initial production ("LRIP") contract awards. If a company's LRIP meets the Army's requirements, the Army may choose to award that company with a potentially much larger full-rate production contract award.

47.    Teal was among the companies selected to compete in Tranche 1 of SRR Program, for which Teal submitted its Golden Eagle drone. Though the Golden Eagle was not selected as a winner for Tranche 1 production, it was one of only five drones chosen to be on the "Blue UAS" ("unmanned aerial system") list, which is a DIU program that selects aircraft that are designed to meet certain performance criteria and statutory requirements, in particular, compliance with Section 848 of the 2020 National Defense Authorization Act, which prohibited the procurement of UAS built in China. Only those drones included on the Blue UAS list are federally vetted and approved for federal government procurement.

**C.    <u>The Company Acquires Teal and Begins Focusing on the Military and Government Market</u>**

48.    In July 2021, the Company entered into a merger agreement to wholly acquire Teal. This marked the Company's pivot to military and government applications. Indeed, the Company's annual report for the fiscal year ended April

17

30, 2021, filed August 12, 2021, stated that "[w]e principally focus on commercial and consumer (*non*-military) markets for drone products and services, although we are continually exploring opportunities to expand into governmental and military applications."[4]

49.    The Company's acquisition of Teal closed on August 31, 2021. In a press release announcing this event, the Company highlighted that "Teal manufactures the Golden Eagle, one of only five drones approved by the U.S. Department of Defense for reconnaissance, public safety, and inspection applications." Thompson was quoted as stating that "Teal's approval from the Pentagon provides a strategic advantage as the military continues to expand its deployment of drones."

50.    The Company then organized its business into (i) an Enterprise segment, anchored by Teal and also including Skypersonic, and focusing on opportunities in the commercial sector and the military, and (ii) a Consumer

---

[4] Until 2024, the Company used a fiscal year ending April 30, with the first quarter of each fiscal year ending on July 31, the second quarter ending October 31, and the third quarter ending January 31. In 2024, the Company began a transition to a fiscal year matching the calendar year. The Company reported financial results for its fiscal year ending April 30, 2024, then quarterly results for the quarters ended July 31, 2024 and October 31, 2024, and then a Form 10-KT "transition report" for the eight-month period from May 1, 2024 to December 1, 2024. Since then, the Company's fiscal year has ended on December 31. Exhibit A hereto lists the Company's periodic reports filed with the SEC during the Class Period.

18

segment, consisting of Rotor Riot and Fat Shark and focusing on enthusiasts and hobbyists.

51.    After "an internal review of the Company's military and enterprise opportunities to focus our efforts on our Made in America Class 1 ISR Drone development program and the Company's Golden Eagle I, Golden Eagle II, Four Ship and swarm software under development," the Company focused even more sharply on military applications.

52.    On November 21, 2022, the Company entered into an agreement to sell its consumer business, i.e., Rotor Riot and Fat Shark, to Unusual Machines, Inc. ("UM"). Thompson stated that the sale "will allow us to focus our efforts and capital on military and defense." The sale took over a year to close. During that time, Defendant Evans, the Company's COO, resigned effective November 27, 2023, in order to join UM as its CEO.

53.    On February 16, 2024, the sale of the Consumer segment to UM closed, concurrently with UM's initial public offering and listing on the New York Stock Exchange. The total consideration received by the Company was valued at $22 million and consisted of (i) $1 million in cash, (ii) $4 million in a secured promissory note, including a post-closing adjustment for excess working capital of $2 million, and (iii) $17 million in securities of UM (valued at the UM's IPO price for UM's of $4.00 per share of common stock), which represented

19

approximately 49% of UM's issued and outstanding common stock after giving effect to the IPO and to the issuance of common stock to the Company.

54.    After the Company's acquisition of Teal closed on August 31, 2021, the Company developed and launched the "Teal 2" drone, an sUAS (small UAS) purportedly designed for military use.

55.    On March 14, 2022, four days before the beginning of the Class Period, the Company announced that Teal had been selected by DIU and the Army to compete in Tranche 2 of the SRR Program. The Company's press release issued that day stated:

> Following a successful demonstration in September 2021, Teal was notified by the U.S. Army's Short Range Reconnaissance Product Office that it would advance to the prototype phase of the SRR T2 [Tranche 2] program and was awarded a $1.5M prototype contract. Teal will develop a next-generation drone that meets or exceeds the Army's technical system requirements of SRR T2 and competes for the SRR T2 production contract.

56.    That same month, the Army announced that it was combining Tranche 2 and an envisioned Tranche 3, making Tranche 2 (or Tranche 2/3, as it was sometimes referred to) the final tranche of the program.

### D.    During the Class Period, Defendants Tout the SRR Program and the Company's Production Capacity

57.    The Class Period begins on March 18, 2022, the day after Red Cat hosted a conference call with investors and analysts during after-market hours to discuss its financial and operating results for the third quarter of its fiscal year 2022

20

(i.e., the quarter ending January 30, 2022 ("3Q22")). As noted above, by this time the Company had already agreed to sell its Consumer segment in order to focus on its Enterprise segment, which consisted primarily of Teal Drones.

58.    During the March 17, 2022 call, Defendant Hernon stated, in relevant part:

> During the quarter, we doubled the size of the Teal facilities, both to increase its manufacturing output capabilities as well as to house its workforce, which is doubled in size since we acquired Teal. While this strategy adversely impacted short-term revenues, we strongly believe that it better positions us to take advantage of much larger and more durable long-term sales opportunities.

59.    Hernon noted that "[o]perating expenses totaled $3.5 million in the third quarter compared to $1.7 million in the third quarter of last year," which he "attributed to the closing of both the Skypersonic and Teal acquisitions, as well as the significant investments that we've made in Teal since we acquired them back at the end of August." Likewise, when discussing the Company's net losses for the three and nine months ended January 31, 2022, which totaled $2.6 million and $6.9 million, respectively, Hernon emphasized that "[a]s both Jeff and I have noted, we have been making a lot of capital investments in Teal both in its facilities and its people to take advantage of what we see as significant commercial opportunities for the Golden Eagle."

60.    During the March 17, 2022 call, Defendant Thompson stated, in relevant part:

[W]e are poised to grow like crazy. ***The plant is ready to go*** . . . . We are keeping our heads down and getting our manufacturing capability to be able to put out ***thousands of drones a month***. We got to get from where we are now to thousands of drones per month, and that's our focus, and everyone is doing a great job on it.

61.    Thus, Defendants assured investors that the Company's elevated operating expenses, and associated net losses, were no cause for concern because they resulted in a facility that was ready to meet demand.

62.    Two months later, on May 4, 2022, Defendant Thompson presented at the Planet MicroCap Showcase 2022, where he again touted the "doubl[ing] in size of our facility in Salt Lake City, where we're building the Golden Eagle" drone. "We're in full production month [*sic*] and everything's on track right now," he added. Later in the call, Thompson claimed that "we have the production facility done and ramping," as a result of which the Company's cash burn would "go away."

63.    These statements represented that the Company's Salt Lake City Facility, where Teal drones were manufactured, was "ready to go" to produce at scale. This was key to the Company's prospects for winning, and delivering on, an SRR Tranche 2 contract that was Defendants' primary focus during the Class Period, and which would—according to Defendants—involve producing hundreds of millions of dollars' worth of drones, if not more.

22

64. Appearing at the LD Micro Invitational XII Conference on June 7, 2022, Defendant Thompson touted the Company's prospects and the value of the hoped for SRR Tranche 2 contract, telling investors:

> People are expecting the second tranche contract to be anywhere from $100 million to $200 million. And with the war in Ukraine and everyone seeing drones on TV every night, we think it's going to be closer to about $200 million. But we don't know the exact amount. But we think we're well-poised to win this contract. That'll be in early next year. So, we're very well-timed.

65. Thompson added that "the entire goal of the SRR Program is to put drones in every rucksack," suggesting a massive opportunity.

66. Thompson also made impressive claims about the Company's production capacity, telling investors that:

> We acquired the company last year, have doubled the engineering team, built a large facility in Salt Lake City. So, we have had the fully loaded cost of a new startup with zero of the revenue. I know that sounds brutal. But it's going to get really good really quick. We did open up the factory finally in April. And we're in our third month of production.

67. Later during the event, Thompson stated that "[o]ur production line can get probably up to a thousand a month. And then, if we add a second shift," representing that the Company was capable of producing far *more* than 1,000 drones per month if it added another shift. Thompson explicitly stated that the Salt Lake City Facility could produce 1,000 drones a month on just *one* production line and *one* shift, stating: "So, we have enough room in the new building that we just moved

23

into to build three or four production lines with two shifts. But what I just gave you [i.e., 1,000 drones per month] is just one production line with one shift."

68.    On July 27, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for its fiscal year ending April 30, 2022 ("FY22"). During the call, Defendant Thompson stated, in relevant part, that "[t]he Teal Drone production line is in *full swing*[,]" that "[w]e expect to go into mass production *in the fall*," and that the SRR Program's "Tranche 2 . . . is for tens of thousands of drones and *hundreds of millions of dollars' worth of revenue*[.]"

69.    That same day, July 27, 2022, the Company filed an annual report on Form 10-K with the SEC reporting the Company's financial and operating results for FY22 (the "2022 10-K"). The 2022 10-K—which was signed by Defendants Thompson and Hernon—stated that in October 2021, Teal "moved to a new 13,000+ square foot facility" and, in January 2022, "doubled the size of [the Salt Lake City Facility] [i.e., to 26,000+ square feet] in order to *fully scale* production capacity to meet the forecasted growth in demand[.]" The 2022 10-K further claimed that "with Teal's new drone manufacturing facility up and running in Utah, the Company is well positioned to provide drones and services to support the needs of these infrastructure programs."

24

70.    Analysts took note. For instance, ThinkEquity, LLC ("ThinkEquity") wrote in an August 8, 2022 analyst report that Teal has "a fully working production line."

71.    On September 12, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the first quarter of its fiscal year 2023. During the call, with respect to the Salt Lake City Facility's production capacity, Defendant Thompson stated, *inter alia*:

> ***We are currently switching from . . . production validation tests to ramp in mass production* . . . . *If we win Tranche 2, we will be capable of basically hitting the ground running*** and produced [*sic*] this drone as quickly as possible . . . . ***[N]ow we basically fix any issues and problems and vendors and tooling that we want to do to automate production line*** so that we can really scale it . . . . ***We hope to have the construction done in the next month or two and put this behind us and that will also bring us into full mass production.***

72.    On November 29, 2022, Red Cat hosted a conference call with investors and analysts to provide a business update, during which Defendant Thompson stated, in relevant part:

> We are about to start being able to ship over the next four to six weeks, the brand new bird that we've been working on with incredible new payload, with incredible light capabilities. ***So the factory is going to be basically in full swing.*** It's starting now and we'll be able to produce ***thousands of drones per month*** if we have the orders for them. We have the inventory, we have the parts, we have the capital ***and our supply chain is looking pretty good right now***. So the factory is doing awesome.

25

73.    On December 15, 2022, Red Cat issued a press release announcing its financial and operating results for the second quarter of its fiscal year ending April 30, 2023 (i.e., the quarter ending October 31, 2022) ("2Q23"). The press release stated, in relevant part, that "[e]xpansion of [the] manufacturing facility at Teal *[is] expected to be completed in [the] fourth quarter of fiscal 2023* and will *double production capacity*[.]"

74.    The same press release also quoted Defendant Thompson, who represented, in relevant part, that "the production line from our new U.S. factory in Salt Lake City . . . *has the capacity to build thousands of drones.*" Thompson was further quoted as stating that "Teal is working closely with the U.S. Army and will demonstrate the Teal Tranche 2 alpha prototype drone in January 2023."

75.    Also on December 15, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 2Q23. During the call, Defendant Thompson emphasized that "[w]e have invested in a new factory in Salt Lake City that can produce *tens of thousands of drones per year*."

76.    Defendant Hernon, for his part, noted during the call that while operating expenses for 2Q23 were $7 million, more than double the $3 million figure for 2Q22, "[t]his increase largely reflects our people and facilities expansion at Teal, *which at this point is significantly completed*."

77.     On March 7, 2023, the Company hosted a conference call with investors and analysts, during which Defendants Thompson and Hernon discussed the Company's financial and operating results for the third quarter of its fiscal year 2023 (i.e., the quarter ending January 30, 2023) ("3Q23"). During the call, Defendant Thompson represented, in relevant part, that "*[t]he Salt Lake City factory is complete and ready to go*" and "*[w]e now have the capacity to produce thousands of drones per month.*"

78.     Defendants' representations buoyed investor sentiment. A January 30, 2023 analyst report from ThinkEquity, which gave a "BUY" rating to Red Cat stock, noted that:

> Red Cat has invested in supply chain inventory and invested in a new factory in Salt Lake City *that can produce tens of thousands of drones per year*. The factory produces the latest version of the Golden Eagle. *Red Cat is well- positioned to meet the growing demand for "Made in USA" drones*.

79.     Another analyst report, dated March 20, 2023 and published by ThinkEquity, reiterated a "BUY" rating for Red Cat stock, and, stated that:

> *The Salt Lake City factory is complete, and Red Cat now has a state-of-the-art drone factory*. The company has strategic chip inventory to make thousands of drones and only produces the new Teal 2 drone with the new camera payload. *The company now can produce thousands of drones per month*.

27

**E.     Investors Begin to Learn the Truth About the Company's Production Capacity**

80.     Defendants' statements repeatedly touting the Company's Salt Lake City Facility did not match reality, as investors began to learn on July 27, 2023. On that day, after-market hours, the Company hosted a conference call (the "FY23 Conference Call") with investors and analysts to discuss its financial and operating results for its fiscal year ending April 30, 2023 ("FY23"). During the FY23 Conference Call, Defendants revealed that the Salt Lake City Facility was not "*complete and ready to go*" with "*the capacity to produce thousands of drones per month*," as Defendant Thompson previously stated on March 7, 2023.

81.     Rather, the facility could at that point produce only *100* drones per month and was still being built, refined, and expanded. Specifically, Defendant Hernon disclosed during the FY23 Conference Call that Teal's operations personnel were ***still*** "focused on building, refining and expanding our production capacity, which is *presently at 100 systems per month*," and that Defendants "*believe* [they] can more than triple [this capacity] over the next *few years*."

82.     During the FY23 Conference Call's question-and-answer phase, an investor noted that "[y]ou said production is 100 per month" but "I think in the past you'd reference maybe 1,000 per month[,]" and asked "[i]s the 100 per month going to increase or is that pretty much where we're at for the rest of the year?" In response, Defendant Thompson stated, in relevant part:

28

[F]irst you just got to get the factory up and running and make sure that you have all the issues out of the production line to reliably do 100 a month, as some of our team says, we do 100 a month, no problem at ease right now. And that number is already growing slightly. ***But you don't go off and build 1,000 drones***, because there's different frequencies . . . . ***And so you can't just make . . . batches and hope for the best of 1,000 and then ship them out.***

83.   In response to the same question, Defendant Hernon stated "***I don't personally recall us ever saying we could produce 1,000 a month.***"

84.   Also on July 27, 2023, during after-market hours, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY23 (the "2023 10-K"). The 2023 10-K reported, *inter alia*, that construction of the Salt Lake City Facility was only "***substantially completed***[,]" reiterated that its "***production capacity was approximately [only] 100 drones per month***[,]" and advised that "maximum production capacity for this facility can reach 1,000 drones per month over the next ***2 to 3 years, provided that additional capital investments are made and manufacturing efficiencies realized***."

85.   Following Red Cat's FY23 Conference Call and its filing of the 2023 10-K, the Company's stock price fell $0.10 per share, or 8.93%, to close at $1.02 per share on July 28, 2023. Despite this decline in the Company's stock price, the stock continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions

29

concerning the Salt Lake City Facility's production capacity and the other matters that Defendants misrepresented as set forth herein.

86.   Analysts noted the new information Defendants provided concerning Red Cat's production capacity. For example, a note published August 14, 2023 by ThinkEquity stated that "During Fiscal 2023, Teal substantially completed construction of its new manufacturing facility in Salt Lake City, UT, and began to scale production levels. *We estimate the current production at 150 drones per month*. At 250 drones a month, the target gross margins are 40%. The maximum production capacity for this facility can reach 1,000 drones per month *over the next 3 years with additional capital investments*." This was in stark contrast to ThinkEquity's March 20, 2023 understanding that Red Cat "*now can produce thousands of drones per month*."

87.   For instance, during a March 18, 2024 call that Red Cat hosted with investors and analysts to discuss its financial and operating results for the third quarter of its fiscal year 2024 (i.e., the quarter ending January 30, 2024) ("3Q24"), Defendant Thompson stated, in relevant part:

> Production facility in Salt Lake City **is in full mass production mode** . . . . **We are now demonstrating that we can build tens of thousands of drones yearly.**

88.   Five months later, on August 8, 2024, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results

30

for its fiscal year ending April 30, 2024 (the "2024 10-K"). The 2024 10-K, which was signed by Defendants Thompson and Lunger, stated:

> The Teal 2 is manufactured exclusively at Teal's purpose-built factory in Salt Lake City, Utah. Teal originally moved into the facility in October 2021. In January 2022, Teal doubled the size of the facility, which now totals approximately 22,000 square feet, to fully scale production capacity to meet the forecast growth in demand and to house its expanding team of software and technology engineers. ***We believe that maximum production capacity for this facility can reach 5,000 or more drones per month over the next few years,*** provided that additional capital investments are made and manufacturing efficiencies realized. Manufacturing in the United States, "Made in the USA," is a critical consideration of the U.S. government and other state and local government agencies. ***During Fiscal 2024, Teal continued to scale the manufacturing facility***, including dedicated teams for production and assembly, manufacturing engineering, supply chain and logistics, warranty and returns, as well as a flight operations team that is focused on manufacturing and quality assurance and quality control.

89. That same day, August 8, 2024, the Company held an earnings call. During the call, Defendant Thompson told investors, in response to an analyst question about "the capacity at Salt Lake," that "***the Salt Lake facilities [sic] can easily do thousands of drones***. Not easily. It's hard to do thousands of drones a month, but we can get to thousands of drones a month for the Teal 2/Teal 3 ***based on getting the demand that we want from that***."

90. Another analyst also asked about the Company's production, noting that "[t]here was a period of time where you lowered production in Q4 to get the Teal 3 out." This referred to the Company's earlier disclosure, on March 18, 2024, that "we must switch production to the Army prototypes in April to satisfy the SRR

31

final prototype delivery in May," which was the deadline for Teal and Skydio to make "final delivery" of prototypes of the drones each had submitted for Tranche 2 of the SRR Program.

91. The analyst question on August 8, 2024, continued: "So, just generally asking about the production capacity capabilities. So is that back up and running things going out the door again?"

92. Defendant Thompson responded:

So, *we are back in production*. We're also – we are in a pretty large hiring spree right now to scale production of the future Teal Drones that we – it's the drone that we actually submitted for the Army prototype. We are preparing for large-scale production and moving into the Teal. We're calling it currently the Teal 3. So *we're back in production*.

93. On September 23, 2024, during after-market hours, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the quarter ending July 31, 2025 ("1Q25") (the "1Q25 Conference Call"). During the 1Q25 Conference Call, Defendant Thompson disclosed that, contrary to his prior representations that the Salt Lake City Facility was "in full mass production mode" and capable of "build[ing] tens of thousands of drones yearly," and that the Company was "back in production" on August 8, 2024, the Company had in fact spent "*the past four months . . . retooling* and preparing for high volume production." Defendant Thompson admitted that a "pause in manufacturing of Teal 2 and building

32

our Army prototypes impacted Teal 2 sales" because, *inter alia*, the Company "*couldn't produce and sell Teal 2 units[] while retooling [its] factory*."

94.     Following Red Cat's issuance of the 1Q25 Press Release and Defendant Thompson's disclosures during the 1Q25 Conference Call, the Company's stock price fell $0.80 per share, or 25.32%, over the following two trading sessions, to close at $2.36 per share on September 25, 2024. Despite this decline in the Company's stock price, Red Cat securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning, among other things, the Salt Lake City Facility's production capacity, Defendants' progress in developing the same, and the overall value of the SRR Contract.

**F.      Information from Former Employees Confirms That Defendants Misrepresented the Company's Production Capacity and the Quality and Failure Rate of Its Drones**

95.     Information from six former employees of the Company confirms that Defendants' representations concerning the Company's Salt Lake Facility and the quality and failure rates of the Company's drones created a false and misleading impression.

*1.      The Company's Production Capacity Was a Fraction of What Defendants Claimed*

96.     Numerous former Company employees—many of whom worked at the Salt Lake City Facility—report that the Company's manufacturing capacity was

33

nowhere near what Defendants claimed. FE-2, the former Lead Electronic Repair Technician, reported that the Company could produce, at most, 200-300 drones a month. FE-7 created a spreadsheet that tracked the Company's progress in producing drones; the spreadsheet indicated how many drones were in production, how many were complete, how many were in testing, and how many "came back with an error." FE-7 created this spreadsheet for VP of Manufacturing Jay Weight's use. FE-7 recalled that the Company was constantly behind its production targets, and that it struggled to produce even 200 drones a month during FE-7's tenure; the highest monthly production that FE-7 recalled was about 250 drones.

97. Corroborating this, FE-2 recalled that the Company used a Google Sheet document to track production numbers and that Jay Weight updated the sheet. The Company's quota of completed drones to reach, and its progress towards that goal, was taken from that document and projected onto a screen at the Salt Lake City Facility. The graphics on the screen tracked output by drone type, with a black line for target numbers and a colored line showing actual production. He said that display was nowhere near 1,000 per month. FE-2 recalled that he could "count on one hand" the number of times he "saw it crack triple digits." Because that facility had "one big manufacturing space," the screen was visible to anyone at the facility. FE-4 also recalled that management displayed production targets, and the Company's progress towards those targets, on a wall at the Salt Lake City Facility. FE-1 recalled the

34

display as well, noting that it tracked numbers hourly and "updated constantly." FE-6 said that this screen would show the number of drones the Company was "shooting for" in that month, and its progress to date.

98.    Corroborating these accounts, FE-3 said that the Company was "not even close" to producing 1,000 drones per month during his time there, which ended in December 2023. "When I left, they did not have the manufacturing capability built up," FE-3 recalled, estimating that the Company could produce approximately 100 drones per month at that time. FE-4 corroborated this, stating that the Company could produce roughly 100 drones per month by the time he left in mid-2024. FE-1, the former Vice President of Engineering, similarly reported that the Company produced approximately 150 to 200 drones per month in 2023, and that even reaching 150 required a "huge effort." FE-1 estimated that it took two days from a drone to get through the production line "all the way into finished goods," and only if the process did not run into any problems. Regarding Thompson's March 2023 statement that the Salt Lake City Facility could produce "thousands of drones a month," FE-1 said, "to do that many, I'm not sure what he would have gotten that from." FE-6 said the Company was producing 100-200 drones per month, could not produce 1,000 drones per month by the time he left in early 2023, and that getting to that point would take "a whole lot of money," and more production lines, more facility space, and more employees.

> 2.    *The Company's Salt Lake City Facility, Manpower, and Financial Position Were Insufficient to Meet Defendants' False Claims*

99.    FE-2 said the Company would need facilities "three times the size of what existed during his employment in order to feasibly produce 1,000 drones per month. FE-2 said that when he was there, there were "no more than 10" people working on the production line at any given time. FE-4 agreed that expanding production to 1,000 drones per month would have required a larger facility and an additional production line. According to FE-4, the Company occupied two suites in the building and planned to take over a third suite and have multiple production lines running simultaneously for manufacturing and testing. However, the Company did not have sufficient funding for this expansion, and was planning to use the hoped for SSR contract as a basis to secure that funding; "we were trying to get the contract so we could get the money to expand the building," according to FE-4.

100.    FE-5 often spoke with Emily Endicott, who was then the Manufacturing Engineer and is now the Manufacturing Process Owner at Teal. FE-5 learned from Endicott that Endicott expressed concerns to management, including Defendant Hitchcock, that their production demands were not achievable because the Company did not have sufficient manpower or capacity. Endicott, according to FE-5, had "major concerns" about the demands that management made regarding manufacturing. Per FE-5, Matus was at the Salt Lake City Facility "a lot."

101. FE-7's information corroborates these accounts, recalling that Company employees, including Jay Weight, expressed concerns about whether the Company could satisfy production targets and deadlines that Defendant Thompson had committed to. Per FE-7, Jay Weight "always had concerns about meeting quota," and that Weight expressed his concerns to Thompson regularly in meetings—where production figures were shared and discussed, including with that Defendants Thompson, Hitchcock, and Lunger. Thompson would push back on Weight's concerns, saying "you got to do it." FE-7 recalled that in a meeting around 4Q23 or 1Q24, Defendant Thompson expressed that the Company needed to produce 1,000 drones monthly, and that Weight spoke up, saying "there's no way" and that he did not want to work the production crew "24/7."

102. FE-7 reported that the Company met some Army orders only by using drones produced for other customers, which of course caused a delay in fulfilling those other customers' orders. According to FE-7, the Army was not told the full truth. FE-7 attended meetings between the Company and the Army regarding the SRR Program; FE-7 was called in to discuss production levels, specifically when a deadline was approaching. According to FE-7, Defendant Thompson assured the Army that it would "get your order," and did not disclose to the Army that the Company was encountering significant challenges in producing the drones the Army

37

had ordered. Defendant Matus also assured the Army that the Company would meet its quota, according to FE-7.

103. Even though the Company reallocated drones produced for other customers to satisfy Army commitments, there were times that it fell short. Per FE-7, shortly before his departure, the Company missed a production deadline for the Army; FE-7 believed that the Company was only able to produce about half of the order. The Army gave the Company "some kind of extension," but FE-7 understood that if the Company also missed that extension it would be "in breach of the contract." The Company's production pause in 2024 lasted longer than a month, according to FE-7, and contributed to the Company's miss for the Army.

104. FE-2 recalled a frantic effort in late 2023 to fulfill an order of approximately 240 drones for the Department of Defense. The Company was in "panic mode" trying to produce the drones on time, working at breakneck speed. In order to meet the timeline, the Company was "cutting corners." In particular, the Company relaxed its acceptance criteria for the drones to avoid the difficult and time-consuming process of determining why many of its drones failed quickly after being produced—in many cases before having any flight time whatsoever. Rather than assure that the drones worked as specified, the Company lowered its testing criteria.

105.    Even then, the Company achieved the timeline "by the skin of their teeth," and was forced to use an upgraded, expedited shipping option to gain another two or three days to finish production. FE-2 recalls Company employees boxing up drones for the order as the FedEx delivery vehicle arrived to pick them up. The Company's management was "grossly overestimating how quickly they could build drones," according to FE-2. FE-3 recalls that the Company was frequently behind its production targets, which was discussed in meetings by, among others, Defendant Evans—the Company's COO from June 3, 2021 until November 27, 2023—who exhorted employees to increase the pace of production to meet those targets. Indeed, according to FE-3, the Company sometimes had to hold orders back from some customers in order to fill orders from others because it could not produce drones quickly enough to honor all of its sales commitments on time.

106.    FE-7 stated that the Company did not have enough capital to scale its production or to hire more workers, even though the production line was understaffed and overworked, so much so that FE-7 "felt bad for the guys that were working on the drones." Indeed, the Company's financial condition was so poor that, at times in 2024, FE-7 doubted whether the Company would be able to meet its payroll commitments, and that at one point the Company had only around one thousand dollars in cash. Per FE-7, the Company relied on customer payments and collections, with FE-7 personally calling customers regarding unpaid balances so

that the Company could stay afloat. FE-7 also recalled that the Company received a grant from the State of Utah that was intended for improvements to the Company's production line, but the Company instead used the money to cover operating costs, including payroll, and that FE-7 was asked, but refused, to prepare a report showing that the funds were used as intended.

107. FE-7 noted that the Company was not breaking even on drone sales. Approximately four months after joining the Company, i.e., in or around August 2023, FE-7 conducted an internal analysis reaching this conclusion; for instance, the Company was selling drones for approximately $20,000 even though they cost about $33,000 to produce. FE-7 shared this analysis with both Jay Weight and Defendant Lunger; in response, Weight said that the Company should increase its prices, and the Company did so several months later.

108. Reflecting the fact that the Company was struggling to complete all necessary production tasks, the Company began outsourcing certain engineering tasks in mid-2024, according to FE-5. FE-5 learned from Emily Endicott that the Company contracted another company to create molds for parts for drones. After FE-5 left the Company, he learned from a mechanical engineer still at the Company that this outsourcing relationship had expanded. FE-5 believed that the other company had a preexisting relationship with Defendant Hitchcock.

40

109.   In an attempt to scale its production, a new head of engineering that was hired during FE-3's tenure hired "low-wage" workers and sought to train them to assemble the Company's drones. However, the process was too complex for inexperienced employees, so this course of action failed to address the Company's lack of sufficient production capacity.

3.    *The Company's Production Suffered from Massive Design and Quality Control Problems*

110.   The necessity for manual testing of each individual drone contributed significantly to the slow rate of production. FE-4 said that the Company had to do a flight test of each drone it produced, which took a significant amount of time, creating a bottleneck in the process. FE-7 also recalled that the Company did not have sufficient people to test drive the drones. FE-1 agreed that the biggest obstacle to scaling production was testing the drones and then addressing any issues revealed by the tests. Automating the testing process was the "key" to scaling production, according to FE-1, but the Company "absolutely" was not able to automate testing.

111.   Rather, testing took at least thirty minutes per drone, but only if everything went smoothly, according to FE-1. However, it did not go smoothly most of the time, as problems were frequently revealed by flight testing, according to FE-1, including issues with flight controllers, estimators, and software. "It was really hard, and the yields were poor at best," per FE-1, who estimated that for every 100 drones tested, approximately only 35-40 did *not* need to be returned to the

41

engineering team for inspection and repair. FE-2 reported that the maximum production he recalled, of 200-300 drones per month, could be achieved only by ignoring persistent quality control issues, which were "immense." If a flight test revealed a problem, the drone had to be disassembled and inspected.

112. Underlying this poor yield was the fact that, according to FE-3, the Company never had a stable design that could be produced consistently at scale during his tenure. FE-1 recalled that that the flight software was still being worked on while the Company was also working on next-generation design. Per FE-2, the design of the Teal 2 was only approximately 70% complete because the Company did not thoroughly test the product before beginning production. Instead, the Company took a preproduction unit, which required additional testing and engineering work, and put that design into full production, which predictably resulted in recurring problems. FE-3 corroborated this account, stating that the Company struggled to produce a stable drone during the entire period of his employment, with the design being constantly revised to address problems as they arose. For instance, FE-3 recalled, engineers modified the propeller design, but the changed design failed during operation, with propellers falling off of drones mid-flight. FE-3 believed these problems reflected the fact that the Teal 2 was adapted from the prior Golden Eagle drone, which was for consumer use, rather than creating a new design for military use from the ground up.

113.   FE-2 recalled that one of the recurring issues with the Teal 2 drone was that many units, when beginning flight, would immediately take off to one side or the other and "run away," rather than going straight. FE-2 said the Company was unable to resolve this issue during his time there. FE-7 also recalled this issue, referring to "zombie failures" where a drone would fail unpredictably, including flying off in an unexpected direction. FE-7 described this zombie defect, the drones "would just shoot off and take off somewhere," and Teal "didn't know where it went." FE-7 attended a meeting about the "zombie" issue with Defendant Lunger and Steve Lunger (Defendant Lunger's spouse, who was also a Company employee). FE-3 similarly recalled "regular flyaways where you lost communication control with the drone," and the drone "would just do its own thing." According to FE-3, "[c]ommunication was a huge issue with our drones."

114.   Another issue, according to FE-2, involved the Teal 2's single-board computers ("SBCs"), which housed the drone's radio, flight controller, motor controllers, gimbal controller, and video encoding, among other components. These SBCs frequently failed during start-up, such that the drone would begin to start up, with indicator "beeps," but then "never turn on," at which point "[y]ou just knew the board's dead."

115.   FE-2 explained that the Teal 2 had more problems than Golden Eagle because "they were trying to fit new requirements into a Golden Eagle frame," but

43

the frame was not designed to withstand the different requirements of the Teal 2. FE-2 descried Teal 2 was "just an upgraded Golden Eagle."

116.    FE-3 explained that these engineering flaws limited the Company's manufacturing capacity, because they created problems during production that slowed down the process. FE-4 also recalled that the Company "had to retool some of the drone parts to make them easier to be built" in order to address these manufacturing problems. FE-7 stated that the manufacturing pause in 2024, which Defendants disclosed on September 23, 2024, was connected to the "zombie failure" issue, and that the Company eventually determined that a part needed to be replaced across all units.

117.    According to FE-1, the Company tracked production problems in detail, including in "daily yield reports" that were sent to the C-suite, including Thompson and Matus, and which FE-1 received through e-mail. Jay Weight was in charge of producing the yield reports, which tracked how many drones failed and for what reason, because each failed unit had to be inspected and repaired.

118.    Thus, not only the necessary testing of each drone, but also the frequent failures revealed by such testing (i.e., the poor yield), posed major constraints to the Company's production levels. FE-1 said that no one in the Company could have been unaware of these failures, which were "pretty obvious to everyone," and was discussed in meetings. FE-1 recalled that if one spoke to employees in 2024,

44

"everyone says, yeah, we are struggling to get 10 drones out a week" or "20 drones out a week."

119.   In addition, the inexperience of the Company's manufacturing operators and the poor quality of the Company's process books, which set forth how to manufacture each drone model, contributed to the many quality control issues arising in the drones that the Company produced, according to FE-2.

120.   FE-2's account of the Company deciding to lower testing criteria is consistent with FE-5's report that Defendant Hitchcock instructed FE-5 to state in a manual for the Army that a drone model had a thirty-minute flight time—as the Army required—despite the fact that, in testing, the drone could only achieve a twenty-five minute flight time. FE-5 wanted to use the accurate figure of twenty-five minutes, but was instructed by Defendant Hitchcock to state the thirty-minute flight time in the manual. Hitchcock stated that this was a "business decision." FE-5 said that the manual given to the Army stated that the drone had a thirty-minute flight time.

> 4.    *The Company's Supply Chain Constrained its Production Capacity and Contributed to Quality Control Problems*

121.   According to FE-4, the Company's supply chain was also one of the "biggest holdups" constraining the Company's production capacity. During his time at the Company, the Company was working to expand its supplier base to support higher production levels, including for mechanical parts, electrical parts, and printed

45

circuit boards. Because the Company was pursuing US military customers, it had to comply with military requirements that it not use components made in China and instead use components made in the US. Because a large portion of the Company's suppliers were Chinese, the Company's pivot to pursuing military customers required it to find new suppliers in the US. FE-4 was directly involved in this effort. When FE-4 left the Company in mid-2024, the Company was still working on this supply chain transition. At that time, the Company's supply chain was not sufficient to produce 1,000 drones per month, according to FE-4. Supply chain problems slowed down production, which was regularly discussed during internal meetings attended by FE-4.

122. Furthermore, according to FE-2, the Company did not have an incoming quality assurance ("IQA") process to assess the quality of the goods received from its suppliers. This is a key process and should identify quality issues before supplies are used in production, at which point addressing any issues is usually much more disruptive and costly. Thus, according to FE-2, component failures were usually not identified until a component was used in production, or by the customer. As an example of one problem that an IQA process would be intended to identify, FE-2 recalled that a supplier put balancing compound, which is used to balance certain electric motor components, into a "locking lug where the propeller was supposed to lock in." As a result, the propellers failed to lock, causing flight

issues. FE-2 was one of the Company employees who discovered the issue when inspecting a drone that failed during a flight—meaning that it had already gone through the production line.

123.   FE-2 believed that the California Department of Forestry and Fire Protection ("Cal Fire"), one the Company's public safety customers, had issues with the locking propellers and wanted Teal to look at the problem. FE-2 said the issue affected "hundreds of arms and motors," but did not know exactly how many drones were affected because Teal received the motors in groups and caught some before they were assembled into arms. The issue affected some drones that had already been produced and shipped, which would should have been prevented by an IQA.

124.   FE-3 also recalled quality issues in the Company's supply chain, with inconsistencies in the parts used to assemble drones contributing to a lack of reliability of the Company's drones. As a result of those inconsistencies, individual units of the same drone did not necessarily operate in the same manner, though they should have.

125.   The Company's lack of any IQA processes was repeatedly raised by employees, including with Jay Weight. "A lot of people" brought it up, including Jeff McGrath, the current Director of Quality, as well as multiple engineers. There was no official explanation from management regarding the lack of IQA; FE-2 said

47

that the "unofficial" explanation was that the Company's employees were too busy with other tasks and did not have time to devote to IQA.

126. Further, according to FE-2, by the time he left the Company, it could not produce the Teal 3 (or Black Widow) drone on the production line. Because the Teal 3 was significantly different than the Teal 2, with different arms, batteries, motors, and frames, the Company would have to change many fixtures on its production line in order to produce the Teal 3 on the line. The Company had not done this by the time FE-2 left in early 2024. Instead, Teal 3 drones were individually built by hand by members of the engineering team. FE-2 stated that both Jay Weight and Defendant Matus were aware that the production line was not set up to produce Teal 3 drones.

127. Further, reflecting the necessity of testing each drone before shipping, and the deficiencies in the Company's manufacturing practices, customers returned a large number of drones received from the Company.

128. FE-2 stated that, during his time at the Company, approximately 25% of shipped Teal 2 drones failed before even being flown by a customer, and "would not turn on out of the box. FE-2 characterized these as "manufacturing failures" caused by quality issues. According to FE-2, the failures were mixed, but the result was that "the drone was not flyable."

48

129.   Per FE-2, the Company received returns of individual drones more than once, i.e., after receiving a specific, individual drone and finding it defective, the customer returned the drone to the Company, which attempted to diagnose and fix the issue, then sent it out to a customer, only for the customer to find it was still defective and return it again. In fact, according to FE-2, some individual drones came back three, four, or even five times. According to FE-2, "[t]he vast majority of them would fail in the field once at least, and then they would fail in the field again after we sent them back." FE-3 also stated that "[y]our odds were greater than 50% you were going to have issues with it," and recalled the Company having to replace the same drone two or three times in some instances. FE-2 stated that "[t]his is not due to pilot error," but rather "actual production faults" and "production issues."

130.   FE-2 stated that the elevated number of returned Teal 2 drones persisted during his entire tenure at the Company, which ended in early 2024, and estimated that 50-90 drones were returned each month during his tenure. Further, for a period of time in early 2023, the Company was receiving more returned drones than it was manufacturing. The situation was evident to other employees. FE-3, who interacted with customers, including the US Border Patrol, Cal Fire, and the US Forest Service, recalled that customers often encountered problems when testing drones that they received, and that the Company would ship out replacements for those faulty units. FE-5, who did not have responsibility for returned drones, recalled that the Salt Lake

City Facility had a room filled with "a lot" of returned drones, and that employees were told not to spend time diagnosing and fixing returned drones, but to just ship another to the customer. FE-7 also recalled about 75 to 100 defective drones that had been returned by customers, including the Army, sitting in one area of the Salt Lake City Facility, and that the Company did not have sufficient manpower to inspect and troubleshoot those drones.

131.    FE-2 stated that management was aware of these problems, but seemed more concerned about shipping drones—and being able to say that they had done so—than with resolving the quality issues that led to the returns. FE-2 discussed the elevated return rate with Jay Weight and Emily Endicott during the last few months of his time at the Company. In addition, FE-2 stated that the persistent quality failures in Teal 2 drones were raised with Dave Barrus, who was responsible for customer service issues and reported to Hitchcock. Barrus told FE-2 that he raised these problems with Hitchcock, and learned that management was aware of these facts but would "deal with it later." FE-2 also recalled discussing with Barrus "the backlash from customers who were getting failed products." FE-3 recalled that that some customers became frustrated with the high failure rate, and that he and other sales staff prepared weekly reports that documented customer problems, which went to his manager.

**G.    Defendants Continue Touting the Value of the SRR Program and Announce that Teal Has Secured a Contract**

132.    Defendants continued to tout the value of the SRR Program during the Class Period. During the FY23 Conference Call that took place after market hours on July 27, 2023, Defendant Thompson represented that the value of the SRR Contract could potentially exceed a billion dollars. Specifically, he noted that, although "[w]e still do not know the size of the award for the now combined Tranche 2 and 3" of the SRR Program, "the information we do have" is that "Tranche 1 production award was for $100 million for approximately 1,000 drones" and "Tranche 2 and 3"—which were combined in March 2022—"is for approximately 12,000 drones[.]" Defendant Thompson thus represented that the Tranche 2 (or 2/3) contract the Company was pursuing was worth, at least, hundreds of millions of dollars.

133.    On December 14, 2023, the Company announced that DIU and the Army had selected Teal "as one of two finalists competing in the Short Range Reconnaissance Tranche 2 (SRR T2) Program of Record," and as a result would be "awarded $3 million of additional funding to support final prototype development and completion of remaining SRR milestones." The other finalist was Skydio.

134.    On March 18, 2024, during a conference call that Red Cat hosted with investors and analysts to discuss its 3Q24 financial and operating results, echoing his July 27, 2023 remarks, Defendant Thompson stated, in relevant part, that "[t]he

51

[SRR] contract is for approximately 12,000 drones. The award for the first tranche of production drones two years ago, was $100 million for 1,083 drones." This again expressed to investors that the Tranche 2 SRR contract was worth at least hundreds of millions of dollars.

135.   Defendant Thompson made that clear in the Company's earnings call on August 8, 2024, when he told investors that:

> This Program of Record selection process has gone on for over five years. It started with 37 companies and is now down to Red Cat and one other company. The final test for the Army was in May. We had to deliver approximately 50 final prototype systems. The final down collection [*sic*] is scheduled for the end of next month, September 2024. ***We believe this production contract will be in the hundreds of millions***.

136.   On September 23, 2024, Defendants issued "[g]uidance of $50-$55 million for calendar year 2025 exclusive of government or NATO programs of record," meaning that it excluded the SRR Program, as the Company had not yet secured a contract under the program.

137.   On November 19, 2024, the Company made an announcement that investors had been waiting for. That day, Defendants issued a press release (the "November 19, 2024 Press Release") announcing that the Company had won what they claimed was the only SRR Tranche 2 Contract, stating that the Company "has been selected as ***the*** winner of the U.S. Army's Short Range Reconnaissance (SRR) Program of Record." The press release stated that the Company "is focused on

52

ramping production of Teal's next generation system ***to meet the Army's currently stated acquisition objective for 5,880 systems***, which is subject to change over the 5 year period of performance."

138.    The same day, after regular stock market trading hours, Red Cat hosted a conference call with investors and analysts (the "November 2024 Conference Call"), during which Defendant Matus represented, *inter alia*, that total revenue under the SRR Contract could exceed $260 million, stating:

> ***[T]he average price per system . . . includes [sic] two drones and one controller is around $45,000, depending on configuration. And the Army's stated authorized acquisition objective or AAO, is 5,880 systems. As [Defendant] Geoff Hitchcock will talk about, you can do some simple math on those numbers. And we also expect the Army to buy spare parts, training and maintenance in addition to systems themselves.*** I think it's also worth noting that the Army's acquisition objective number was created before the invasion of Ukraine and before the world realized that drones are really as impactful as the introduction of the machine gun, a 100 years ago. ***In my opinion, the United States Army is going to need a lot more drones.***

139.    Likewise, Defendant Matus stated that "the contract can go up to five years, but again, they need ***at least 5,880 systems*** and they want to field those as fast as possible as budget allows."

140.    Also during the November 2024 Conference Call, Defendant Thompson assured investors that Red Cat could realize up to $50 million to $79.5 million in revenue from the SRR Contract during the Company's fiscal year 2025 alone.

53

141.   Brendan Stewart, the Company's Vice President of Regulatory Affairs, told investors on the call that:

> Right now, in the National Defense Authorization Act, we're sitting at a [*sic*] approximate program line value . . . *that supports SRR of $79.5 million*. Now that is a – that number is not final. The NDAA is still not passed and won't be for about 60 days. But we feel very confident that through this support, we'll be able to expand this program going into the future.

142.   Shortly thereafter, Defendant Thompson stated:

> [W]e gave guidance of $50 million to $55 million for calendar 2025 . . . . And if you add the number that Brendan was talking about . . . for 2025, which is that *$79 million that could possibly put the calendar year on $120 million for next year*. So, that's pretty exciting. And that would just be the army . . . . [W]e're trying to figure out that line item that [Brendan Stewart] talked about is *up to $79 million for the – for 2025* . . . . [W]e're supposed to be making the first deliveries in late spring, and we only have till the end of September to deliver on 2025 calendar. *So, it could be up to $79 million.* Once we have more clarity, *we think it's easily going to be in the close to $50 million anyway for 2025 calendar*. So, guidance will probably and this isn't official guidance yet. But again, we just got this notification and we think *it'll be approximately $50 million from SRR and other things that will add to that* as other branches of the Army piles on there.

143.   During the same call, Defendants Thompson and Hitchcock represented that Red Cat could earn an additional *30% to 70%* of revenue from the SRR Contract based on supplemental services. Defendant Thompson stated:

> So, I'm learning about how these programs of records [e.g., the SRR Program] work [is] that *they typically have anywhere from 30% to 65%, 70% sometimes of additional revenue from training, spares and repairs*."

144.   Defendant Hitchcock added:

So, the key takeaway from this is what we're talking about today specifically is the SRR Program of Record. And typically, year-over-year, *you could expect somewhere in the range of 30% added for spares, repairs and training year-over-year*."

145. Consistent with Defendants' announcement that the Company was "*the*"—i.e., sole—winner of an SRR Tranche 2 contract, Defendant Matus represented to investors that the Company had secured the entirety of Tranche 2 of the SRR Program, stating:

I also saw another question asking if Red Cat is the only drone manufacturer awarded an SRR production selection? And *yes, the answer is yes. Teal is the only vendor selected to move into production*.

146. Defendant Matus also represented that the Company was ready to massively scale production, stating that

What we're looking at now is entering low rate initial production *early next year, that'll be in the hundreds of systems per month*. And *then by the end of next year, as demand ramps up and deliveries ramp up, we'll be in the, thousands per month*. Right now, we're still operating a single shift on our production line. *We can easily go to two shift[s] or three shift[s]*, including weekends.

147. On this news Red Cat's stock increased by *34.3%* on November 20, 2024. While the Company's stock had closed November 18, 2024, prior to Defendants' SRR announcement, at $4.90 per share, by November 29, 2024, it had more than doubled to close at $11.77 per share.

148. The following month, on December 16, 2024, the Company held an earnings call regarding its financial results for the quarter ending October 31, 2024.

55

During the call, Defendant Thompson repeatedly emphasized that the Company's SRR contract was a "sole source" contract under which the Army would purchase 12,000 drones, stating "And what we are doing now is we're taking the Black Widow, which is the winner of SRR Sole Source, which is going to be 12,000 drones out there." Defendant Lunger also stated during the call that "We won a sole-sourced contract," and assured investors that the Company would progress "from LRIP to full rate production with the Black Widow."

149. In light of the SRR contract, Defendants updated their 2025 guidance from a range of $50 million to $55 million to a range of $80 million to $120 million, including SRR sales—an increase of up to $70 million, or $47.5 million (over *90%*) at the midpoint.

150. Analysts focused on, and accepted, Defendants' statements about the SRR Program size and Red Cat's revenue guidance, for example with Ladenburg Thalmann & Co. Inc. publishing a note on December 17, 2024, with the heading "Benefits of SRR Win Continue to Reverberate; Reiterate Buy, Raise PT to $15." The note stated regarding the SRR Program that "[t]he typical system (two UAVs) will cost about $45,000 each. This award is for almost 6,000 systems. This would amount to about $260 million over the next 3-5 years, with the possibility for that number to increase for spare parts and training." The analysts further noted "the significant upswing expected from the Short-Range Reconnaissance (SRR)

contract," and that "the company yesterday released their guidance for the first time post SRR, and it points to $100 million at the mid-point for [calendar year 2025]. Our new outlook calls for about $92 million."

151. Similarly, ThinkEquity published a note on November 22, 2024 with the heading "RCAT Secures U.S. Army SRR Contract, Paving the Way for Transformative Growth," which reiterated its "BUY" rating and increased its price target from $5 per share to $12 per share. The note stated that "[t]he contract encompasses 5,880 systems, with each system including two drones and one controller, priced at approximately $45,000 per unit. Additional revenue streams are anticipated from spare parts, training, and maintenance contracts, which historically add 30-70% to the value of initial contracts in similar programs," and that "[t]he SRR contract is a significant milestone for Red Cat, potentially generating $260 million in revenue over the next five years."

### H. Kerrisdale Capital Reveals that Defendants Had Misled Investors Regarding the SRR Contract and the Company's Production Capacity

152. However, on January 16, 2025, Kerrisdale published the Kerrisdale Report, alleging, *inter alia*, that Defendants had overstated the value of the SRR Contract, which Kerrisdale found was only worth approximately $20 million to $25 million based on U.S. Army budget documents. The Kerrisdale Report also alleged that Defendants had been misleading investors about the Salt Lake City Facility's

production capacity for years, while also raising concerns about the timing of executive departures and insider transactions that took place shortly after Red Cat announced it had won the SRR Contract.

153.   More specifically, the Kerrisdale Report stated, *inter alia*:

**The SRR contract that Red Cat won in November and preemptively announced without the Army's permission is much smaller and less favorable than management has intimated.** Red Cat management has spent years hyping the potential of Tranche 2 of the Army's [SRR sUAS] program for which the company was competing. Investors were initially led to believe that the revenue potential of a win would be in the billion dollar range over the course of 5-10 years. *Upon winning the contract*, *management* curbed those expectations by quite a bit, though *still* *signaled revenue of $260 million for 5,880 drone systems over the next five years, plus about 30% of that sticker price to be earned in repairs, replacements, and training services. Management called out $80 million in 2025 expected revenue*, specifically citing the National Defense Authorization Act (NDAA) text.

But the NDAA says nothing about the SRR funding in particular and *the Army's detailed funding request for 2025 shows that the service expects to procure between 275 and 300 systems annually at a cost of $20-25 million*, which is a very far cry from Red Cat's 2025 SRR guidance. *Additionally, the cost for repairs, replacements, and related services are included in that $20-25 million*, so Red Cat's "plus 30%" should be entirely discounted.

154.   The Kerrisdale Report cited and linked to detailed factual support for its claims, including the following U.S. Army procurement request:

58



Source: US Army *Aircraft Procurement FY 2025 Budget Estimates Justification Book*

155. In addition, the Kerrisdale Report revealed that Defendants had misleadingly suggested that a Tranche 2 contract "for approximately 12,000 drones" would be worth, at least, hundreds of millions because "Tranche 1 production award was for $100 million for approximately 1,000 drones." Kerrisdale identified federal procurement records and an Army press release showing that, in Tranche 1, "the Army only used *$47.8 million* of the total contract's capacity and acquired 1083 systems (that's about 2200 drones)."

59

156. The Kerrisdale Report also alleged that Red Cat had continued to mislead investors about the Salt Lake City Facility's production capacity, stating, *inter alia*:

> Over the last 3 years, Red Cat has promised investors *multiple times* that within some clearly definable near-term deadline it will be capable of producing "thousands of drones" per month. First it was "by the fall" in early 2022, then it was "in a few months" in November of 2022, then "now" in March of 2023, then "in a few months" in July of that year, then "now" (again) in early 2024, and most recently (in September) it was to be at some point in 2025 . . . . ***[D]rone industry sources close to the company don't think Red Cat has the manufacturing capability for mass production of drones.*** Getting there would take time and a real capital expenditure commitment.

* * *

> In the course of our due diligence, ***we found a drone industry specialist who's been following Teal since its founding by [Defendant] Matus*** and who had the utmost admiration for what he's accomplished. ***They were adamant that there's just no way that Teal is capable of any sort of mass production***, though a contract like the SRR that calls for 30-50 units a month is definitely achievable.

157. In response to the Kerrisdale Report, Red Cat's stock price fell $2.35 per share, or *21.54%,* over the following two trading sessions, to close at $8.56 per share on January 17, 2025.

158. Defendants publicly responded to the Kerrisdale Report in an interview with Defendant Thompson posted to YouTube on January 21, 2025, by Alpha Wolf Impact (available at https://www.youtube.com/watch?v=9eGsfxMdkrU). In the interview, Defendant Thompson admitted, among other things, that Red Cat had

60

known of the Army procurement request cited in the Kerrisdale Report since March 2024, although he attempted to downplay its significance:

> I'm just going to start with there's this document, it's dated March 2024, it's called the president's budget, it's also with the nickname of the J-Book. But it was done by the Biden administration way before there was actually a winner selected for SRR, and the bottom line of *this document, which we looked at as soon as it came out, which does have, used to have some relevance*, but as of yesterday at 12 o'clock with the new administration it has zero relevance. This document's completely useless, because the new administration is going to rewrite the president's budget.

159.   In the January 21, 2025 interview, Thompson further admitted that, contrary to Defendants' prior public statements, the NDAA had no bearing on Red Cat's expected 2025 revenue from the SRR Program:

> October of last year they announced, so let me actually back up a second, so there's a line item in there $69 million that's been very prevalent through a lot of different reports. *The NDAA, which is also, also doesn't matter, that's just Santa's wish list, has nothing. Appropriations is the only thing that matters. That is the only thing that matters. Everything else is, kind of, not even worth your time.*

160.   Finally, during Red Cat's February 27, 2025 Investor Day, Defendant Thompson further attempted to respond to the Kerrisdale Report, and in the process of explaining Red Cat's guidance admitted that it was based in significant part on the Army procurement document cited in the Kerrisdale Report:

> we said we'd update guidance once we got to an SRR contract, if we had a SRR contract, which we got down selected for in November, which was a few months late. So we upped our guidance there to – the SRR specifically is $25 million to $65 million. Very wide goalposts. Why? How come so wide? So, you know, *there's a lot of information*

61

*out there from a really bad person* that I hopefully can use that Mjolnir and drop on, although I don't think he would want urine I think he likes snow, or something, we heard when he got arrested.[5] So the goalposts are *actually, his number is correct on the bottom. When we talked to the Army over the last few weeks, they say we've got $20.5 million, which you can see in a bunch of documents from the president's budget last March.* $20.5 million they have in the bank. And that's for SRR currently for 2025, which ends in September. And then you get about anywhere from 20% to 50% in spares and repairs and that comes from a completely different bucket. That comes from sustainment. There's three buckets in the army. There's readiness, there's modernization and there's sustainment. *So, we took the 20% and we use -- so that's where we got the $25 on the low end.*

## I.    Defendants Reiterate 2025 Guidance

161.    Also on February 27, 2025, during the same Investor Day call for analysts and investors, Defendant Thompson reiterated the 2025 guidance of $80 million to $120 million in revenue, specifying that the SRR Program accounted for $25 million to $65 million of the guidance, with Defendant Thompson stating that "we know that we got $25 million *no matter what*," which he repeatedly said was "in the bank." After Thompson's comments (quoted in the preceding paragraph) concerning the $25 million low end of the guidance range for SRR in 2025, he continued in part:

> So the guidance, $25 million to $65 million. Okay. ***We know that we got $25 million no matter what. That's there. It's in the bank, as they say. But we also get a full quarter of our calendar year on their first quarter, which will be the first year of full rate production***. So, we just

---

[5]    In this sentence Defendant Thompson was referring back to comments he made earlier in the presentation where he jokingly discussed using lethal drones to drop urine on analysts who did not provide favorable coverage.

*kind of thumbnailed it on what full rate production will hopefully look like.* And you're going to hear some great information from Brendan on what we think the POM, which now we're a program of record will become part of the POM, which is a five-year budget process. We weren't before. *So that's how we went from $25 to $65. The $25 like I said, is in the bank. We'll be making those drones for LRIP. We've got the additional features for I think it's a few million, whatever it is. And then we get that full quarter of full rate production in our calendar year, which is their first quarter of 2026.*

162. On August 14, 2025, the Company announced that the Company had achieved another milestone with respect to the SRR Program. On that day, the Company filed a Form 10-Q for the quarterly period ending July 30, 2025 (the "2Q25 10-Q"), which stated that "[i]n July 2025, the Company obtained the TD3 LR[I]P contract with the U.S. Army to deliver up to 690 SRR Black Widow systems."

163. In an earnings call that same day, August 14, 2025, Defendants told investors that the Company was already producing drones for the Army under the SRR Program and would ship them imminently, with Thompson stating: "Black Widow, we are finally done with our Black Widow holding pattern. The Black Widow is in production, and we will be making our first delivery under contract this month to the Army after signing TD3/LRIP at the end of July."

164. In response to the question, "[w]hat is [*sic*] the next steps for starting to deploy Black Widow to the Army?," Defendant Thompson stated that "we've already done the training. Chris [Ericson] can talk more about this. He's right next to it, and he showed me a lot of piles of drones heading out to the U.S. Army this

week. How many did we make on Saturday, one day?" Ericson responded, "Saturday was 32. On Monday was 56." This indicated that the Company could produce, on average, 44 Black Widow drones per day (the average of 32 and 56), or 1,320 per month.

165.   Thompson continued:

Yeah, we're getting there. I'm sure we're going to get a lot of questions on how we're going to hit our guidance with last Q, but this is not a last Q story. We've been in a holding pattern with Black Widow, waiting for the Army to say, yes, this is a final version. ***We actually got changes as close as four weeks ago***. Never mind the March 27th stuff that expanded our range and battery life. ***For us to get the contract done at the end of last month and to be shipping this month is pretty darn exciting***. ***With those run rates, we can easily do 1,000 drones a month of just Black Widow. Since this has already been hit upon, we believe we can still hit at least the lower end of our 80 - 120 guidance, just mostly with the Black Widow.***

166.   In light of Thompson's earlier claim that "we can easily do 1,000 drones a month of just Black Widow," Defendants' statements created the impression that the Company would quickly deliver all 690 Black Widow systems to the Army.

167.   Further, Thompson's statement represented that the Company could achieve at least $80 million in revenue in 2025—hitting the lower end of its previous guidance—"just mostly with the Black Widow" alone, meaning that Black Widow revenue would approach $80 million.

64

168.    This was highly material to investors. Northland Capital Markets issued an analyst report increasing its price target for the Company's stock to $16 per share from $13 per share, writing that

> Importantly, Red Cat announced they signed the TD3 LR[I]P contract for 690 SRR Black Widow systems. A system is one controller and two drones. Given historic communications, and the listing in the Jbook filing, an SRR system is about $65,000. That puts the initial low rate contract at $45 million. This further shows Red Cat is positioned to see the multi-hundred million dollar full rate contract.

**J.    Fuzzy Panda Research Reveals Information Mispresented by Defendants, and Additional Disclosures Confirm that the Company Was Not the "Only Vendor" Selected for Tranche 2**

169.    The following day, August 15, 2025, before or during market hours, Fuzzy Panda Research ("Fuzzy Panda") published a report (the "First Fuzzy Panda Report," attached as Exhibit C hereto) undermining Defendants' statements. The report revealed that the Company was not assured to advance from LRIP to full rate production and that, to the contrary, the Company's continued production difficulties materially endangered the prospect of moving into full rate production. Further, the report revealed that the SRR contract was not "sole source" and that, in fact, the Company's competitor, Skydio, which had also won an SRR contract, had already delivered hundreds of drones to the Army in May.

170.    The First Fuzzy Panda Report confirmed that an LRIP contract was merely "a preliminary stage where a contractor tries to prove to the Pentagon it can produce," contrary to Defendant Lunger's assurance on December 16, 2024, that that

65

the Company *would* progress "from LRIP to full rate production with the Black Widow."

171. The report also quoted a "Former Assistant Defense Secretary" as stating that "LRIP is to prove out the production process … it is not the final step, which would be full rate production," and a "Retired Army Colonel & Former Contracting Officer" as stating that "LRIP is not a blank check. It's a limited buy to make sure you can build what you promised." Thus, the Company's production capacity was key securing a "full rate production" contract.

172. The First Fuzzy Panda Report further reported that that both Teal and Skydio had been selected for Tranche 2 of the SRR Program, noting an Army press release stating that "[b]oth Skydio and Teal will support Army Transforming in Contact brigades" and that "[m]ulti-vendor awards and continuous competition ensures we can field the most capable and cost effective UAS, at scale, that aligns with Soldier needs."

173. Further, the First Fuzzy Panda Report pointed to Skydio's May 5, 2025 announcement that it had already "fulfilled the first order under the U.S. Army's Short Range Reconnaissance (SRR) Tranche 2 program with the delivery of X10D small unmanned aircraft systems (sUAS)." The report added that "[a] senior Skydio

66

executive told us that *for the SRR Tranche 2 contract that Skydio had already supplied the Army with drones 'in the hundreds.'*"[6]

174.    By contrast, the report revealed that:

We spoke to former Teal Drone engineers and learned that on the last program they tried to scale production that Teal Drones had a 60% initial failure rate.

The former Teal senior engineers told us that "First pass yield was 40%, where you take it off the line and the thing works" they also said that "10% had to be scrapped entirely."

Primary issues that this senior engineer pointed out were:

- Sensors not having quality calibrations and parts not getting soldered down properly

- Slow at making repairs – Broken drones – would sit on the shelf and wait for an engineer since they didn't have a repair technician

- After additional calibrations on the 60% that didn't work Teal was able to get the yield up to 70%.

- These issues were regarding the scale up of the Teal 2 drone which the Black Widow is the upgraded successor to.

---

[6] Notably, Skydio's May 5, 2025 press release quoted its CEO as stating that "[w]hen the Army contracted Skydio to fill this urgent need, we shipped systems within *5 days*," and that "[w]e produce 1,000+ drones a month at our facility in California with the ability to rapidly scale beyond that rate, enabling us to ship at the speed of need. Ultimately, product readiness is deterrence." The press release also noted that "Skydio's manufacturing facility in Hayward, CA is one of the world's largest drone manufacturing facilities outside of China."

67

175.   The First Fuzzy Panda Report also revealed that the testing bottleneck in the Company's production process had not been resolved, stating:

> We spoke to several former Red Cat/Teal Drone employees who all told us that a major bottleneck in the production process is their drone testing process. They cited many issues with the testing process and explained how every drone has to be flight tested individually by a human outdoors in a nearby field.
>
> Drone Testing Issues Included:
>
> - Time Consuming – Each manual test take ~30 minutes
>
> - Weather Problems – Testing only occurs during day light hours and when the weather is good.
>
> - Pairing Issues – Complaints about it being time consuming to pair a drone to a receiver, walk out to a field, need to get a gps signal, download the flight logs.

176.   The report also disclosed that the Company continued to rely heavily on manual production process, stating that "[f]ormer employees told us a significant part of the assembly process for each drone is done by hand and that drone testing is done manually in a field nearby."

177.   The Company's stock price dropped $0.96 per share, or 10.25%, to close at $8.41 per share on August 15, 2025.

178.   Consistent with the First Fuzzy Panda Report, an Army press release issued August 26, 2025, announcing that "[t]he U.S. Army has initiated production of the second tranche of its Short Range Reconnaissance (SRR) UAS (Unmanned Aerial Systems)," noted that "[t]he Army selected Teal Drones and their Black

68

Widow system as *one of **two** vendors* to manufacture the SRR system." Another Army press release, this one issued June 10, 2025, quoted Col. Danielle Medaglia, UAS Project Manager, as stating that "[c]ontinuous iteration and integration of new technology, multi-vendor awards and continuous competition ensures we can field the most capable and cost effective UAS, at scale, that aligns with Soldier needs," making clear that the SRR Program reflected a "multi-vendor" approach with "continuous competition" between vendors. The press release further stated that:

> Demonstrating the Army's ability to rapidly equip its forces, ***Skydio X10D systems were delivered to the 1st Brigade Combat Team under the Army's Transforming in Contact 2.0 initiative within one month of the request****. Additionally, Teal Drones' Black Widow system is preparing to field. Both Skydio and Teal will support Army Transforming in Contact brigades* in developing and refining tactics, techniques and procedures for employing networked reconnaissance and surveillance systems against emerging battlefield threats.

179.    Further corroborating claims in the First Fuzzy Panda Report, although Red Cat had stated in its Form 10-K filed with the SEC on March 31, 2025, that "[i]n November 2024, Teal was selected as *the sole winner* of the U.S. Army's Short Range Reconnaissance (SRR) Program of Record," the Company's Form 10-K for 2025, filed on March 19, 2026 changed this disclosure to say "[i]n November 2024, Teal was selected as *a winner* of the U.S. Army's Short Range Reconnaissance (SRR) Program of Record."

69

**K.    Defendants Made Repeated Misrepresentations about Raising Capital and Diluting Shareholders**

180.    In addition to the misstatements alleged above, during the Class Period, Defendants also repeatedly misrepresented the Company's need for, and plans for, raising capital, assuring investors that the Company had no intention of raising capital—and especially not in a manner that would dilute the investments of existing shareholders—only to surprise investors shortly thereafter by doing just that.

181.    Before and during much of the Class Period, the Company's auditors required the Company to disclose a "going concern" qualification, and thus the Company informed investors that "[i]f we are unable to obtain sufficient funding, our business, prospects, financial condition and results of operations will be materially and adversely affected and we may be unable to continue as a going concern." The Company's quarterly report on Form 10-Q for the quarter ended January 31, 2023, filed on March 7, 2023, stated that

> We only began generating revenues in January 2020 and have reported net losses since inception. *We expect to report net losses for at least the next twelve months.* To date, we have funded our operations through debt and equity transactions. In May and July 2021, we completed common stock offerings which generated gross proceeds of approximately $70 million. At January 31, 2023, we reported cash and investment balances of approximately $24.6 million. We expect these financial resources to be sufficient to fund our operations for at least the next twelve months. However, *we can provide no assurance that these financial resources will be sufficient to fund our operations until we reach profitability. If we are unable to become profitable before expending our current financial resources, we will need to raise additional capital through equity or debt transactions.* We can

70

provide no assurance that such additional financing, if required, will be available to us on acceptable terms, or at all. If we are unable to become profitable or obtain sufficient funding, our business, prospects, financial condition and results of operations will be materially and adversely affected, and we may be unable to continue as a going concern.

182. This was especially salient because the Company had especially high expenses during the fiscal year ended March 30, 2023. As Defendant Thompson stated during the July 27, 2023 earnings call, "[f]iscal year 2023 was a year of change and *investment*." The Company's operating expenses nearly doubled compared to the prior fiscal year, to approximately $27 million from approximately $14 million. As Defendant Hernon noted on the July 27, 2023 call, "[i]n summary, we spent a lot of money in fiscal 2023." Thus, the Company's cash position was material to investors.

183. Further, in light of the Company's significant expenses in FY2023, Defendants had a strong incentive to assure stockholders that—now that those expenses were in the past and the Company was "poised to grow like crazy," with the Salt Lake City Facility "ready to go," as Defendant Thompson previously stated—Defendants were not in need of a large capital raise, especially through "dilutive" transactions.

184. For the Company's stockholders, whether the Company raised capital through equity transactions was a key concern, because the issuance of additional stock would "dilute" the value of each existing share of stock, as each share thus

71

represents a lesser portion of the company. In addition, the voting power of each existing share is lowered by a dilutive transaction. As a hypothetical, consider a company with 100 shares for 100 shareholders, each owning 1%. After issuing 100 more shares, each shareholder's ownership drops to 0.5%, also reducing their voting power. Further, the issuance of additional stock also, all things being equal, lowers a company's earnings per share, which tends to depress the stock price.

185.    Defendants were aware that Company stockholders were interested in whether the Company's capital-raising activities diluted their investments. Defendants emphasized, for instance, that the sale of the Company's consumer division, discussed above, provided $18 million of non-dilutive capital. As Defendant Thompson stated during the Company's March 7, 2023 earnings call: "As a reminder the sale of the consumer division will be *non-dilutive* event and will raise cash for Red Cat." Indeed, Thompson told investors during the August 9, 2023 Cannacord Genuity Growth Conference that he "preferred" to raise cash in non-dilutive ways, explaining that "I'm the largest shareholder. I don't like dilution. So *you won't see us doing any large raises like that*. And we don't – *we don't have any short term need for cash whatsoever*." Thompson noted, in support of his point, that the Company had "$40 million left on our shelf that we haven't touched in two years," referring to the Company's previously-filed shelf registration for the issuance and sale of additional common stock.

72

186.    On September 19, 2023, the Company filed its quarterly report on Form 10-Q for the first quarter of fiscal 2024 (i.e., the quarter July 31, 2023). The Form 10-Q again disclosed a going concern qualification, stating that:

> During the three months ended July 31, 2023, the Company incurred net losses of $5,567,775 from continuing operations and $242,573 from discontinued operations and used cash in operating activities of $6,926,069 from continuing operations and $356,109 from discontinued operations. As of July 31, 2023, the Company has working capital of $22,945,400. While the Company has historically been successful in raising capital to meet its working capital requirements, the ability to continue raising such capital to enable the Company to continue its growth is not guaranteed. Therefore, there is substantial doubt about the Company's ability to continue as a going concern as the Company will require additional liquidity to continue its operations and meet its financial obligations for twelve months from the date these consolidated financial statements are issued.

187.    However, Defendants assured investors that the Company had several non-dilutive mechanisms to raise sufficient capital. During the Company's earnings call held September 19, 2023—the same day as the filing of the Form 10-Q— Defendant Hernon told investors at the outset of his remarks that his "comments [we]re going to focus on a number financial-based milestones and events leave us strongly positioned for the balance of fiscal 2024 and beyond." Hernon reminded investors that the sales price for the Company's "pending agreement to sell our Consumer segment to Unusual Machines, include[d] an immediate cash payment of $3 million, plus $17 million in shares of UM. We also expect to receive a favorable working capital adjustment of approximately $4 million, which will be payable in

73

additional stock." Hernon noted that "[w]hile we can't immediately sell our 21 million shares of UM, the 180-day lockup period is relatively short and could begin to generate cash proceeds late in fiscal 2024." Hernon explained that "[w]e expect that orders from government agencies will continue to be the source of most of our Enterprise revenues. Due to the high certainty of the funding sources for government-based orders, there are greater-than-normal opportunities for us to secure financing secured by these orders."

188.   Analysts pressed Defendants on this. For instance, one analyst asked:

In terms of your Q3 fiscal guidance of $5 million and your current cost structure and improving margins, will that get you close to cash flow positive? And the second part of that question is, given your current cash position and the near-term burn, is there a need to raise capital?

189.   In response, Defendant Thompson represented that the Company had several non-dilutive options to raise sufficient capital and thus could avoid diluting shareholders:

I'll go into your question about do we need to raise capital? And we've gotten that question a lot while we were at all these conferences we were at last week, and it's legitimate question. Let me just start with the C level and the executives and the employees. We are not hired guns. The company, the employees, we own almost 40% of the shares outstanding. So, we've written checks. We're not hired guns. We don't own 0.0% and just want to do a bunch of raises and dilute everybody. Because if we dilute the shareholders, we're half the shareholders almost. So, we do not want to do that. So let me go through some of the details on this. As Joseph just mentioned, we'll be turning millions of dollars of inventory into sales over the next couple of quarters. In our first three quarters, we've got about $10 million in shipped revenue we'll be posting, which is more than all of last year. And we're not even

74

done with sales yet, so those numbers could actually be higher. As also as Joseph noticed, we expect to close UM[] in the next few weeks, which will generate approximately $3 million in non-dilutive capital. And he also mentioned the $1 million to $2 million in inventory or more. We will also be getting approximately $2.4 million from our SRR prototype contract starting in November, and that goes through March. And we've recently received research project that could generate approximately $1 million to $2 million. ***On top of that, last week and as recent as today, we've gotten term sheets for small debt offerings, not convertible debt.*** And we stated, as Joseph mentioned, exploring credit lines based on our government contracts, which are much less expensive debt. So to summarize, this ***non-dilutive*** way to raise capital over the next few months is approximately $7.4 million to $9.4 million the next six months of ***non-dilutive*** capital. And if you add a small debt offering, it goes from offering of $3 million to $5 million which we could easily service in our models. ***That's a total of $10.4 million to $14.4 million of non-dilutive capital, which is more than enough to get us to cash flow positive.***

190. On October 3, 2023, Defendant Thompson presented on behalf of the Company at the LD Micro Main Event XVI. During that event, Thompson was asked: "you're talking about $20 million run rate. Where are we in the cash burn profitability? What's the sort of the break even whether it's revenue, capacity in the factory, maybe kind of help us appreciate that and the margin profile?"

191. In response, Defendant Thompson stated, in part:

[O]ne of the other exciting things about what we're doing right now is because ***people are concerned about our cash, it's probably putting a cap on our stock right now***. But we – as I mentioned on our Q conference call, we think ***we've got a lot of term sheets for ways to take our purchase orders from the US government and use them to borrow against them, which we've gotten some great offers on that, not perfect in this environment, but pretty darn good. So we don't dilute***. Secondly, we've got on our inventory, we got lots and they tell me out

75

of stop. But just FYI, *we have lots of non-dilutive ways to get to cash flow positive*.

192.   Several days later, on October 12, 2023, Defendant Thompson presented on behalf of the Company at the Dawson James Small Cap Growth Conference, where he was asked about the Company's financial condition. Defendant Thompson stated:

> *So I think what everyone wants to get to right now is where our cash position is probably scaring some folks. So let's just talk about the elephant in the room. We have a lot of ways to raise non-dilutive capital over the next few months*. One is we're selling our consumer division, which is probably going to be closed. We hope it's closed by the end of this month, which will raise $3 million to $5 million of non-dilutive cash, which is great. Then once that is, once we have that spun out completely, we'll also own 41% of that new public company where we're not sure what we're going to do. *What we're probably going to do is dividend out a good portion of that to our shareholders*. But well, we'll make that announcement probably six weeks before the lockup is done if we decide to go that route.
>
> On top of that, we have a lot of grant opportunities in front of us. So hopefully some of those come in. We also have a lot of POS because we have POS from the US government. We have financing that we can do against those POS. And as I mentioned in the last conference last week, *we've got a bunch of term sheets on that. The terms even in this horrible market for microcap terms on that – the terms are getting better every, every, every term sheet. So we have a lot of ways of raising non-dilutive cash over the next few months. You're not going to see a big financing come out and crush investors*, which Red Cat employees are the largest amount of investors.

193.   Indeed, Thompson stated emphatically during the event: "*We're not going to dilute the company*."

76

194. However, less than two months later, on December 6, 2023, after the market closed, the Company filed an amendment to the prospectus supplement for its shelf registration statement previously declared effective on June 14, 2021 (the "June 2021 Registration Statement") (i.e., the shelf registration that Thompson referred to on August 9, 2023, at Cannacord Genuity Growth Conference, when he reassured investors concerned about potential dilution). This amendment (the "December 6, 2023 Prospectus Amendment") disclosed that the Company had entered into an agreement with ThinkEquity as sales agent to sell newly-issued shares of Company common stock with an aggregate offering price of up to $4,375,000.

195. The same day, also after market hours, the Company also filed a preliminary prospectus supplement (the "December 6, 2023 Preliminary Prospectus Supplement"), which supplemented the June 2021 Registration Statement, for the sale of additional shares of common stock. The Company issued a press release after market hours stating:

> Red Cat [] today announced the pricing of its previously announced underwritten public offering of 16,000,000 shares of its common stock at a public offering price of $0.50 per share, for gross proceeds of $8,000,000, before deducting underwriting discounts, commissions and offering expenses. All of the shares of common stock are being offered by the Company. In addition, the Company has granted the underwriters a 45-day option to purchase up to an additional 2,400,000 shares of common stock at the public offering price less discounts and commissions, to cover over-allotments. The offering is expected to

77

close on December 11, 2023, subject to satisfaction of customary closing conditions.

196.    The Company's stock price fell **27.6%** the following day as the market reacted to this news, closing at $0.55 per share on December 7, 2023.

197.    On December 11, 2023, the Company issued a press release announcing "the closing of its previously announced public offering of 18,400,000 shares of its common stock, including 2,400,000 shares sold upon full exercise of the underwriter's option to purchase additional shares, at a public offering price of $0.50 per share for gross proceeds of $9,200,000."

198.    Unsurprisingly, investors queried Defendants about the surprise offering. On Red Cat's 2Q24 earnings call on December 15, 2023, a vice president of the Company's external investor relations firm stated to Defendant Thompson that

> we received a few pre-submitted questions from investors recently and thought this would be a good forum for you to address those questions. So with that, the first question is *last quarter, you said that you did not believe you needed to do an equity raise and were looking at non-dilutive financing. Can you explain maybe what changed given the recent equity raise?*

199.    Defendant Thompson responded:

> So the bottom line is all of the non-dilutive possibilities we had no control over. As we lightly mentioned Replicator tonight, which is who knows when that's coming. Getting an FMS award if they pre-pay. *The debt term sheets we were getting were horrific and would have destroyed the company.* So basically, we didn't want to play Russian roulette while we're having so many good things happening, great

78

revenue growth, margin expansion, all things can get us to breakeven. So, we raised the money that we needed to and you'll notice that we no longer have a going concern in our [Q].

200. Thus, by contrast to Thompson's previous representations that the Company had numerous avenues to raise sufficient capital without diluting exiting shareholders, and specifically stated that "we've got a lot of term sheets" that were "pretty darn good," he conceded that, in fact, those term sheets "would have *destroyed* the company."

201. Later in the Class Period, on February 12, 2025, the Company announced in a press release that it had "entered into an agreement for up to $20 million and closed on the initial tranche of $16.5 Million in debt financing with The Lind Partners, a New York based institutional fund manager ('Lind')." Per the Company's press release, this agreement included debt that was convertible to equity at the price of $16.15 per share, initial tranche proceeds of $15 million, and 1 million warrants to buy common stock exercisable at $15 per share non cashless. The press release also disclosed that the Company had applied for $58 million in debt financing from the DoD Office of Strategic Capital ("OSC"), which "implements strategies and partnerships to accelerate and scale private investment in critical supply chain technologies needed for national security."

202. The Company's press release stated that "[t]he investment is expected to provide Red Cat with the working capital needed to scale up production and the

79

ongoing development of its Arachnid Family of Systems, which includes Black Widow™, Edge 130, and a new line of FANG™ First-Person View (FPV) drones." The press release quoted Defendant Thompson as stating: "The recent financing will allow us to expedite and expand the Edge 130 factory and build-out and ramp up mass production of the Black Widow," and that "[t]he potential total financing of $93 million is the least dilutive option for our shareholders."

203. The next day, using his username "Duckworks", Defendant Thompson posted a publicly-available message on stocktwits, a social platform for investors, where his profile page identifies him by name as shown in the screenshot below:



204. The message, posted on February 13, 2025 at 7:37 am, stated "We believe *we are fully funded after yesterday's above market deal* at $16.15" and that "*Financing is done and out of the way*," as shown in the following screenshot:

80



**Duckworks** Feb 13, 2025 7:37 AM

🦇 $RCAT

Good morning Red Cat.

We believe we are fully funded after yesterday's above market deal at $16.15 Financing is done and out of the way.

Back to work!

205. Further, the Company's transition report on Form 10-KT for the transition period from May 1, 2024 to December 31, 2024 (the "2024 10-KT") (reflecting the Company's change to a fiscal year ending on December 31), filed with the SEC on March 31, 2025, stated that, while the Company's "financial results and our financial position at December 31, 2024 raise substantial doubt about our ability to continue as a going concern," the Company had "recently taken actions to strengthen our liquidity through additional financings," including the February 2025 financing with Lind. Thus, the 2024 10-KT, which was signed by Defendant Thompson and filed on March 31, 2025, stated that "[m]anagement has concluded that these recent positive developments alleviate any substantial doubt about our ability to continue our operations, and meet our financial obligations, for twelve months from the date these consolidated financial statements are issued."

206. However, only ten days later, on April 10, 2025, before market hours, the Company announced that it had "entered into securities purchase agreements

81

with certain institutional investors for the purchase and sale of 4,724,412 shares of common stock, pursuant to a registered direct offering, expected to result in gross proceeds of approximately $30 million."

207. Thus, financing was not "***done and out of the way***," and stockholders faced yet another dilutive event. In response, the Company's stock price nosedived 22.15%, closing at $5.80 per share on April 10. 2025.

208. Further, only two months later, on June 17, 2025, before market hours, the Company issued a press release disclosing that the Company had "entered into securities purchase agreements with certain institutional investors for the purchase and sale of 6,448,276 shares of common stock, pursuant to a registered direct offering, expected to result in gross proceeds of approximately $46.75 million."

209. After market hours that same day, the Company filed a prospectus supplement for this offering, which stated that the offering price of the shares covered by the prospectus supplement was $7.25 per share.

210. The Company's stock price dropped in response to this news, falling 20.35% to close at $7.32 per share on June 17, 2025.

211. However, this was not the last time Company stockholders would be misled into believing the Company was sufficiently funded and would not pursue dilutive financing.

212. On August 14, 2025, the Company held a Town Hall meeting open to analysts and investors. During the meeting, Stan Nowak, the Company's Vice President of Marketing, posed a question to Defendants Thompson and Ericson, asking, "Next up, Jeff and Chris, I think maybe you guys can both answer this. With the projected growth plans, are there any plans for additional debt or equity raise in the near future?"

213. In response, Defendant Thompson stated:

I'll start, and then Chris [Ericson] will yell at me after whatever I say. *We have a very strong balance sheet right now*. As Brendan mentioned, it sounds like we're in the second phase of the Office of Strategic Capital, which is about a $50 million infusion. Our burn is basically where it is without the revenue starting yet. As we're producing hundreds and thousands and then thousands of drones per month, that burn's going to come down dramatically. We have $66 million in the bank. I think *we're very well funded. No need to do a debt offering. I mean, our debt's going to be gone in a few months, so that'll be gone. We're not doing that again. We have a strong balance sheet, so we do not see any need for a raise right now*.

214. Though the question was directed to both Thompson and Ericson, and Thompson stated that he would "start" and then hand it off to Defendant Ericson, Ericson did not "yell" at Thompson, or correct or qualify his statement in any way, despite his position as CFO.

215. Indeed, Thompson's statement was consistent with Ericson's remarks that "[w]e have successfully positioned ourselves with a strong $66 million cash balance and a $16 million inventory buildup to deliver results in the second half of

83

2025" and that "we've successfully controlled non-labor operating costs to keep a steady and efficient cash burn."

216. Thus, Defendants Thompson and Ericson represented that investors that there were no "plans for additional debt or equity raise in the near future" and no "need for a raise right now" given the Company's "strong balance sheet," "strong . . . cash balance," "inventory build-up," and "steady and efficient cash burn."

217. Investors, however, were misled. Only a month later, on September 17, 2025, the last day of the Class Period, after market hours, the Company announced

> that it intends to offer and sell shares of its common stock in an underwritten public offering. In connection with the offering, Red Cat also expects to grant the underwriter a 30-day option to purchase up to an additional 15% of the shares of common stock offered in the public offering. The offering is subject to market and other conditions, and there can be no assurance as to whether or when the offering may be completed, or as to the actual size or terms of the offering.

218. That same day, also after market hours, the Company filed a preliminary prospectus supplement for the offering of an unspecified number of shares of common stock.

219. The next morning, September 18, 2025, before market hours, the Company issued another press release, which disclosed "the pricing of an underwritten public offering of 15,625,000 shares of common stock at a price to the public of $9.60 per share. The gross proceeds from the offering to the Company are expected to be approximately $150 million."

84

220. In response to this news, the Company's stock price fell 10.91%, closing at $10.04 on September 18, 2025.

### L.     Relevant Post-Class Period Events

221. Following the Class Period, on October 10, 2025, Fuzzy Panda published another report (the "Second Fuzzy Panda Report," attached as Exhibit D hereto). That report disclosed that the SRR contract the Company signed in July 2025 was "~60% smaller than claimed." The Second Fuzzy Panda Report explained that Fuzzy Panda had contacted the Army about the contract and received a response stating that it was a "bridge contract" for only $12,910,216, as shown below:



222. In light of this information, Fuzzy Panda reported that "Red Cat's estimated revenue [for 2025 would be] ~$57 million short of the low end of their $80-$120 million guidance."

223.   In addition, after market hours on November 13, 2025, Defendants issued a press release announcing the Company's results for the quarter ended September 30, 2025. The press release announced that "[t]he Limited Rate Production (LRIP) Tranche 2 contract, signed in July 2025, has been expanded and is now valued at approximately $35 million." This made clear that the pre-"expansion" value was less than $35 million, and thus far less than the $47.5 million by which the Company increased its 2025 revenue guidance when it added the SRR contract.

224.   Further, the Company lowered 2025 revenue guidance by *74%* at the midpoint, from the prior range of $80 million to $100 million to a meagre *$34.5 million to $37.5 million*. The November 13, 2025 press release also revealed that, contrary to Thompson's previous statements to investors that $25 million of SRR revenue was "in the bank" for the government's fiscal year ending September 30, 2025, Red Cat reported only $14.5 million in *total* revenue, inclusive of SRR and all other sources, during the nine months ended September 30, 2025.

225.   Indeed, when the Company later released full-year 2025 results, it reported only $40.7 million in revenue—merely half of the lower end of Defendants' prior guidance of $80-120 million, and far closer to the Fuzzy Panda's analysis than to Defendants' prior assurances.

226. In addition, on December 16, 2025, the Army issued a press release stating that "[t]he Army's Program Executive Office for Aviation and Uncrewed Aircraft Systems Project Management Office, have issued a Technical Directive to Skydio Inc. under the Short-Range Reconnaissance (SRR) contract to procure X10D unmanned aircraft systems (UAS)." Then, on March 22, 2026, Skydio announced that it had received "an order exceeding $52 million for over 2,500 X10D drones from the U.S. Army," emphasizing that "[t]he order is the largest small unmanned aircraft system (sUAS) procurement from a single manufacturer in the Army's history and moved from bid to award in less than 72 hours." These post-Class Period reports confirmed that Defendants had misled investors regarding the Company's SRR contract with the Army, such as when Defendant Thompson stated that "Black Widow[] . . . is the winner of SRR *Sole Source*" and Defendant Matus touted the Company as "*the only vendor* selected to move into production."

## V.    CLASS PERIOD MISREPRESENTATIONS

### A.    March 17, 2022 3Q22 Earnings Call

227. On March 17, 2022, after market hours, the Company hosted a conference call regarding its 3Q22 financial and operating results.

228. During the same call, Defendant Thompson stated, in relevant part:

[W]e are poised to grow like crazy. *The plant is ready to go* . . . . We are keeping our heads down and getting our manufacturing capability to be able to put out *thousands of drones a month*.

87

229.    The statements in the above paragraph, which represented that the production capacity of the Company's Salt Lake City Facility could quickly increase to "thousands of drones a month," were materially false and misleading because: (1) the facility's production capacity was a mere fraction of that, (2) the Company faced daunting obstacles to increasing its production to 1,000 drones per month, including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, and (4) the Company's supply chain was insufficient to support the production of "thousands of drones a month."

**B.    June 7, 2022 LD Micro Conference**

230.    Appearing at the LD Micro Invitational XII Conference on June 7, 2022, Defendant Thompson stated: "***Our production line can get probably up to a thousand a month. And then, if we add a second shift***." Thompson added that "So, we have enough room in the new building that we just moved into to build three or four production lines with two shifts. But ***what I just gave you [i.e., 1,000 drones per month] is just one production line with one shift***."

231.    The statements in the above paragraph, which represented that the production capacity of the Company's Salt Lake City Facility was "a thousand a month" running "just one production line with one shift," were materially false and misleading because: (1) the facility's production capacity was a mere fraction of that,

88

(2) the Company faced daunting obstacles to increasing its production to 1,000 drones per month, including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, and (4) the Company's supply chain was insufficient to support the production of "thousands of drones a month."

232.    Also at the same conference, Thompson stated, "We've got chipsets of about 3,700 chipsets that we've already bought and paid for, and that will yield about 3,500 drones."

233.    The statements in the above paragraph were materially false and misleading because the Company's production line suffered from massive design and quality control problems, leading to poor yields and failure rates higher than Thompson represented.

C.    **July 27, 2022 FY22 Earnings Call and 2022 10-K**

234.    On July 27, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for FY22. During the call, Defendant Thompson stated, in relevant part, that "[t]he Teal Drone production line is in *full swing*[,]" that "[w]e expect to go into mass production *in the fall*," and that the SRR Program's "Tranche 2 . . . is for tens of thousands of drones and *hundreds of millions of dollars' worth of revenue*[.]"

89

235. The statements in the above paragraph regarding production were materially false and misleading because: (1) the Salt Lake City Facility's production capacity was plagued by massive design and quality control problems, (2) the Company faced daunting obstacles to moving into "mass production," including insufficient space, manpower, and funding, (3) the Company's production line was severely constrained by the need to test each drone, (4) the Company's supply chain was insufficient to support the production of "thousands of drones a month," and (5) there were thus material, undisclosed risks to the Company's ability to begin "mass production in the fall" of 2022. Further, the statement in the above paragraph regarding the value of the SRR Tranche 2 program created the false and misleading impression that Tranche 2 of the SRR Program would involve a sole source contract whereby a single vendor would be produce all "tens of thousands of drones" procured by the Army.

236. Also during the conference call, Thompson stated, "So, as I've mentioned previously, we've had already committed in delivery already is 3,730 chipsets. That will yield about 3,500 drones," and similarly "we're not going to get a full yield. It's not going to be 100% yield. It'll be about 3,500 drones that those chipsets can deliver."

237. The statements in the above paragraph were materially false and misleading because the Company's production line suffered from massive design

90

and quality control problems, leading to poor yields and failure rates higher than Thompson represented.

238.   That same day, July 27, 2022, the Company filed the 2022 10-K, which was signed by Defendants Thompson and Hernon and stated that in October 2021, Teal "moved to a new 13,000+ square foot facility" and, in January 2022, "doubled the size of [the Salt Lake City Facility] [i.e., to 26,000+ square feet] in order to *fully scale production capacity to meet the forecasted growth in demand*[.]" The 2022 10-K further claimed that "*with Teal's new drone manufacturing facility up and running in Utah*, the Company is *well positioned* to provide drones and services to support the needs of these infrastructure programs."

239.   The statements in the above paragraph, which represented that the Company's Salt Lake City Facility could quickly "fully scale" to meet demand, were materially false and misleading because: (1) the Company faced daunting obstacles to "fully scal[ing] production capacity," including insufficient space, manpower, and funding, (2) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, and (3) the Company's supply chain was insufficient to support the production of "thousands of drones a month."

91

D.      **September 12, 2022 1Q23 Earnings Call**

240.    On September 12, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for the first quarter of its fiscal year 2023. During the call, with respect to the Salt Lake City Facility's production capacity, Defendant Thompson stated during his prepared remarks:

> And now, I'll talk about Teal Drones. Let's start with the production line. ***We are currently switching from PVT, production validation test, to ramp and mass production***. Mass production enables Teal to continue to improve ongoing yields, qualify additional tools.

241.    Later in the call, in response to a request for "any color on the Tranche 2," Thompson stated:

> And, again, we're getting ourselves into mass production, ***if we win Tranche 2, we will be capable of basically hitting the ground running*** and produced [*sic*] this drone as quickly as possible.

242.    Also during the call, in response to the question, "How about progress update on construction of the manufacturing facilities, just to look into material sourcing and your comfort in meeting timelines?," Thompson stated:

> And as I mentioned in some of my comments in my press releases that ***we're now going from PVT to mass production and ramp***, which we, you know, take all the things that we learned from the PVT stage. ***And now, we basically fix any issues and problems and vendors and tooling that we want to do to automate the production line, so that we can really scale it as we – if we get any of these RFPs we're going to have to start producing a lot of drones very quickly***.

92

243.   The statements in the three paragraphs above, which represented that the Company's Salt Lake City Facility was moving into "mass production" and could quickly "hit[] the ground running" to produce drones for Tranche 2 of the SRR Program and "produc[e] a lot of drones very quickly," were materially false and misleading because: (1) the Company faced daunting obstacles to moving into "mass production," including insufficient space, manpower, and funding, (2) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, (3) the Company was building drones by hand and thus not "automate the production line," and (4) the Company's supply chain was insufficient to support mass production.

### E.   November 29, 2022 Business Update Call

244.   On November 29, 2022, Red Cat hosted a conference call with investors and analysts to provide a business update, during which Defendant Thompson stated, in response to the question, "[b]ut where are we with regards to the anticipated completion and how much − what is production capacity going to be?":

> *[T]he production line is up and moving.* We are about to start being able to ship over the next four to six weeks, the brand new bird that we've been working on with incredible new payload, with incredible light capabilities. *So the factory is going to be basically in full swing.* It's starting now and we'll be able to produce *thousands of drones per month* if we have the orders for them. *We have the inventory, we have the parts, we have the capital and our supply chain is looking pretty good right now. So the factory is doing awesome*.

245. The statements in the above paragraph were materially false and misleading because: (1) the Company faced daunting obstacles to increasing its production to 1,000 drones per month, including insufficient space, manpower, and funding, (2) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, and (3) the Company's supply chain was insufficient to support the production of "thousands of drones a month."

F.    **December 15, 2022 2Q23 Press Release and Earnings Call**

246. On December 15, 2022, Red Cat issued a press release announcing 2Q23 results. The press release stated, in relevant part, that "[e]xpansion of [the] manufacturing facility at Teal *[is] expected to be completed in [the] fourth quarter of fiscal 2023* and will *double production capacity*[.]"

247. The same press release also quoted Defendant Thompson as stating, in relevant part, that "the production line from our new U.S. factory in Salt Lake City . . . *has the capacity to build thousands of drones*."

248. Also on December 15, 2022, Red Cat hosted a conference call with investors and analysts to discuss its financial and operating results for 2Q23. During the call, Defendant Thompson emphasized that "[w]e have invested in a new factory in Salt Lake City that can produce *tens of thousands of drones per year*."

249. Defendant Hernon, for his part, noted during the call that while operating expenses for 2Q23 were $7 million, more than doubled the $3 million figure for 2Q22, "[t]his increase largely reflects our people and facilities expansion at Teal, *which at this point is significantly completed*."

250. The statements in the four above paragraphs, which created the impression that the Company's Salt Lake City Facility could produce thousands of drones per month and that an expansion to double that capacity would be complete by April 30, 2023, were materially false and misleading because: (1) the facility's production capacity was a mere fraction of "tens of thousands of drones per year," (2) the Company faced daunting obstacles to increasing its production to tens of thousands of drones per year, including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, (4) the Company's supply chain was insufficient to support the production of "tens of thousands of drones per year," and (5) the Company's expansion to that level was not "significantly complete[]" and there were thus material, undisclosed risks to its ability to double that capacity by April 30, 2023.

## G.    March 7, 2023 3Q23 Earnings Call

251. On March 7, 2023, Red Cat hosted a conference call regarding 3Q23 results. During the call, Defendant Thompson represented, in relevant part, that

95

"*[t]he Salt Lake City factory is complete and ready to go*" and "*[w]e now have the capacity to produce thousands of drones per month.*"

252. The statements in the above paragraph were materially false and misleading because: (1) the Salt Lake City Facility could not produce 1,000 drones per month, (2) the Company faced daunting obstacles to increasing its production to 1,000 drones per month, including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, (4) the Company's supply chain was insufficient to support the production of "thousands of drones a month," and (5) the facility was not "complete and ready to go" for these reasons.

253. Also on the call, Thompson responded to a question about chip inventories by stating, "Yeah. Well, the number hasn't changed since we put in the initial order of approximately 3,700 chipsets over almost 2 years ago now, which would they're not going to give you 100% yield. You're going to have some don't don't don't [*sic*] make it end up in scrap. But we think that those could produce between 3,200 and 3,500 drones."

254. The statements in the above paragraph were materially false and misleading because the Company's production line suffered from massive design

and quality control problems, leading to poor yields and failure rates higher than Thompson represented.

### H.    July 27, 2023 FY23 Earnings Call

255.    During the FY23 Conference Call that took place after market hours on July 27, 2023, Defendant Thompson represented that the value of the SRR Contract could potentially exceed a billion dollars. Specifically, he noted that, although "[w]e still do not know the size of *the* award for the now combined Tranche 2 and 3" of the SRR Program, "the information we do have" is that "Tranche 1 production award was for $100 million for approximately 1,000 drones" and "Tranche 2 and 3 is for approximately 12,000 drones[.]"

256.    The statements in the above paragraph, which represented that the Company was pursuing a contract pursuant to which a single vendor would receive an award to produce approximately 12,000 drones and that was worth, at least, hundreds of millions of dollars, were materially false and misleading because (1) as revealed by the Kerrisdale Report, based on federal procurement records and an Army press release, in Tranche 1, the Army only used $47.8 million of the total contract's capacity and acquired 1083 systems (with about 2200 drones), and (2) the Tranche 2 contract was not sole source and thus, even if the Company was awarded a contract, it would not provide all "approximately 12,000 drones."

97

## I.    September 19, 2023 1Q24 Press Release

257.    On September 19, 2023, the Company issued a press release that quoted Defendant Hernon as stating: "***With our manufacturing facility completed and operating efficiently***, we plan to spend an additional $3 million to convert our existing inventory into approximately 1,200 drones, representing more than $18 million in future revenues."

258.    The statement in the above paragraph that the Salt Lake City Facility was "complete[] and operating efficiently" was materially false and misleading because: (1) the Company faced daunting obstacles to its production capacity including insufficient space, manpower, and funding, (2) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, (3) the Company's supply chain was insufficient to support the production of "thousands of drones a month," and (4) the facility was not "operating efficiently" for these reasons.

## J.    October 3, 2023 LD Micro Conference

259.    On October 3, 2023, Defendant Thompson presented on behalf of the Company at the LD Micro Main Event XVI. During that event, Thompson was asked: "you're talking about $20 million run rate. Where are we in the cash burn profitability? What's the sort of the break even whether it's revenue, capacity in the factory, maybe kind of help us appreciate that and the margin profile?"

98

260.   In response, Defendant Thompson stated, in part:

[O]ne of the other exciting things about what we're doing right now is because people are concerned about our cash, it's probably putting a cap on our stock right now. But we – as I mentioned on our Q conference call, we think *we've got a lot of term sheets for ways to take our purchase orders from the US government and use them to borrow against them, which we've gotten some great offers on that, not perfect in this environment, but pretty darn good. So we don't dilute*. Secondly, we've got on our inventory, we got lots and they tell me out of stop. But just FYI, *we have lots of non-dilutive ways to get to cash flow positive*.

261.   The statements in the above paragraph, which represented that the Company had sufficient "non-dilutive" ways to raise any necessary capital, including "pretty darn good" "term sheets" for debt transactions, and would "[]n[o]t dilute," were materially false and misleading because, as Defendant Thompson admitted on December 11, 2023, after the Company raised equity in a dilutive transactions, "[t]he debt term sheets we were getting were horrific and would have destroyed the company."

### K.   October 12, 2023 Dawson James Conference

262.   On October 12, 2023, Defendant Thompson presented on behalf of the Company at the Dawson James Small Cap Growth Conference, where he was asked about the Company's financial condition. Defendant Thompson stated:

*So I think what everyone wants to get to right now is where our cash position is probably scaring some folks. So let's just talk about the elephant in the room. We have a lot of ways to raise non-dilutive capital over the next few months*. One is we're selling our consumer division, which is probably going to be closed. We hope it's closed by

99

the end of this month, which will raise $3 million to $5 million of non-dilutive cash, which is great. Then once that is, once we have that spun out completely, we'll also own 41% of that new public company where we're not sure what we're going to do. What we're probably going to do is dividend out a good portion of that to our shareholders. But well, we'll make that announcement probably six weeks before the lockup is done if we decide to go that route.

On top of that, we have a lot of grant opportunities in front of us. So hopefully some of those come in. We also have a lot of POS because we have POS from the US government. We have financing that we can do against those POS. And as I mentioned in the last conference last week, *we've got a bunch of term sheets on that. The terms even in this horrible market for microcap terms on that – the terms are getting better every, every, every term sheet. So we have a lot of ways of raising non-dilutive cash over the next few months. You're not going to see a big financing come out and crush investors*, which Red Cat employees are the largest amount of investors.

263.    Thompson also stated during the event: "*We're not going to dilute the company*."

264.    The statements in the two paragraphs above, representing, inter alia, that the Company had "*a lot of ways to raise non-dilutive capital over the next few months,*" including "a bunch of term sheets" for debt transactions, and that the Company would not conduct a financing that would "crush" (or dilute) investors, were materially false and misleading because, as Defendant Thompson admitted on December 11, 2023, after the Company raised equity in the dilutive transaction disclosed in the December 6, 2023 Prospectus Amendment, the December 6, 2023 Preliminary Prospectus Supplement, and the associated press release, "[t]he debt

100

term sheets we were getting were horrific and would have destroyed the company," resulting in Defendants conducting that dilutive transaction.

**L.      November 7, 2023 2Q24 Preliminary Results Press Release**

265.   On November 7, 2023, the Company issued a press release that quoted Defendant Evans as stating: "We are well positioned to efficiently fulfill our growing backlog of orders."

266.   The statement in the above paragraph was materially false and misleading because (1) the Company faced daunting obstacles to its production capacity including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, (4) the Company's supply chain was insufficient to support the production of "thousands of drones a month," (5) the facility was not operating "efficiently" for these reasons, and (6) the Company repeatedly missed order deadlines and was forced to reallocate drones produced for certain customers to others.

**M.      March 18, 2024 3Q24 Earnings Call**

267.   On March 18, 2024, the Company held an earnings call regarding 3Q24 results. During the call, Defendant Thompson stated, in relevant part, that "[t]he [SRR] contract is for approximately 12,000 drones. The award for the first tranche

101

of production drones two years ago, was $100 million for 1,083 drones," implying that a Tranche 2 SRR contract worth at least hundreds of millions of dollars.

268.    The statements in the above paragraph, which represented that the Company was pursuing a contract pursuant to which a vendor would produce approximately 12,000 drones and that was worth, at least, hundreds of millions of dollars, were materially false and misleading because (1) as revealed by the Kerrisdale Report, based on federal procurement records and an Army press release, in Tranche 1, the Army only used $47.8 million of the total contract's capacity and acquired 1083 systems (with about 2200 drones), and (2) the Tranche 2 contract was not sole source and thus, even if the Company was awarded a contract, it would not provide all "approximately 12,000 drones."

269.    During the call, Defendant Thompson stated, in relevant part:

> ***Production facility in Salt Lake City is in full mass production mode. We are now running 1.5 shifts to meet production goals*** as we continue to invest in facilities, people and processes. ***We are now demonstrating that we can build tens of thousands of drones yearly.***

270.    The statement in the above paragraph was materially false and misleading because (1) Salt Lake City Facility could not produce "tens of thousands of drones yearly," (2) the Company faced daunting obstacles to increasing to that production capacity and to moving into "full mass production mode," including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was severely

102

constrained by the need to test each drone, (4) the Company was not "meet[ing] production goals," as the Company repeatedly missed order deadlines and was forced to reallocate drones produced for certain customers to others and (5) the Company's supply chain was insufficient to support the production of "tens of thousands of drones yearly."

271. Also during the call, Thompson was asked: "Okay. So you anticipate being able to knock out the backlog quickly, is that correct?" In response, Defendant Thompson stated:

> Well, the good news is that we have been doing that with these huge increases in revenue every quarter and we continue to sell more. So we kind of have the best of both worlds. But we will continue to increase our production to not let get the backlog too high and to meet the time frames that our customers want. ***So if our customers need 90 days, we're going to make sure they get it in 90 days. If they need it in 120, we'll make sure they get it in 120. If they need it in 60, we'll increase production to get it in 60.*** So we have to adjust to our customers.

272. The statement in the above paragraph was materially false and misleading because (1) the Company faced daunting obstacles to its production capacity including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was severely constrained by the need to test each drone, (4) the Company's supply chain was insufficient to support the production of "thousands of drones a month," (5) the facility was not operating "efficiently" for these reasons, and (6) the Company

103

repeatedly missed order deadlines and was forced to reallocate drones produced for certain customers to others.

273.   Also on the call, Defendant Lunger stated, "We expect to improve margins. We've had some one-time scrap items and we're working toward a 1% scrap rate, which would improve margins. We're also working on improving our yields, which would improve margins because of the related labor costs . . . And we've also historically had a very robust warranty program so far that we expect to."

274.   The statements in the paragraph above, which represented that the Company had a minimal "scrap rate," which refers to the percentage of unusable materials discarded during procurement, normal manufacturing processes, and final quality checks, was materially false and misleading because the Company's production line suffered from massive design and quality control problems, resulting in a poor yield in its production line, as reflected by FE-2's report that approximately 25% of shipped Teal 2 drones failed before even being flown by a customer.

275.   Defendant Thompson interrupted Lunger's remarks to state that:

[L]et me jump in on the warranty because you – I'm the one that's dealing with it mostly and it kind of upsets me when we do this. But *just to be very frank, folks, we're, as she mentioned, we have a very generous warranty program.* ***And the reason that we have a generous warranty program at the beginning is we're trying to gain market share on large programs*** that are converting from our competitors and lots of time these programs go on for five years. *So we've made the decision to make sure that these people get their drones fixed immediately. if they can't be fixed in the field.* ***And, basically, sometimes we get stuff sent back to us and we find out it was actually***

104

*pilot and operator error, not our issue*. *But we still support the warranty as we're building market share and it's worked very well*. We expect that the warranty – generosity is what I'll say will continue to go down with all the other items that Leah mentioned.

276. The statements in the paragraph above, which represented that the Company's "generous warranty program" was adopted in order to "gain market share" and that the customer returns were primarily due to "pilot and operator error," were materially false and misleading because (1) the Company's production line suffered from massive design and quality control problems, resulting in a poor yield in its production line, as reflected by FE-2's report that approximately 25% of shipped Teal 2 drones failed before even being flown by a customer, and thus a "generous warranty program" was necessary to avoid losing customers, and (2) customer returns were primarily due to the Company's deficient manufacturing, rather than "pilot and operator error."

### N.    August 8, 2024 4Q24 Earnings Call

277. On August 8, 2024, the Company held an earnings call regarding its FY24 results. During the call, Defendant Thompson stated that:

> This Program of Record selection process has gone on for over five years. ***It started with 37 companies and is now down to Red Cat and one other company.*** The final test for the Army was in May. We had to deliver approximately 50 final prototype systems. The final down collection [*sic*] is scheduled for the end of next month, September 2024. ***We believe this production contract will be in the hundreds of millions***.

105

278. The statements in the above paragraph, which represented that the Company was pursuing a contract worth hundreds of millions of dollars pursuant to which a single vendor would be chosen in the "down [sel]ection" to provide all drones ordered by the Army under Tranche 2 of the SRR Program because (1) in light of the Kerrisdale Report's disclosure, based on federal procurement records and an Army press release, that the Army used only a fraction of the total Tranche 1 contract's capacity, there was no basis to state that a Tranche 2 contract would "be in the hundreds of millions," and (2) the Tranche 2 contract was not sole source.

279. Also during the call, Defendant Thompson stated, in response to an analyst question about "the capacity at Salt Lake," that "the Salt Lake facilities [sic] can easily do thousands of drones. Not easily. It's hard to do thousands of drones a month, but we can get to thousands of drones a month for the Teal 2/Teal 3 based on getting the demand that we want from that."

280. The statements in the paragraph above, which represented that the Company's Salt Lake City Facility could produce "thousands of drones a month," were materially false and misleading because (1) the facility could not produce "thousands of drones a month," (2) the Company faced daunting obstacles to increasing to that production capacity and to moving into "full mass production mode," including insufficient space, manpower, and funding, (3) the Company's production line suffered from massive design and quality control problems, and was

106

severely constrained by the need to test each drone, (4) the Company's supply chain was insufficient to support the production of "thousands of drones a month," and (5) as Defendants admitted on September 23, 2024, the Company had spent "the past four months . . . retooling and preparing for high volume production" and had "pause[d] manufacturing" during that time because the Company "couldn't produce and sell Teal 2 units[] while retooling [its] factory."

281.   Also during the call, an analyst asked: "So, just generally asking about the production capacity capabilities. So is that back up and running things going out the door again?"

282.   Defendant Thompson responded:

So, *we are back in production*. We're also – we are in a pretty large hiring spree right now to scale production of the future Teal Drones that we – it's the drone that we actually submitted for the Army prototype. We are preparing for large-scale production and moving into the Teal. We're calling it currently the Teal 3. So *we're back in production*.

283.   The statements in the paragraph above were materially false and misleading because, as Defendants admitted on September 23, 2024, the Company had spent "the past four months . . . retooling and preparing for high volume production" and had "pause[d] manufacturing" during that time because the Company "couldn't produce and sell Teal 2 units[] while retooling [its] factory."

107

### O.    September 23, 2024 1Q25 Earnings Call

284.    On September 23, 2024 Defendants Thompson and Lunger hosted Red Cat's 1Q25 earnings call. During the Q&A session, analyst Glenn Mattson asked:

And let's discuss a couple quick ones on SRR. Jeff, do you have a sense – I know you it could be any day now. Is there any type of like specific times that you're looking for, for when announcement could be made? Number one. And then, can you just remind us one more time of the scope – and I believe I have a number in my head of like $79 million in the first fiscal – a government fiscal year potentially as kind of the TAM or SAM, I guess.

285.    Defendant Thompson responded:

Yeah. Thanks. Yeah. ***Like I said, it's been said publicly that there's a clear winner and it's done***. But when you submit your final prototypes, you don't really get to communicate. So, you don't have any information till they call you and give you the news of down selection. Usually, three or four days before the rest of the world finds out. We think it could happen anywhere from early October or maybe they wait to the big Army show they have every year at AUSA.

We're very confident. But until we get official notice, we have no idea. *And yeah, some of the things that you can find online for the first year of deliveries between May and September of 2025 **is approximately 79**. That's the same stuff – that's the same number we found out there.*

286.    The statements in the paragraph above, which represented that the Company was pursuing a contract pursuant to which a single vendor would receive an award under Tranche 2 of the SRR Program, worth "approximately [$]79" million "between May and September of 2025," were materially false and misleading because (1) the Tranche 2 contract was not sole source and thus no "clear winner and it's done," (2) as because it was not sole source, there was no basis to state that

108

"approximately [$]79" million would be awarded to a single vendor, (3) the Company's production line was plagued by massive design and quality control problems and thus was not ready to fulfill a $79 million order for the Army "between May and September of 2025," (4) the Army's detailed funding request for its fiscal year 2025 (ending on September 30, 2025) showed that it expected to procure between 275 and 300 systems annually at a cost of $20-25 million, including repairs, replacements, and related services, and (5) as Defendants later admitted, the figure of "approximately [$]79" million was taken a line item in the NDAA, which was "just Santa's wish list, has nothing," and was "not even worth [one's] time" that was likely to have "zero relevance."

**P.    November 19, 2024 SRR Selection Announcements**

287.  On November 19, 2024, the Company issued the November 19, 2024 Press Release announcing that it "has been selected as *the* winner of the U.S. Army's Short Range Reconnaissance (SRR) Program of Record."

288.  The statement in the paragraph above was materially false and misleading because (1) the Company had not yet been awarded a contract under Tranche 2 of the SRR Program and (2) the Tranche 2 program was not sole source and thus there was not one winner.

289.  The November 19, 2024 Press Release also stated that the Company was "focused on ramping production of Teal's next generation system ***to meet the***

109

***Army's currently stated acquisition objective for 5,880 systems***, which is subject to change over the 5 year period of performance."

290. The statement in the paragraph above, which represented that the Company was awarded a contract to fulfill the "stated acquisition objective for 5,880 systems," was materially false and misleading because (1) the Company had not yet been awarded a contract under Tranche 2 of the SRR Program and (2) the Tranche 2 program was not sole source and thus there was no basis to represent that the Company was the sole vendor that would provide drones towards the "stated acquisition objective."

291. The same day, Red Cat hosted the November 2024 Conference Call. During the call, Defendant Matus stated:

> ***[T]he average price per system . . . includes [sic] two drones and one controller is around $45,000, depending on configuration. And the Army's stated authorized acquisition objective or AAO, is 5,880 systems . . . . [Y]ou can do some simple math on those numbers. And we also expect the Army to buy spare parts, training and maintenance in addition to systems themselves.*** I think it's also worth noting that the Army's acquisition objective number was created before the invasion of Ukraine and before the world realized that drones are really as impactful as the introduction of the machine gun, a 100 years ago. ***In my opinion, the United States Army is going to need a lot more drones.***

292. Defendant Matus also stated that "the contract can go up to five years, but again, they need ***at least 5,880 systems*** and they want to field those as fast as possible as budget allows."

110

293. During the same call, Defendants Thompson and Hitchcock suggested that Red Cat could earn an additional *30% to 70%* of revenue from the SRR Contract based on supplemental services. Defendant Thompson stated:

> So, I'm learning about how these programs of records [e.g., the SRR Program] work [is] that *they typically have anywhere from 30% to 65%, 70% sometimes of additional revenue from training, spares and repairs*."

294. Defendant Hitchcock added:

> So, the key takeaway from this is what we're talking about today specifically is the SRR Program of Record. And typically, year-over-year, *you could expect somewhere in the range of 30% added for spares, repairs and training year-over-year*."

295. The statements in the four paragraphs above, which represented that the Company had secured a contract to provide "at least 5,880 systems" worth at least approximately $264 million ($45,000 multiplied to 5,880) (plus an additional 30-70% from parts, training, and maintenance/repairs), were materially false and misleading because (1) the Company had not yet been awarded a contract under Tranche 2 of the SRR Program and (2) the Tranche 2 program was not sole source and thus there was no basis to represent that the Company was the sole vendor that would provide drones towards the "stated acquisition objective" of "5,880 systems" or "at least 5,880 systems," and (3) the Army's detailed funding request for its fiscal year 2025 (ending on September 30, 2025) reflected expected procurement of only

111

275 and 300 systems annually at a cost of $20-25 million, including repairs, replacements, and related services.

296.  During the call, in response to the question, "when can everyone expect maybe updated guidance?", Defendant Thompson stated in part:

> [W]e gave guidance of $50 million to $55 million for calendar 2025 . . . . And if you add the number that Brendan was talking about . . . for 2025, which is that *$79 million that could possibly put the calendar year on $120 million for next year*. So, that's pretty exciting. And that would just be the army . . . . [W]e're trying to figure out that line item that [Brendan Stewart] talked about is *up to $79 million for the – for 2025* . . . . [W]e're supposed to be making the first deliveries in late spring, and we only have till the end of September to deliver on 2025 calendar. *So, it could be up to $79 million.* Once we have more clarity, *we think it's easily going to be in the close to $50 million anyway for 2025 calendar*. So, guidance will probably and this isn't official guidance yet. But again, we just got this notification and we think *it'll be approximately $50 million from SRR and other things that will add to that* as other branches of the Army piles on there.

297.  The statements in the paragraph above were materially false and misleading because (1) the Company had not yet been awarded a contract under Tranche 2 of the SRR Program, (2) Tranche 2 program was not sole source and thus there was no basis to represent that the "line item" for up to $79 million for 2025 would be spent on the Company's drones, (3) the Army's detailed funding request for its fiscal year 2025 (ending on September 30, 2025) showed that it expected to procure between 275 and 300 systems annually at a cost of $20-25 million, (4) as Defendants later admitted, the $79 million figure was taken a line item in the NDAA, which was "just Santa's wish list, has nothing," and was "not even worth [one's]

112

time" that was likely to have "zero relevance," (5) the Company's production line was plagued by massive design and quality control problems and thus was not ready to fulfill a $79 million order for the Army in 2025.

298.  Further, Defendant Matus represented to investors that the Company had secured the entirety of Tranche 2 of the SRR Program, stating:

> I also saw another question asking if Red Cat is the only drone manufacturer awarded an SRR production selection? And *yes, the answer is yes. Teal is the only vendor selected to move into production*.

299.  The statement in the paragraph above was materially false and misleading because (1) the Company had not yet been awarded a contract under Tranche 2 of the SRR Program and (2) the Tranche 2 program was not sole source and thus there was not one winner.

300.  Defendant Matus also represented that the Company was ready to massively scale production, stating that

> What we're looking at now is entering low rate initial production *early next year, that'll be in the hundreds of systems per month*. And *then by the end of next year, as demand ramps up and deliveries ramp up, we'll be in the, thousands per month*. Right now, we're still operating a single shift on our production line. *We can easily go to two shift[s] or three shift[s]*, including weekends.

301.  The statements in the paragraph above were materially false and misleading because the Company's production line was plagued by massive design

113

and quality control problems and thus was not ready to "ramp up" to producing thousands of drones per month.

### Q.    December 16, 2024 2Q25 Earnings Call

302.    On December 16, 2024, the Company held an earnings call, during which Defendant Thompson stated: "And what we are doing now is we're taking the Black Widow, which is the winner of SRR *Sole Source*, *which is going to be 12,000 drones out there*."

303.    Defendant Lunger also stated during the call that "*We won a sole-sourced contract*," and assured investors that the Company would progress "*from LRIP to full rate production with the Black Widow*."

304.    The statements in the two paragraphs above were materially false and misleading because (1) the Army had not awarded a contract to the Company under Tranche 2 of the SRR Program as of December 16, 2024, (2) the Company's selection to provide drones to the Army under Tranche 2 of the SRR Program was not a "sole source" relationship, (3) the Company was not selected to, or guaranteed to, provide 12,000 drones to the Army under Tranche 2 of the SRR Program, and (4) the Company faced material obstacles to progressing "from LRIP to full rate production with the Black Widow," especially in light of the myriad obstacles it faced with respect to producing drones at its Salt Lake City Facility.

114

### R.    February 12, 2025 Press Releases

305.   On February 12, 2025, the Company announced in a press release that it had "entered into an agreement for up to $20 million and closed on the initial tranche of $16.5 Million in debt financing with The Lind Partners, a New York based institutional fund manager ('Lind')." Per the Company's press release, this agreement included debt that was convertible to equity at the price of $16.15 per share, initial tranche proceeds of $15 million, and 1 million warrants to buy common stock exercisable at $15 per share non cashless. The press release also disclosed that the Company had applied for $58 million in debt financing from the DoD Office of Strategic Capital ("OSC"), which "implements strategies and partnerships to accelerate and scale private investment in critical supply chain technologies needed for national security."

306.   The Company's press release stated that ***"[t]he investment is expected to provide Red Cat with the working capital needed to scale up production and the ongoing development of its Arachnid Family of Systems, which includes Black Widow™, Edge 130, and a new line of FANG™ First-Person View (FPV) drones***." The press release quoted Defendant Thompson as stating: "***The recent financing will allow us to expedite and expand the Edge 130 factory and build-out and ramp up mass production of the Black Widow***," and that "[t]he potential total financing of $93 million is the least dilutive option for our shareholders."

115

307.    The statements in the two paragraphs above were materially false and misleading because Red Cat suffered from serious, undisclosed problems that created a material risk that it would require additional financing, including (1) production shortfalls, (2) quality problems, and (3) that the SRR Program provided significantly less potential revenue, and at later dates, than Defendants had publicly stated, and thus the financing transaction announced on February 12, 2025 would not "provide Red Cat with the working capital needed to scale up production and the ongoing development" of the specified products, nor be sufficient to "allow us to expedite and expand the Edge 130 factory and build-out and ramp up mass production of the Black Widow."

### S.    February 13, 2025 Thompson Stocktwits Post

308.    On February 13, 2025 at 7:37 am, Defendant Thompson posted on stocktwits: "We believe *we are fully funded after yesterday's above market deal* at $16.15" and that "*Financing is done and out of the way*," as shown in the following screenshot:

116



**Duckworks** Feb 13, 2025 7:37 AM

😈 $RCAT

Good morning Red Cat.

We believe we are fully funded after yesterday's above market deal at $16.15 Financing is done and out of the way.

Back to work!

309. The statements in the paragraph above were materially false and misleading because the Company was not "fully funded" and financing was not "done and out of the way," because Red Cat suffered from serious, undisclosed problems that created a material risk that it would require additional financing, including (1) production shortfalls, (2) quality problems, and (3) that the SRR Program provided significantly less potential revenue, and at later dates, than Defendants had publicly stated.

**T.    February 27, 2025 Investor Day**

310. On February 27, 2025, during Red Cat's Investor Day presentation, Defendant Thompson reiterated the 2025 guidance of $80 million to $120 million in revenue, specifying that the SRR Program accounted for $25 million to $65 million of the guidance, and that "we know that we got $25 million *no matter what*," which he repeatedly said was "*in the bank*." Thompson stated in part:

> So the guidance, $25 million to $65 million. Okay. ***We know that we got $25 million no matter what. That's there. It's in the bank, as they say***.

117

*But we also get a full quarter of our calendar year on their first quarter,* which will be the first year of full rate production. So, we just kind of thumbnailed it on what full rate production will hopefully look like. And you're going to hear some great information from Brendan on what we think the POM, which now we're a program of record will become part of the POM, which is a five-year budget process. We weren't before. So that's how we went from $25 to $65. *The $25 like I said, is in the bank*. We'll be making those drones for LRIP. We've got the additional features for I think it's a few million, whatever it is. And then we get that full quarter of full rate production in our calendar year, which is their first quarter of 2026.

311. The statements in the above paragraph were materially false and misleading because Red Cat was not assured of obtaining $25 million during the government's fiscal year because the SRR contract was not sole source, and Red Cat's undisclosed production shortfalls and quality problems created material risks to its ability to obtain the level of SRR sales in the timeframe that Thompson represented.

### U.    August 14, 2025 Town Hall Investor Meeting

312.    On August 14, 2025, the Company held a Town Hall meeting open to analysts and investors, during which Defendant Thompson stated:

Yeah, we're getting there. I'm sure we're going to get a lot of questions on how we're going to hit our guidance with last Q, but this is not a last Q story. We've been in a holding pattern with Black Widow, waiting for the Army to say, yes, this is a final version. We actually got changes as close as four weeks ago. Never mind the March 27th stuff that expanded our range and battery life. For us to get the contract done at the end of last month and to be shipping this month is pretty darn exciting. *With those run rates, we can easily do 1,000 drones a month of just Black Widow. Since this has already been hit upon, we believe*

118

*we can still hit at least the lower end of our 80 - 120 guidance, just mostly with the Black Widow*.

313.   The statements in the paragraph above were materially false and misleading because (1) the Army's detailed funding request for its fiscal year 2025 (ending on September 30, 2025) showed that it expected to procure between 275 and 300 systems annually at a cost of $20-25 million, (2) the Tranche 2 program was not sole source and thus there was no basis to represent that detailed funding request to procure between 275 and 300 systems annually at a cost of $20-25 million related entirely the Company's drones, and (3) the Company's production line was plagued by massive design and quality control problems and thus was not ready to fulfill nearly $80 million in Black Widow orders.

314.   Also during the call, Stan Nowak, the Company's Vice President of Marketing, posed a question to Defendants Thompson and Ericson, asking, "[n]ext up, Jeff and Chris, I think maybe you guys can both answer this. With the projected growth plans, are there any plans for additional debt or equity raise in the near future?"

315.   In response, Defendant Thompson stated:

I'll start, and then Chris [Ericson] will yell at me after whatever I say. ***We have a very strong balance sheet right now***. As Brendan mentioned, it sounds like we're in the second phase of the Office of Strategic Capital, which is about a $50 million infusion. Our burn is basically where it is without the revenue starting yet. As we're producing hundreds and thousands and then thousands of drones per month, that burn's going to come down dramatically. We have $66

119

million in the bank. I think *we're very well funded. No need to do a debt offering. I mean, our debt's going to be gone in a few months, so that'll be gone. We're not doing that again. We have a strong balance sheet, so we do not see any need for a raise right now*.

316.    Also during the call, Defendant Ericson stated: "[w]e have successfully positioned ourselves with a strong $66 million cash balance and a $16 million inventory buildup to deliver results in the second half of 2025" and that "we've successfully controlled non-labor operating costs to keep a steady and efficient cash burn."

317.    The statements in the two paragraphs above, which represented that the Company's financial position was such that it would not, and had no need to, raise capital in the near future, were materially false and misleading because the Company was not "well funded" and did in fact have a "need for a raise" because Red Cat suffered from serious, undisclosed problems that created a material risk that it would require additional financing, including (1) production shortfalls, (2) quality problems, and (3) that the SRR Program provided significantly less potential revenue, and at later dates, than Defendants had publicly stated.

## VI.    <u>LOSS CAUSATION</u>

318.    Beginning on July 27, 2023, through the end of the Class Period, a series of disclosures revealed that Defendants had made material misstatements and/or constituted the materialization of risks concealed by Defendants. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the

120

market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

### A.    July 27, 2023 FY23 Earnings Call

319.    On July 27, 2023, after the market closed, Red Cat hosted a conference call (the "FY23 Conference Call") with investors and analysts to discuss its financial and operating results for its fiscal year 2023 ("FY23"). During the FY23 Conference Call, Defendants revealed that the Salt Lake City Facility could only currently produce 100 drones per month and was still being built, refined, and expanded. Specifically, Defendant Hernon disclosed that Teal's operations personnel were ***still*** "focused on building, refining and expanding our production capacity, which is ***presently at 100 systems per month***," and that Defendants "***believe*** [they] can more than triple [this capacity] over the next ***few years***."

320.    During the FY23 Conference Call's question-and-answer phase, an investor noted that "[y]ou said production is 100 per month" but "I think in the past you'd reference maybe 1,000 per month[,]" and asked "[i]s the 100 per month going to increase or is that pretty much where we're at for the rest of the year?" In response, Defendant Thompson stated, in relevant part:

> [F]irst you just got to get the factory up and running and make sure that you have all the issues out of the production line to reliably do 100 a month, as some of our team says, we do 100 a month, no problem at ease right now. And that number is already growing slightly. ***But you don't go off and build 1,000 drones***, because there's different

121

frequencies . . . . ***And so you can't just make . . . batches and hope for the best of 1,000 and then ship them out.***

321. In response to the same question, Defendant Hernon stated "I don't personally recall us ever saying we could produce 1,000 a month."

322. Also on July 27, 2023, during after-market hours, Red Cat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for FY23 (the "2023 10-K"). The 2023 10-K, which was signed by Defendants Thompson and Hernon, reported, *inter alia*, that construction of the Salt Lake City Facility was only "***substantially completed***[,]" reiterated that its "***production capacity was approximately [only] 100 drones per month***[,]" and advised that "maximum production capacity for this facility can reach 1,000 drones per month over the next ***2 to 3 years, provided that additional capital investments are made and manufacturing efficiencies realized***."

323. These disclosures revealed the false and misleading nature of Defendants' prior statements regarding the Salt Lake City Facility's production capacity. By contrast to Defendants' previous misrepresentations that the facility could "produce ***thousands of drones per month,***" the 2023 10-K revealed that the Company could only produce "100 drones per month." Indeed, Defendant Hernon's response to an investment analyst questioning this discrepancy, that "I don't personally recall us ever saying we could produce 1,000 a month," when, in fact, they did, is an effective concession that their prior statements were false. Moreover,

122

contrary to their statements on December 15, 2022, that their facility was *"significantly completed"* and on March 7, 2023, that "*[t]he Salt Lake City factory is complete and ready to go,*" the 2023 10-K revealed that the facility was only "substantially completed" as of July 27, 2023.

324. Following Red Cat's FY23 Conference Call and its filing of the 2023 10-K, the Company's stock price fell $0.10 per share, or 8.93%, to close at $1.02 per share on July 28, 2023.

**B.      December 6, 2023 Prospectus Filings**

325. On December 6, 2023, after the market closed, the Company filed the December 6, 2023 Prospectus Amendment, amending the June 2021 Registration Statement previously declared effective on June 14, 2021 (i.e., the shelf registration that Thompson referred to on August 9, 2023, at Cannacord Genuity Growth Conference, when he reassured investors concerned about potential dilution). The December 6, 2023 Prospectus Amendment disclosed that the Company had entered into an agreement with ThinkEquity as sales agent to sell newly-issued shares of Company common stock with an aggregate offering price of up to $4,375,000.

326. The same day, also after market hours, the Company also filed the December 6, 2023 Preliminary Prospectus Supplement, which supplemented the June 2021 Registration Statement, for the sale of additional shares of common stock. The Company issued a press release after market hours stating:

123

Red Cat [] today announced the pricing of its previously announced underwritten public offering of 16,000,000 shares of its common stock at a public offering price of $0.50 per share, for gross proceeds of $8,000,000, before deducting underwriting discounts, commissions and offering expenses. All of the shares of common stock are being offered by the Company. In addition, the Company has granted the underwriters a 45-day option to purchase up to an additional 2,400,000 shares of common stock at the public offering price less discounts and commissions, to cover over-allotments. The offering is expected to close on December 11, 2023, subject to satisfaction of customary closing conditions.

327. These disclosures revealed the false and misleading nature of Defendants' prior statements representing that the Company would pursue non-dilutive ways to raise capital, such as "pretty darn good" term sheets that it had received to borrow against government orders.

328. The Company's stock price fell 27.6% the following day as the market reacted to this news, closing at $0.55 per share on December 7, 2023.

## C.     September 23, 2024 1Q25 Earnings Call

329. On September 23, 2024, the Company hosted a conference call regarding 1Q25 results. During the call, Defendant Thompson disclosed that, contrary to his prior representations that the Salt Lake City Facility was "in full mass production mode" and capable of "build[ing] tens of thousands of drones yearly," Red Cat had spent "the past four months . . . retooling and preparing for high volume production." Likewise, in addressing the Company's sales results for the quarter, Defendant Thompson admitted that a "pause in manufacturing of Teal 2 and building

124

our Army prototypes impacted Teal 2 sales" because, *inter alia*, Red Cat "couldn't produce and sell Teal 2 units[] while retooling [its] factory."

330. These disclosures revealed the false and misleading nature of Defendants' prior statements regarding the Company's Salt Lake City Facility, including those (1) touting the facility's capacity to produce "tens of thousands of drones yearly" or "thousands of drones per month," and (2) representing that the facility was "back in production" on August 8, 2024,

331. Following Red Cat's issuance of the 1Q25 Press Release and Defendant Thompson's disclosures during the 1Q25 Conference Call, the Company's stock price fell $0.80 per share, or 25.32%, over the following two trading sessions, to close at $2.36 per share on September 25, 2024.

### D. January 16, 2025 Kerrisdale Report

332. On January 16, 2025, during intraday trading hours, Kerrisdale published a report (the "Kerrisdale Report," attached as Exhibit B hereto) alleging, *inter alia*, that Red Cat had overstated the value of the SRR Contract and lacks the production capacity to deliver on its promises. For example, the Kerrisdale Report stated, *inter alia*:

> **The SRR contract that Red Cat won in November and preemptively announced without the Army's permission is much smaller and less favorable than management has intimated.** Red Cat management has spent years hyping the potential of Tranche 2 of the Army's [SRR sUAS] program for which the company was competing. Investors were initially led to believe that the revenue potential of a win

125

would be in the billion dollar range over the course of 5-10 years. Upon winning the contract, management curbed those expectations by quite a bit, though *still* signaled revenue of $260 million for 5,880 drone systems over the next five years, plus about 30% of that sticker price to be earned in repairs, replacements, and training services. Management called out $80 million in 2025 expected revenue, specifically citing the National Defense Authorization Act (NDAA) text.

But the NDAA says nothing about the SRR funding in particular and the Army's detailed funding request for 2025 shows that the service expects to procure between 275 and 300 systems annually at a cost of $20-25 million, which is a very far cry from Red Cat's 2025 SRR guidance. Additionally, the cost for repairs, replacements, and related services are *included* in that $20-25 million, so Red Cat's "plus 30%" should be entirely discounted.

(Emphases in original.)

333. The Kerrisdale Report also alleged that Red Cat has continued to mislead investors about the Salt Lake City Facility's production capacity, stating, *inter alia*:

Over the last 3 years, Red Cat has promised investors *multiple times* that within some clearly definable near-term deadline it will be capable of producing "thousands of drones" per month. First it was "by the fall" in early 2022, then it was "in a few months" in November of 2022, then "now" in March of 2023, then "in a few months" in July of that year, then "now" (again) in early 2024, and most recently (in September) it was to be at some point in 2025 . . . . *[D]rone industry sources close to the company don't think Red Cat has the manufacturing capability for mass production of drones.* Getting there would take time and a real capital expenditure commitment.

\* \* \*

In the course of our due diligence, *we found a drone industry specialist who's been following Teal since its founding by [Defendant] Matus* and who had the utmost admiration for what he's accomplished. *They*

126

*were adamant that there's just no way that Teal is capable of any sort of mass production* . . . . Red Cat's financials seem to confirm this assessment: ***Over the 3 years ending on October 31, the company has spent a mere $3.1 million on capital expenditures, with over two thirds of that before the end of 2022. It's highly implausible that a mass-production facility for manufacturing drones has been built at any point in the last two years for less than $1 million.***

334. The Kerrisdale Report revealed that Defendants' statements representing that the SRR Tranche 2 program was "sole source," touting the scope and value of an SRR Tranche 2 contract and its significance for the Company's 2025 financial results, and representing that the Company could quickly ramp up to fulfill the Army's orders under such a contract, were false and misleading.

335. Following publication of the Kerrisdale Report, Red Cat's stock price fell $2.35 per share, or 21.54%, over the following two trading sessions, to close at $8.56 per share on January 17, 2025.

**E.    April 10, 2025 Stock Offering Press Release**

336. On April 10, 2025, before market hours, the Company announced that it had "entered into securities purchase agreements with certain institutional investors for the purchase and sale of 4,724,412 shares of common stock, pursuant to a registered direct offering, expected to result in gross proceeds of approximately $30 million."

337. This news revealed the false and misleading nature of Defendants' February 12, 2025 representations concerning "recent financing [that] will allow us

127

to expedite and expand the Edge 130 factory and build-out and ramp up mass production of the Black Widow," and Defendant Thompson's February 13, 2025 stocktwits post representing that the Company was "fully funded" and that "Financing is done and out of the way."

338.  In response to this news, the Company's stock price nosedived 22.15%, closing at $5.80 per share on April 10. 2025.

**F.      June 17, 2025 Stock Offering Press Release**

339.  On June 17, 2025, before market hours, the Company issued a press release disclosing that the Company had "entered into securities purchase agreements with certain institutional investors for the purchase and sale of 6,448,276 shares of common stock, pursuant to a registered direct offering, expected to result in gross proceeds of approximately $46.75 million."

340.  After market hours that same day, the Company filed a prospectus supplement for this offering, which stated that the offering price of the shares covered by the prospectus supplement was $7.25 per share.

341. This news further revealed the false and misleading nature of Defendants' February 12, 2025 representations concerning "recent financing [that] will allow us to expedite and expand the Edge 130 factory and build-out and ramp up mass production of the Black Widow," and Defendant Thompson's February 13,

128

2025 stocktwits post representing that the Company was "fully funded" and that "Financing is done and out of the way."

342. The Company's stock price dropped in response to this news, falling 20.35% to close at $7.32 per share on June 17, 2025.

### G.    August 15, 2025 First Fuzzy Panda Report

343. On August 15, 2025, before or during market hours, Fuzzy Panda published the First Fuzzy Panda Report, which revealed, inter alia, that the Company was not assured to advance from LRIP to full rate production and that, to the contrary, the Company's continued production difficulties materially endangered the prospect of moving into full rate production. Further, the report revealed that the SRR contract was not "sole source" and that the Company's competitor, Skydio, which had also won an SRR contract, had already delivered hundreds of drones to the Army in May. The First Fuzzy Panda Report also revealed that the Company encountered high failure rates in its production lines, contrary to Defendants' statements regarding the Salt Lake City Facility's production capacity, failure rate (or "scrap rate"), and customer returns.

344. Following publication of the First Fuzzy Panda Report, the Company's stock price fell $0.96 per share, or 10.25%, to close at $8.41 per share on August 15, 2025.

129

**H.      September 17-18, 2025 Stock Offering Press Releases**

345.   On September 17, 2025, after market hours, the Company announced

that it intends to offer and sell shares of its common stock in an underwritten public offering. In connection with the offering, Red Cat also expects to grant the underwriter a 30-day option to purchase up to an additional 15% of the shares of common stock offered in the public offering. The offering is subject to market and other conditions, and there can be no assurance as to whether or when the offering may be completed, or as to the actual size or terms of the offering.

346.   That same day, also after market hours, the Company filed a preliminary prospectus supplement for the offering of an unspecified number of shares of common stock.

347.   The next morning, September 18, 2025, before market hours, the Company issued another press release, which disclosed "the pricing of an underwritten public offering of 15,625,000 shares of common stock at a price to the public of $9.60 per share. The gross proceeds from the offering to the Company are expected to be approximately $150 million."

348.   These disclosures on September 17 and 18, 2025, revealed the false and misleading nature of Defendants Thompson and Ericson's August 14, 2025 statements touting the Company's financial condition and representing that the Company had no plans or need to raise capital in the near future.

349.   In response to this news, the Company's stock price fell 10.91%, closing at $10.04 on September 18, 2025.

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

350.   A strong inference that the Individual Defendants, and thus the Company, acted with scienter when making material misstatements is established by the allegations above as well as those set forth below.

### A.   The Individual Defendants Had a Motive to Sell Company Stock at Artificially Inflated Prices

351.   During the Class Period, the Individual Defendants had the opportunity to commit fraud because they made, and had authority for, the material misstatements alleged above. In addition, the Individual Defendants had a motive, as they could sell massive amounts of Company stock at prices artificially inflated by their misstatements. Defendants Thompson, Hitchcock, Matus, and Lunger all sold millions of dollars of Company stock in December 2024, right after Defendants misleadingly announced that the Company was "*the* winner" of Tranche 2 of the SRR Program, and before Kerrisdale revealed that Defendants' statements were false and misleading.

352.   Defendant Thompson never reported any sales of his Company stock holdings until December 23, 2024, very shortly after Defendants misled investors regarding the SRR contract. Over the course of that day, December 23, and December 26, 2024, he sold a total of *500,000* shares for total proceeds of over *$5.7 million*. These proceeds dwarfed his cash compensation: during the fiscal year ended April 30, 2024, Thompson received a salary of $300,000 and a cash bonus of

131

$155,600. For the eight-month transition period ending December 31, 2024 (reflecting the change of the Company's fiscal year to match the calendar year), Thompson's salary was $200,000 and his cash bonus was $100,000; these amounts are also dwarfed by his insider stock sale proceeds.

353. Defendant Hitchcock, who also never previously reported any sales of Company stock, sold a total of 113,823 shares of the Company's common stock, for total proceeds of approximately $1.2 million, on a single day, December 20, 2024. This was merely three weeks after his November 27, 2024 promotion to the CRO role. His employment agreement for the CRO role provided that he would receive an initial equity of 575,000 shares. Thus, less than a month after his promotion to the C-suite and receiving that equity grant, he cashed in nearly *20%* of his shares. His $1.2 million in insider proceeds far exceeded his cash compensation, which consisted of $138,750 for the eight-month transition period ending December 31, 2024 (reflecting the change of the Company's fiscal year to match the calendar year), as well as a $50,000 cash bonus for that period.

354. Defendant Matus, who also never previously reported any sales of Company stock, enriched himself by approximately $9.2 million by selling 781,383 shares of Red Cat common stock—approximately *72%* of his holdings—during the period from December 18, 2024 through December 26, 2024. Again, these proceeds vastly exceeded his cash compensation. During the fiscal year ended April 30, 2024,

Matus received a salary of $183,333 and no cash bonus. For the eight-month transition period ending December 31, 2024 (reflecting the change of the Company's fiscal year to match the calendar year), Matus's salary was $150,139 and his cash bonus was $25,000.

355.   Defendant Lunger, who also never previously reported any sales of Company stock, sold 524,798 shares of Company common stock—over 59% of her holdings—enriching herself by approximately $5 million.[7] *All* of these sales were made on December 18, 2024. These proceeds far outweighed her cash compensation: during the fiscal year ended April 30, 2024, Lunger received a salary of $188,750 and no cash bonus. For the eight-month transition period ending December 31, 2024 (reflecting the change of the Company's fiscal year to match the calendar year), Lunger received a salary of $153,333 and no cash bonus.

356.   Thus, nearly all of the Individual Defendants who were at the Company when they made false and misleading statements while announcing the SRR contract dumped massive amounts of stock at artificially inflated prices, yielding millions of dollars in proceeds. These insider sales were highly unusual, as none of these Individual Defendants reported *any* sales of Company common stock before or since December 2024.

---

[7] This includes 56,159 shares sold by Defendant Lunger's spouse, Steve Lunger, who is the Company's current Director of Technical Reporting.

133

357.    Further, Defendants prematurely announced the Company's selection as a vendor under Tranche 2 of the SRR Program on November 19, 2024, enabling them to sell their Company shares at inflated prices in December 2024, before the Army officially awarded the Company a contract. As *Breaking Defense*, a news organization focused on "the strategy, politics and technology of global defense," reported after contacting the Army—and as discussed in the Kerrisdale Report—the Company "preempted the service announcement." *Breaking Defense* further reported that when it reached the Army for comment, the Army "confirmed today that it had selected Red Cat's quadcopter for SRR but noted that 'exact funding, quantities, and other details' will be hammered out throughout the rest of the year as the duo work though the contract details." Rather than waiting until the Army was ready to make its own announcement, Defendants rushed to announce the development in their own misleading characterization, and thus could unload millions of dollars of stock before others (such as Kerrisdale) could perform their own investigations and reveal that Defendants had misled the market.

358.    Indeed, FE-7 recalled that in all-hands Zoom meetings, Thompson emphasized that securing a contract with the Army would drive up the Company's stock price, saying that the Company would "look good on the stock market" and make employees "millionaires." This certainly proved true for the Individual Defendants that made insider sales during the Class Period.

134

### B.     Defendant Thompson Had Additional Motives to Inflate Red Cat's Stock Price

359.    In addition to Defendant Thompson's motive to sell Red Cat stock at artificially inflated prices, his motive to inflate Red Cat's stock price is further shown by the structure of his compensation agreements with the Company.

360.    Thompson's Executive Employment Agreement with Red Cat dated March 31, 2021 provides that he is eligible to receive an annual cash bonus of up to 200% of his base salary, as determined by the board of directors and its compensation committee. The agreement further provides that Thompson "shall be entitled to receive the full Annual Bonus upon achieving the Incentive Criteria during the prior fiscal year," where Incentive Criteria are defined as "A) at any time [Red Cat's] market cap is at least $500,000,000; and B) traded price per share is at least $6.00 per share stock price on a national securities exchange for 60 consecutive days."

361.    Thompson and other Red Cat executives participated in Red Cat's 2019 Equity Incentive Plan, which provided for performance-based awards based on criteria selected by Red Cat's board, which could expressly include, among others: (i) "total stockholder return," (ii) "price per share of Common Stock," and (iii) "successful completion of financings."

362.    In addition, Defendant Thompson entered into two variable prepaid forward contracts secured by Red Cat stock with Morgan Stanley Bank, N.A. First,

135

on December 30, 2024, he entered into an agreement secured by up to 1.5 million shares of Red Cat stock. Second, on September 12, 2025, Thompson entered into an agreement secured by up to 750,000 shares.

363. Furthermore, Defendant Thompson made statements showing his desire to attract retail investors and index funds to purchase the Company's shares and thereby increase its stock price.

364. In an interview posted to YouTube on October 1, 2024 by the PJ Daniels Show (available at https://www.youtube.com/watch?v=eOuy7HDLahw), Defendant Thompson stated "drones are just fricking cool, it gets retail folks a little excited."

365. In an interview posted to YouTube on January 2, 2025 by Alpha Wolf Impact (available at https://www.youtube.com/watch?v=HJdhH7uBdK8), Defendant Thompson stated "we're well into the mid- to upper-Russell 2000 market cap now, so we're looking forward to June and getting on to the Russell. That'll be great, that'll mop up a bunch of shares."

366. And on January 22, 2025, Thompson posted to his public Stocktwits account, referring to his followers as Red Cat's "retail army":

136



**Duckworks** Jan 22, 2025 8:22 AM

🐱 $RCAT

Good morning Red Cat.

I have 20+ meetings with institutional investors over next couple of days. If any recurring themes emerge I will bring them to our retail army!

Stay tuned for some business updates !

## C.   Red Cat Suffered Large Losses and Its Survival Depended on Obtaining Cash from Investors

367.   At all relevant times, Red Cat reported only modest revenues, while incurring increasingly large losses of tens of millions of dollars per year, and so depended on money raised from investors to fund its operations. The following table reports select data from Red Cat's annual financial statements:

| | Year Ended 12/31/2025 | Eight Months Ended 12/31/2024 | Year Ended 4/30/2024 | Year Ended 4/30/2023 | Year Ended 4/30/2022 |
|---|---|---|---|---|---|
| *Consolidated Statements of Operations* | | | | | |
| **Revenues** | $40,729,000 | $4,850,304 | $17,836,382 | $9,911,780 | $6,428,963 |
| **Net Loss** | ($72,075,000) | ($43,613,971) | ($24,052,629) | ($27,087,737) | ($11,689,128) |
| *Consolidated Statements of Cash Flows* | | | | | |
| **Net cash provided by (used in) financing activities** | $254,492,000 | $19,386,660 | $7,802,076 | ($1,215,325) | $66,430,274 |

368.   As described *supra* in Part IV.K, the Company's financial statements often included a "going concern" warning. For example, Red Cat's Form 10-K filed with the SEC on July 27, 2023 stated that:

137

there is substantial doubt about the Company's ability to continue as a going concern as the Company will require additional liquidity to continue its operations and meet its financial obligations for twelve months from the date these consolidated financial statements are issued . . . If the Company is unable to raise additional capital, there is a risk that the Company could default on its financial obligations and could be required to discontinue or significantly reduce the scope of its operations.

369.   The Company's 10-K forms filed with the SEC on August 8, 2024 and March 31, 2025 similarly noted that Red Cat's financial results and financial position "raise substantial doubt about our ability to continue as a going concern," while simultaneously stating that "Management has concluded that . . . recent positive developments alleviate any substantial doubt about our ability to continue our operations, and meet our financial obligations, for twelve months from the date these consolidated financial statements are issued."

370.   In its Form 10-Q filed with the SEC on August 14, 2025, Red Cat stated for the first time that "the Company no longer has substantial doubt of its ability to continue as a going concern."

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

371.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of all persons and entities that purchased shares of the Company's common stock or call options, or sold Company put options, during the Class Period and were damaged thereby.

372. Excluded from the Class are: Defendants; members of the immediate family of any Defendant who is a natural person; any person who was an officer or director of the Company during the Class Period; any firm, trust, corporation, or other entity in which any Defendant has, or had during the Class Period, a controlling interest; any Company employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person.

373. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are thousands of members in the Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

374. Plaintiffs' claims are typical of the claims of Class members as all were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

139

375.   Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

376.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether Defendants' acts violated the federal securities laws as alleged herein;

- whether Defendants made materially false or misleading statements to the investing public during the Class Period;

- Whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period; and

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the price of the Company's common stock was artificially inflated during the Class Period because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

377.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

140

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

378. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- Defendants' omissions and misrepresentations were material;

- The Company's common stock traded in an efficient market;

- The Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;

- The Company's common stock traded on the Nasdaq and the Company was covered by multiple analysts during the Class Period;

- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold the Company's common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

379. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

380. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens*

*of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    COUNTS

### COUNT I

#### For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Against All Defendants

381.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

382.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other Class members to purchase Company common stock at artificially inflated prices.

383.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

384. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

385. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

386. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the Company's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

387. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for the Company's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

388.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

389.  By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Securities Exchange Act of 1934 Against the Individual Defendants

390.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

391.  Defendant Thompson was the CEO of the Company, as well as a member and Chairman of its Board. Thompson was directly involved in the day-to-day management of the Company, including its communications to investors. Thompson spoke on behalf of the Company during earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, and certified those filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, he had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

144

392.    Defendant Matus was the CTO of the Company and the CEO of Teal Drones. Matus was directly involved in the day-to-day management of the Company, including its communications to investors. Matus regularly spoke on behalf of the Company during earnings calls and other events. As a result, he had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

393.    Defendant Hitchcock served as the Company's CRO, as Teal's General Manager, and as Company's Senior Vice President of Global Defense Solutions. Hitchcock was directly involved in the day-to-day management of the Company, including its communications to investors. Hitchcock regularly spoke on behalf of the Company during earnings calls and other events. As a result, he had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

394.    Defendant Hernon served as the Company's CFO. Hernon was directly involved in the day-to-day management of the Company, including its communications to investors. Hernon spoke on behalf of the Company during

145

earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, and certified those filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, he had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

395.    Defendant Lunger served as the Company's CFO, Interim CFO, Vice President of Finance, and Corporate Controller. Lunger was directly involved in the day-to-day management of the Company, including its communications to investors. Lunger spoke on behalf of the Company during earnings calls and other events, signed periodic filings on behalf of the Company, and certified those filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, she had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

396.    Defendant Evans served as the Company's COO. Evans was directly involved in the day-to-day management of the Company, including its communications to investors. Evans spoke on behalf of the Company during

146

earnings calls and other events and was quoted in the Company's press releases. As a result, he had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

397.    Defendant Ericson was the Company's COO and CFO. Ericson was directly involved in the day-to-day management of the Company, including its communications to investors. Ericson spoke on behalf of the Company during earnings calls and other events, was quoted in the Company's press releases, signed periodic filings on behalf of the Company, and certified those filings pursuant to the Sarbanes-Oxley Act of 2002. As a result, he had the power and ability to control the actions of the Company, and acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of the Company alleged herein, and is liable for the Company's violations of the Exchange Act related thereto.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action is a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

147

B.     Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated: May 5, 2026               */s/ Brian Calandra*

**POMERANTZ LLP**
Jeremy A. Lieberman
Brian Calandra
Jonathan D. Park (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
bcalandra@pomlaw.com
jpark@pomlaw.com

148

*Counsel for Co-Lead Plaintiffs James Cheng and Levelt Howard, and Co-Lead Counsel for the Class*

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Robert V. Prongay
Charles H. Linehan
Garth Spencer (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
Email: clinehan@glancylaw.com
Email: gspencer@glancylaw.com

*Counsel for Co-Lead Plaintiffs William and Tamara Mayers, and Co-Lead Counsel for the Class*

**PORTNOY LAW FIRM**
Lesley F. Portnoy, Esq.
(*pro hac vice* application forthcoming)
1100 Glendon Avenue, 14th Floor
Los Angeles, California 90024
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Co-Lead Plaintiff Levelt Howard*

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Kevin Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

149

decklund@carellabyrne.com
kcooper@carellabyrne.com

*Local Counsel for Co-Lead Plaintiffs*
*William Mayers and Tamara Mayers*

**KAHN SWICK & FOTI, LLC**
Kim E. Miller (*pro hac vice*)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498
Email: kim.miller@ksfcounsel.com

*Counsel for Additional Plaintiff*
*Greenstone Nevada, LLC*

150